## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| REID FRIEDMAN, on behalf of himself and all others similarly situated, | § § § | |
| | § | Case No. 11-cv-02098-O |
| Lead Plaintiff, | § § | |
| vs. | § § | |
| | § | |
| PENSON WORLDWIDE, INC., PHILIP A. PENDERGRAFT, KEVIN W. MCALEER, ROGER J. ENGEMOEN, DANIEL P. SON, THOMAS R. JOHNSON, BDO SEIDMAN, LLP AND BDO USA, LLP, | § § § § § § | |
| Defendants. | § | |

## DEFENDANTS BDO SEIDMAN, LLP AND BDO USA, LLP'S MOTION TO DISMISS PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT AND BRIEF IN SUPPORT

### BAKER BOTTS L.L.P.

Robb L. Voyles
Texas State Bar No. 20624100
Timothy W. Mountz
Texas State Bar No. 14604300
Jessica B. Pulliam
Texas State Bar No. 24037309
2001 Ross Avenue, Suite 600
Dallas, Texas 75201
Tel: 214.953.6500
Fax: 214.953.6503
robb.voyles@bakerbotts.com
t.mountz@bakerbotts.com
jessica.pulliam@bakerbotts.com

**ATTORNEYS FOR DEFENDANTS
BDO SEIDMAN, LLP AND BDO USA, LLP**

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

STANDARD OF REVIEW ................................................................................................... 3

BACKGROUND .................................................................................................................. 6

ARGUMENT ..................................................................................................................... 13

I.   The claim against BDO must be dismissed because the Complaint does not plead facts demonstrating a strong inference of scienter. ........................................... 13

    A.   Allegations that BDO knew facts that were publicly disclosed (red flags "a" and "b") are contrary to any claim that BDO had an intent to aid a fraud. ............. 14

    B.   Claims that Penson violated GAAP (red flags "d" – "g") do not amount to a strong inference of BDO's scienter. ........................................................................ 15

    C.   BDO's knowledge of auditing standards (red flag "c") is not a red flag at all ........ 19

    D.   Plaintiff's unsupported argument that Hall should have been disclosed as a related party (asserted as part of red flag "a") creates no inference of BDO's scienter. ....................................................................................................................... 19

    E.   That BDO audited Call Now in 1997 (red flag "h") is hardly an indication that it intended to aid a fraud when it issued its opinions more than a decade later on Penson's financial statements. .................................................................... 20

    F.   Viewing the allegations as a whole, the Complaint falls far short of demonstrating that any individual at BDO possessed the requisite scienter. .......... 21

II.  The claim against BDO must be dismissed for failure to plead with particularity that BDO's audit opinions constituted a misstatement. ...................... 23

    CONCLUSION ............................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abrams v. Baker Hughes Inc.,*
    292 F.3d 424 (5th Cir. 2002) ................................................................................................. 16

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................................................................ 4

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.,*
    497 F.3d 546 (5th Cir. 2007) .............................................................................................. 4

*Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.,*
    454 F.3d 1168 (10th Cir. 2006) ......................................................................................... 4

*Dura Pharm., Inc. v. Broudo,*
    544 U.S. 336 (2005) ............................................................................................................ 3

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.,*
    565 F.3d 200 (5th Cir. 2009) .............................................................................................. 4

*In re ArthroCare Corp. Sec. Litig.,*
    726 F. Supp. 2d 696 (W.D. Tex. 2010) ..................................................... 1, 5, 14, 19, 21, 25

*In re Capstead Mortg. Corp. Sec. Litig.,*
    258 F. Supp. 2d 533 (N.D. Tex. 2003) ...................................................................... 3, 23, 25

*In re Dell Inc. Sec. Litig.,*
    591 F. Supp. 2d 877 (W.D. Tex. 2008) ................. 1, 3, 5, 6, 13, 14, 16, 19, 20, 21, 22, 23, 25

*In re Franklin Bank Corp. Sec. Litig.,*
    782 F. Supp. 2d 402 (S.D. Tex. 2011) ..................................................... 1, 2, 5, 14, 17, 22, 25

*In re Lehman Bros. Sec. and Erisa Litig.,*
    799 F. Supp. 2d 258 (S.D.N.Y. 2011) ........................................................................ 4, 23, 24

*In re PetSmart, Inc. Sec. Litig.,*
    61 F. Supp. 2d 982 (D. Ariz. 1999) .................................................................................. 20

*Indiana Elect. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.,*
    537 F.3d 527 (5th Cir. 2008) ..................................................................................... 3, 5, 22, 24

*Lovelace v. Software Spectrum Inc.,*
    78 F.3d 1015 (5th Cir. 1996) ............................................................................................. 6

*Magruder v. Halliburton Co.,*
    No. 05-cv-1156, 2009 WL 854656 (N.D. Tex. Mar. 31, 2009) ................................. 16, 22, 24

*Melder v. Morris,*
    27 F.3d 1097 (5th Cir. 1994) ..................................................................................... 5

*R2 Invs. LDC v. Phillips,*
    401 F.3d 638 (5th Cir. 2005) ..................................................................................... 3

*Reiger v. Price Waterhouse Coopers LLP,*
    117 F. Supp. 2d 1003 (S.D. Cal. 2000) ...................................................................... 5

*Rosenzweig v. Azurix Corp.,*
    332 F.3d 854 (5th Cir. 2003) ..................................................................................... 4

*Rothman v. Gregor,*
    220 F.3d 81 (2d Cir. 2000) ........................................................................................ 5

*Schiller v. Physicians Resource Group, Inc.,*
    No. 97-cv-3158, 2002 WL 318441 (N.D. Tex. Feb. 26, 2002) .............................. 2, 21, 22, 25

*Simons v. Dynacq Healthcare, Inc.,*
    No. 03-cv-5825, 2005 WL 1801946 (S.D. Tex. July 28, 2005) ........................................ 6, 22

*Southland Secs. Corp. v. Inspire Ins. Solutions, Inc.,*
    365 F.3d 353 (5th Cir. 2004) ..................................................................... 2, 3, 4, 6, 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ................................................................................ 2, 3, 4, 20, 22

## STATUTES

15 U.S.C. § 78u–4 ....................................................... 1, 3, 4, 5, 17, 21, 23, 25

Section 10(b) of the Securities and Exchange Act of 1934 ....................................... 1, 3

## OTHER AUTHORITIES

AU § 230.11 ............................................................................................................. 7

Fed. R. Civ. P. 9(b) .............................................................................................. 1, 4, 23

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 1

iii

Defendants BDO Seidman, LLP and BDO USA, LLP[1] (collectively, "BDO"), added as Defendants in the Amended Complaint, file this motion to dismiss and brief in support. Pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 ("PSLRA"), BDO moves to dismiss Plaintiff's only claim against it—Count Two of the Amended Complaint ("Complaint" or "AC") asserting a claim under Section 10(b) of the Securities and Exchange Act of 1934. (AC ¶¶ 318-29.)

## PRELIMINARY STATEMENT

The PSLRA and Federal Rule of Civil Procedure 9(b)—along with decisions of the Supreme Court and the Fifth Circuit—impose stringent pleading standards in securities fraud claims against auditors, like BDO. Here, Plaintiff seeks to pin fraud on an auditor without any particularized allegations regarding how the auditor supposedly intended to aid in the alleged fraud. Plaintiff's paltry and conclusory allegations concerning BDO do not come close to satisfying the requisite standards.

Penson Worldwide, Inc. provides multiple services to the financial industry, one of which is margin loans to customers who trade in accounts with Penson. This case involves Penson's decision to take a charge for $43 million after reassessing the value of certain collateral for a small group of margin loans. Plaintiff contends that Penson made this decision too late. Plaintiff's conclusory disagreement with Penson's accounting judgment is the only basis for Plaintiff's claim that BDO's audit opinions were fraudulent.

Courts regularly dismiss claims against auditors based on a plaintiff's second guessing of an audited company's accounting decisions. *See, e.g., In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 402 (S.D. Tex. 2011); *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 732 (W.D. Tex. 2010); *In re Dell Inc. Sec. Litig.*, 591 F. Supp. 2d 877, 899 (W.D. Tex. 2008);

---

[1]      BDO Seidman, LLP changed its name to BDO USA, LLP.

1

*Schiller v. Physicians Resource Group, Inc.*, No. 97-cv-3158, 2002 WL 318441, at *15-*16 (N.D. Tex. Feb. 26, 2002).  For at least two reasons, this Court should do the same.

**First,** the Complaint wholly fails to plead the strong inference of scienter required by the Supreme Court's decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  To suffice under *Tellabs*, a complaint must allege facts to demonstrate at the very least that the auditor possessed "a mental state so culpable that it approximates an actual intent to aid in the fraud being perpetrated by the audited company."  *See Franklin Bank*, 782 F. Supp. 2d at 403. There are no facts in the Complaint concerning BDO's audit procedures concerning the margin loans at issue, much less facts from which the Court could draw a strong inference that BDO intended to aid a fraud by Penson.  At best, Plaintiff argues with no supporting facts that his accounting judgments should be substituted for Penson's.  But bare conclusions that the audited company's accounting was incorrect can never form the basis of an inference that an auditor acted with fraudulent intent, much less an inference that is "more than merely reasonable or permissible."  *Tellabs*, 551 U.S. at 324.  Beyond these obvious faults, the Complaint must also be dismissed because it does not attempt to plead that any individual at BDO had a culpable state of mind.  *See Southland Secs. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 367 (5th Cir. 2004) (an entity cannot "be deemed to have a culpable state of mind when that state of mind is possessed by no single employee").

**Second,** the Complaint fails to plead with the requisite particularity that BDO's audit opinions were false or misleading.  The Complaint is devoid of any particularized facts concerning BDO's audit procedures—it never explains what BDO did and why it failed to satisfy auditing standards.  Plaintiff's allegations that Penson failed to comply with generally accepted accounting principles ("GAAP") are entirely conclusory in nature and are wholly insufficient to

2

state a claim against BDO.  As a result, Plaintiff fails to plead anything close to a misstatement by BDO.  *See Southland*, 365 F.3d at 370; *In re Capstead Mortg. Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 549 (N.D. Tex. 2003).

Accordingly, the Court should dismiss the Section 10(b) claim against BDO with prejudice.[2]

## STANDARD OF REVIEW

A Section 10(b) claim requires proof that the investor incurred losses as a result of <u>fraud</u>. *Dura Pharm., Inc.*, 544 U.S. at 346.  Thus, a private right of action under Section 10(b) is not intended to "provide investors with broad insurance against market losses."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).  Likewise, Section 10(b) and Rule 10b-5 "do not protect investors against negligence."  *See Indiana Elect. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 539 (5th Cir. 2008).  Instead, Plaintiff's claim against BDO requires proof that "in connection with the purchase or sale of securities" BDO made: "(1) a misstatement or an omission (2) of material fact (3) . . . *with scienter* (4) on which plaintiff relied (5) that proximately caused the plaintiff's injury." *R2 Invs. LDC v. Phillips,* 401 F.3d 638, 641 (5th Cir. 2005) (citation omitted) (emphasis added); *see Tellabs*, 551 U.S. at 321.

Congress and the Supreme Court have recognized that private securities actions create particular risks of "impos[ing] substantial costs on companies" that did not engage in fraud. *Tellabs*, 551 U.S. at 313.  To curb these risks, Congress enacted the PSLRA, which mandates that to survive a motion to dismiss, securities plaintiffs must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's

---

[2]  Despite Plaintiff's ample time to investigate his claim against BDO before amending his Complaint, the allegations against BDO are so far from satisfying the pleading standards that any amendment would be futile.  *See Dell*, 591 F. Supp. 2d at 913 (denying leave to amend where plaintiff had "ample time to set forth sufficient allegations" and "made no effort to indicate what additional facts [it] would assert to adequately plead its case").

intention to deceive, manipulate or defraud." *Id.*  The PSLRA, along with Rule 9(b), imposes a heightened pleading standard both on Plaintiff's allegation that BDO made a misstatement and on the assertion that BDO did so with scienter.  *Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 866 (5th Cir. 2003); *see Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009).

To allege a misstatement, Plaintiff must (1) "specify the statements contended to be fraudulent"; (2) "identify the speaker"; (3) "state when and where the statements were made"; and (4) "explain why the statements were fraudulent."  *Southland*, 365 F.3d at 362 (citation omitted).  "[C]onclusory allegations, unwarranted factual inferences, or legal conclusions" do not suffice.  *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 550 (5th Cir. 2007) (citation omitted); *see also Iqbal*, 556 U.S. at 679 ("pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth").  With respect to audit opinions, "more is necessary to make out a claim that the statement of opinion [i]s false than a quarrel with whether [audit] standards have been satisfied."  *In re Lehman Bros. Sec. and Erisa Litig.*, 799 F. Supp. 2d 258, 300-301 (S.D.N.Y. 2011); *see also Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.*, 454 F.3d 1168 (10th Cir. 2006).  A plaintiff must allege "specific departures from GAAP [or audit standards] and, in addition, set forth facts sufficient to warrant a finding that the auditor did not actually hold the opinion it expressed or that it knew that it had no reasonable basis for holding it."  *Lehman*, 799 F. Supp. 2d at 303.

To plead scienter, Plaintiff must satisfy the PSLRA's rigorous standard explained in the Supreme Court's *Tellabs* opinion.  Scienter requires "an intent to deceive, manipulate, or defraud" or severe recklessness, which "is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care."  *Flaherty & Crumrine Preferred Income*

4

*Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (citation omitted).  Under the PSLRA, a Plaintiff must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2) (emphasis added).  To qualify as a "strong inference" of scienter, the inference "must be more than merely plausible or reasonable."  *Franklin Bank*, 782 F. Supp. 2d at 376.  Instead, it must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent," including negligence.  *Id.* ("omissions and ambiguities count against inferring scienter"); *Indiana Elec.*, 537 F.3d at 533 (quotation omitted) (scienter requires more than "simple or even inexcusable negligence").

An independent auditor like BDO "will rarely, if ever, have any rational economic incentive to participate in its client's fraud" since its "success depends on maintaining a reputation for honesty and integrity."  *Dell*, 591 F. Supp. 2d at 901 (quoting *Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1007 (S.D. Cal. 2000)); *see also Melder v. Morris*, 27 F.3d 1097, 1103 (5th Cir. 1994) (because "an accountant's greatest asset is its reputation for honesty, followed closely by its reputation for careful work," auditors have little incentive to engage in fraud) (citation omitted).  For this reason, pleading a strong inference that an independent auditor possessed the requisite scienter is especially difficult.  *See, e.g., Franklin Bank*, 782 F. Supp. 2d at 402 ("the meaning of recklessness in securities fraud cases is especially stringent when the claim is made against an outside auditor").

Plaintiff has not attempted to plead that BDO had a motive to defraud, nor could he.  Thus, at the very least, Plaintiff must plead particularized facts demonstrating that BDO possessed "a mental state so culpable that it approximates an actual intent to aid in the fraud being perpetrated by the audited company."  *Dell*, 591 F. Supp. 2d at 899-900 (internal quotation marks omitted); *see also ArthroCare*, 726 F. Supp. 2d at 732; *Rothman v. Gregor*, 220 F.3d 81,

98 (2d Cir. 2000).  Allegations that the audited entity departed from accounting principles or that the audit was deficient do not create a compelling inference that the auditor intended to aid fraud. *See, e.g., Dell,* 591 F. Supp. 2d at 902.  Thus, even in cases where the audited entity has concluded in a restatement that its previously issued financial statements were in error, the auditor's failure to catch the error is not enough to state a claim for securities fraud.  *Id.*  Instead, a plaintiff must allege, for example, specific facts concerning the audit procedures, which indicate the audit was "so deficient that [it] amounted to no audit at all." *Id.* at 900.

Allegations that a group of persons collectively possessed the necessary scienter can never suffice.  An entity cannot "be deemed to have a culpable state of mind when that state of mind is possessed by no single employee."  *See Southland*, 365 F.3d at 367 (citation omitted); *see also Simons v. Dynacq Healthcare, Inc.*, No. 03-cv-5825, 2005 WL 1801946, at *3 (S.D. Tex. July 28, 2005) (complaint did not plead a strong inference of scienter where it lacked "any suggestion that *individual members* of [auditor] stood improperly to gain from concealing financial irregularities" and the competing inference that an auditor "would go to great effort to avoid engaging in anything resembling securities fraud" was "more logical") (emphasis added).

## BACKGROUND[3]

**Penson's financial statements and BDO's role as auditor.**  Consistent with the bedrock principle of corporate financial reporting, all of Penson's financial statements "[we]re the responsibility of [Penson's] management," not its auditor.  (App. 15, 36.)  BDO audited Penson's financial statements on a yearly basis.  (App. 15, 36.)  BDO's opinions were issued in connection with Penson's annual report in its Form 10-Ks filed with the SEC.  (App. 15, 36.)  Penson's

---

[3]    When deciding whether to dismiss a securities fraud claim, a court may look to relevant public disclosure documents that are required by and filed with the SEC without transforming the motion to dismiss into a motion for summary judgment. *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996).

quarterly financial statements were not audited, and BDO did not issue opinions, or make any statements, concerning them. (*See, e.g.,* App. 45.)

BDO's responsibility was to express an opinion on the year-end financial statements based on its audit. (App. 15, 36.)  BDO did not provide investors with a guarantee or insurance against risk.  Instead, BDO expressed an opinion whether "in all material respects" the company's financial statements "present fairly . . . in conformity with accounting principles generally accepted in the United States of America," commonly known as GAAP. (App. 15, 36.) BDO's audits included "examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation." (App. 15, 36.)  BDO conducted its audits in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB").[4]  (App. 15, 36.)  Under these standards, an auditor's "judgment is required in interpreting the results of audit testing and evaluating audit evidence."  AU § 230.11.[5]

For certain years, BDO also audited and issued reports regarding Penson's internal control over its financial reporting.  Internal control over financial reporting is a company's process designed to provide reasonable—not absolute—assurance regarding the reliability of financial reporting and the preparation of financial statements in conformity with GAAP. (App. 15, 36.)  As with its financial statements, Penson's management was "responsible for maintaining effective internal control over financial reporting and for its assessment," expressed in a report accompanying its financial statements, of the effectiveness of its internal control.

---

[4]        Plaintiff incorrectly refers to the standards governing BDO's audits at issue as "GAAS."  For the audit reports at issue BDO's audits were governed by PCAOB standards.  (App. 15, 36.)

[5]        Available at http://pcaobus.org/Standards/Auditing/Pages/AU230_11.aspx.

(App. 16, 37.)  BDO's responsibility was to express an opinion on Penson's internal control based on its audit, which involved, *inter alia*, testing and evaluating the design and operating effectiveness of Penson's internal control.  (App. 16, 37.)

> **Penson's margin-lending business.**  Penson provided securities clearing services to the financial industry.  (App. 25.)  Penson's operations included a margin lending business with its correspondents (i.e., broker-dealers) and their customers.  (App. 28.)  "As is typical in margin lending arrangements," Penson "extend[ed] credit for a portion of the purchase price of [its customers'] securities."  (App. 28.)  Cash and securities in the accounts of margin customers served as collateral for the margin loans.  (App. 28.)  Because Penson provided "margin loans to investors" it was "subject to risks inherent in extending credit."  (App. 30.)  Such risks included "that the value of the collateral [Penson] h[e]ld could fall below the amount of an investor's indebtedness."  (App. 30.)  In such cases, additional risks were that Penson would "be unable to liquidate" securities in the accounts of its margin customers because the securities might "not [have] be[en] actively traded" or "there may [have] be[en] an undue concentration of securities pledged."  (App. 30.)

> **Plaintiff's disagreement with Penson's accounting for four margin loans.**  Plaintiff's claims concern four of Penson's margin loans (or "receivables") to Christopher J. Hall, Call Now, Inc., Global Trust, and Hemisphere Trust.  (AC ¶¶ 12(e), 24, 50, 64.)  Collateral for these accounts included municipal bonds, Penson stock, bonds issued by the Retama Development Corporation, and related interests in the horse racing track and project financed by the Retama bonds.  (App. 22, 42, 48, 49, 60.)  Plaintiff contends that Penson's decision in the second quarter of 2011 to take a charge after reevaluating the value of this collateral came too late.  Plaintiff argues, with no explanation, that Penson should have instead recorded some portions of the

margin loan amounts in the company's allowance for doubtful accounts as of December 31, 2009 and December 31, 2010.  (AC ¶¶ 12(e), 50, 64.)

Without detail other than its disagreement with Penson's accounting for these four margin loans, Plaintiff also contends that Penson's "internal control over financial reporting was materially defective."  (AC ¶ 12(f).)

As a result of its disagreement with Penson's accounting for the four margin loans, Plaintiff also contends that BDO's audit opinions for the two years at issue—years ending December 31, 2009 and 2010—were materially misleading.  (AC ¶¶ 110, 147.)

*Penson's disclosures concerning its margin loans and BDO's audit reports.*  At the time of BDO's opinions on Penson's financial statements for years ended 2009 and 2010, Penson made detailed disclosures concerning the risks associated with its margin lending business.  For example, Penson explained: "Although we attempt to minimize the risk associated with our margin lending activities, there is no assurance that the assumptions on which we base our decisions will be correct or that we are in a position to predict factors or events which will have an adverse impact on any individual customer or issuer, or the securities markets in general." (App. 9, 29.)  Penson also warned that its "quarterly revenue and operating results m[ight] fluctuate significantly in the future due to a number of factors," including "changes in bad debt expense from margin lending as compared to historical levels."  (App. 12-13, 31.)

Penson also disclosed its approach when one of its margin loans becomes less than fully collateralized.  (App. 17-18, 38-39.)  Penson explained that in valuing such margin loans, it "compares the market value of the collateral and any additional guarantees to the balance of the loan outstanding" and makes an allowance for doubtful accounts where appropriate.  (App. 17, 38.)  Penson explained that its allowance for doubtful accounts represented "amounts, [which] in

the judgment of management, [are] necessary to adequately absorb losses from known and inherent losses in outstanding receivables." (App. 18, 39.) Penson further disclosed that it carries "less than fully collateralized/unsecured balances for which no allowance has been recorded due to [its] judgment that the amounts are collectable." (App. 39.) Penson informed investors that it regularly monitors accounts that are less than fully collateralized and that it takes an account-by-account review of "all such accounts on a monthly basis." (App. 17-18, 39.)

Also at the time of BDO's audit opinions, Penson disclosed that it extends margin credit to certain "directors and executive officers and their associates, including family members." (App. 33.) Under the heading "related party transactions," Penson disclosed that it extended margin credit to Call Now and that Thomas Johnson was both a member of Penson's board of directors and also a director, the President, the CEO, and a stockholder of Call Now. (App. 21.)

Plaintiff contends that BDO's first alleged misstatement was its March 2010 audit opinion on Penson's 2009 year-end financial statements. (AC ¶ 110.) As of December 31, 2009, Penson had $1.1 billion of receivables from its customers and correspondents, which predominately reflected margin loans. (App. 10.) For approximately $52.4 million of those receivables, Penson recorded interest income only when interest was received (sometimes referred to as "Nonaccrual Receivables"). (App. 30.) As of December 31, 2009, Penson's allowance for doubtful accounts was $9.7 million. (App. 18.)

In Penson's 10-K for December 31, 2009—issued at the same time as the first of the two BDO audit opinions at issue—Penson made additional disclosures concerning its margin loan to Call Now. (App. 22.) Penson disclosed that its management had "recently determined that certain municipal bonds underlying Call Now's margin position had suffered reduced liquidity." (App. 22.) To address the reduced liquidity, Penson "began working with Call Now to

restructure the margin loan," including by converting $13.9 million of Call Now's margin loan into a Promissory Note due from Call Now to Penson on February 25, 2012. (App. 22.)

Though Penson stated in the 2009 10-K that "management currently believes that all amounts due under the Promissory Note will be collected pursuant to [its] terms," it warned investors of the possibility that Call Now could "default on its obligations under the Promissory Note." (App. 22.) Penson further noted that Johnson—the Penson Board Member and Call Now's president—had no interest in the Call Now margin account or the Promissory Note, except to the extent of his approximately 3.2% ownership interest in Call Now, and that he had abstained from voting on matters relating to Call Now. (App. 22.)

A year later, in March 2011, BDO issued an audit opinion on Penson's financial statements for the year ended December 31, 2010. (App. 36.) By that date, Penson's receivables were $2.3 billion. (App. 30.) Of that $2.3 billion, there were $97.4 million in Nonaccrual Receivables for which Penson recorded interest income only when interest was received. (App. 30.) Penson's allowance for doubtful accounts was $14.17 million. (App. 39.) In its 10-K for year end 2010, Penson also disclosed the details concerning the restructuring of the Call Now margin loan into a Promissory Note, including that Call Now had paid amounts on the Note and an advance totaling more than $1 million. (App. 42.)

After its March 2011 audit opinion on Penson's 2010 financial statements, BDO did not issue any additional reports during the class period.

**_Penson's disclosures describe its management's reasoning for the timing of the $43 million charge._** On August 4, 2011, Penson issued a press release announcing its unaudited financial results for the quarter ended June 30, 2011. (App. 60.) Penson reported that it had recorded a non-cash charge of $43 million against $96.6 million of its Nonaccrual Receivables.

(App. 60.)  The $43 million in receivables represented margin loans to Call Now, Hall, Global Trust, and Hemisphere Trust collateralized in part by the Retama bonds.  (AC ¶ 24.)

Plaintiff contends (without further explanation) that, with respect to these receivables, Penson should have recorded in its allowance for doubtful accounts an additional $9 million and $21 million as of December 31, 2009 and 2010, respectively.  (AC ¶¶ 50, 64.)  Penson's disclosures indicate, however, that Penson's management had—after frequent monitoring of the value of the collateral underlying the receivables at issue—determined that the charge was not appropriate until the second quarter 2011.  (App. 48, 60.)

For example, Penson explained that during periods prior to the period in which it took the charge, that it had "regularly review[ed] the value of the collateral" underlying the $43 million in receivables. (App. 54.)  This is consistent with its previous disclosures that it regularly monitored accounts that were less than fully collateralized and had reviewed "all such accounts on a *monthly basis*" (App. 17-18, 39) (emphasis added).

Additionally, Penson had obtained a third-party appraisal of the real estate related assets underlying the Retama bonds.  (AC ¶ 132; App. 54.)  With respect to non-real estate assets, Penson had, among other things, studied the potential for the Texas Legislature to pass gaming legislation, which would enhance the value of the Retama bonds.  (App. 48-49.)  In its Form 10-Q report for the first quarter of 2011, Penson disclosed that if the gambling legislation were not to pass, the collateral of the Retama related receivables "might be impaired."  (App. 48-49.)

In summer 2011, the Texas Legislative Session ended without passage of the gaming legislation.  By August 2011, Penson had obtained "an updated evaluation of [the Nonaccrual Receivables] collectability based on new appraisals of the underlying collateral."  (App. 60.)  Based on this evaluation and the impact of the Texas Legislature's failure to enact the gaming

legislation, Penson's management determined that the $43 million charge was appropriate. (App. 60.)

Plaintiff never alleges (nor could he) that BDO failed to perform audit procedures relating to Penson's allowance for doubtful accounts or failed to assess Penson's determinations concerning the value of the four margin loans at issue or the collateral underlying them. Indeed, Plaintiff does not plead a single fact demonstrating its conclusory allegation that the judgments BDO made in its 2009 and 2010 audits amounted to "no audit at all." (AC ¶¶ 257, 286, 327.)

## ARGUMENT

### I.    The claim against BDO must be dismissed because the Complaint does not plead facts demonstrating a strong inference of scienter.

The Complaint comes nowhere close to demonstrating that BDO had "a mental state so culpable that it approximate[d] an actual intent to aid" in any alleged fraud by Penson. *See Dell*, 591 F. Supp. 2d at 899-900 (citation omitted). The essence of Plaintiff's claim is that Penson should have recorded portions of the $43 million charge in its allowance for doubtful accounts earlier than it did. (AC ¶ 12(e).) With respect to BDO, Plaintiff merely cut and pasted into the Complaint a string of auditing standards (AC ¶¶ 151, 152, 155-57), and concludes without support that "BDO should have issued an adverse opinion on the financial statements of Penson" (AC ¶ 142). The Complaint fails to plead a single fact concerning BDO's audit procedures related to the margin loans at issue and does not identify any specific individual at BDO who possessed the necessary scienter. A Complaint that fails to allege a violation of audit standards cannot possibly demonstrate that the auditor intended to aid the client's alleged fraud. *Dell*, 591 F. Supp. 2d at 903 (complaint did not allege "what [the auditor's] procedures or audits actually entailed" or how specifically they violated auditing standards and therefore did not demonstrate an inference of scienter). The Complaint fails even to allege that BDO's exercise of judgment

13

was incorrect, which even if it had, would be insufficient to plead scienter with the necessary rigor. *Franklin Bank*, 782 F. Supp. 2nd at 402 (dismissing claims for failing to plead a strong inference of scienter because plaintiff's inference was less compelling than inferences supporting "an allegation of negligence").

Plaintiff's sole basis for pleading scienter against BDO is eight supposed "red flags" Plaintiff lists in paragraph 110 of the Complaint. (AC ¶¶ 110, 150.) Bare and conclusory allegations that BDO "knew or recklessly disregarded" red flags cannot create a strong inference of scienter. *See Dell*, 591 F. Supp. 2d at 903; *ArthroCare*, 726 F. Supp. 2d at 736 (both dismissing claim against auditor where alleged "red flags" were unsupported by particularized facts). Here, the supposed "red flags" indicate the opposite of an intent to commit fraud. Some refer to BDO's knowledge of the very facts included in Penson's public disclosures. Others are merely expressions of Plaintiff's disagreement with Penson's accounting decisions, which in no way support a strong inference that BDO intended to aid a fraud. Indeed, the more logical inference to be drawn from the Complaint, BDO's audit opinions, and Penson's public disclosures is that BDO's audits complied with applicable standards.

### A.    Allegations that BDO knew facts that were publicly disclosed (red flags "a" and "b") are contrary to any claim that BDO had an intent to aid a fraud.

Generally, "for a red flag to contribute to a strong inference of scienter," it must indicate that the auditor "knew or had reason to think" that the audited entity's conduct was fraudulent. *Dell*, 591 F. Supp. 2d at 904. Yet the thrust of the first two "red flags" is that BDO was aware of facts that Penson publicly disclosed and therefore obviously had no intent to conceal from investors.

First, Plaintiff contends that BDO's knowledge that Johnson and Call Now were related parties to Penson constitutes a "red flag." (AC ¶ 110(a).) Yet at the time BDO issued its

allegedly fraudulent audit opinions for the years ended 2009 and 2010, Penson publicly disclosed the Johnson/Call Now relationship in the notes to its financial statements under the heading "related party transactions." (App. 20-22, 40-42.) The second supposed "red flag" is BDO's awareness of the delinquent status of Call Now's margin loan. (AC ¶ 110(b).) Penson disclosed this as well, along with details concerning its effort to restructure the loan, at the same time as BDO's 2009 audit opinion—its first alleged misstatement. (App. 22.) Similarly, Plaintiff contends that BDO was aware that Penson had "significant risk exposure" due to its margin accounts, delinquent or otherwise. But it was not only BDO who had this knowledge—so did anyone who read Penson's public filings, which described these risks in detail. (App. 9, 12-13, 29, 31.) BDO's knowledge of these *publicly disclosed* facts does nothing to create a strong inference that BDO had an intent to aid Penson's alleged fraud. Instead, these allegations lead to an inference opposing scienter—that BDO was aware that Penson was disclosing to investors facts concerning related parties and margin accounts that were not fully collateralized.

**B. Claims that Penson violated GAAP (red flags "d" – "g") do not amount to a strong inference of BDO's scienter.**

Half of Plaintiff's alleged "red flags" ("d" – "g") are mere conclusions that BDO "knew or ignored" the very alleged accounting violations on which Plaintiff bases his claim against Penson. Plaintiff contends that "BDO knew or ignored" that:

- "Penson had failed to adequately reserve for its Nonaccrual Receivables," (AC ¶ 110(f)), the total amount of which represented 15% and 32% of its stockholder equity as of December 31, 2009 and 2010, respectively (AC ¶ 110(g));

- The "Retama Series B Bonds that served as collateral for Call Now's margin loan were worthless as of December 31, 2009 and 2010" (AC ¶ 110(d));

- Call Now was insolvent and would be unable to repay the Note to Penson resulting from the restructure of its margin loan (AC ¶ 110(e)).

15

In essence, Plaintiff contends that BDO should have adopted Plaintiff's unexplained position that (1) $9 million of the $43 million receivables subject of Penson's second quarter 2011 charge should have been recorded in Penson's allowance for doubtful accounts as of December 31, 2009 (AC ¶ 50); and (2) an additional $21 million should have been recorded as of December 31, 2010 (AC ¶ 64).  These supposed "red flags" amount to legally insufficient allegations that BDO must have intended to commit fraud because, in Plaintiff's view, Penson violated accounting standards.

It is well-settled that a company's alleged GAAP violations do not create a strong inference of scienter on the part of the company's auditor.  *See, e.g., Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) ("the mere publication of inaccurate accounting figures or failure to follow GAAP, without more, does not establish scienter").  Here, Plaintiff pleads nothing more.  Alleged departures from GAAP do not establish an inference of scienter because they "merely suggest that either management or the accountant missed something, and may have failed to prepare or review the financial statements in accordance with an accepted standard of reasonable care."  *Dell*, 591 F. Supp. 2d at 902 (citation omitted) (dismissing claim against auditor where alleged GAAP violations coupled with the audited company's restatement of prior financial reports were insufficient to demonstrate scienter).  "Simply put, accounting violations can easily arise from negligence, oversight, or mismanagement, none of which rise to the standard required to support a securities fraud action."  *Magruder v. Halliburton Co.*, No. 05-cv-1156, 2009 WL 854656, at *8 (N.D. Tex. Mar. 31, 2009).

Yet Plaintiff's claims do not even adequately assert that BDO was negligent.  The Complaint contains no facts demonstrating that, at the time of its audit reports on Penson's financial statements for the years ending 2009 and 2010, BDO ignored facts that would have

16

required Penson to record additional amounts in its allowance for doubtful accounts.  Plaintiff merely takes the same facts that were publicly disclosed and argues in a conclusory fashion that they should have led to different accounting.  Plaintiff's mere conclusions do not suffice to plead scienter with the particularity required by the PSLRA.  *Id.*

Plaintiff's bare assertion that the Retama bonds were worthless as of the dates of BDO's audit opinions (AC ¶ 110(d)) is insufficient to support a strong inference of fraudulent intent. Instead, the most logical inference to be drawn from the facts is that Penson carefully considered the value of the collateral underlying the margin loans at issue and that BDO exercised its audit judgment with respect to that information.  Penson's public filings indicate that, prior to the second quarter 2011 charge, Penson had "regularly review[ed] the value" of the Retama bonds and other collateral underlying the four margin loans.  (App. 54.)  Indeed, Penson disclosed that it regularly monitored its margin accounts that were less than fully collateralized and that it undertook an account-by-account review of such margin loans on a "monthly basis."  (App. 17-18, 39.)  Additionally, Penson disclosed that prior to taking the charge it had obtained a "third party appraisal of the real estate" associated with the Retama bonds (App. 54) and that it had considered the impact of the Texas Legislature's potential passage of gaming legislation on the value of those bonds (App. 48-49).  The Complaint pleads no particularized facts that BDO ignored obvious signs that Penson's support for the collateral's value was a mere sham, much less that BDO "failed to perform the audit . . . it had been engaged to perform" (AC ¶ 149).  As a result, the claim against BDO cannot survive dismissal.  *See Franklin Bank*, 782 F. Supp. 2d at 402 (dismissing complaint against auditor for failure to plead facts demonstrating that auditor's performance was so deficient that it "amounted to no audit at all").

Likewise, Plaintiff's general allegation that BDO knew that Call Now's Promissory Note to Penson was worthless (AC ¶ 110(d)) is so conclusory that it must be disregarded. The facts support an inference opposite of the one Plaintiff asks the Court to assume. For example, Plaintiff does not even plead that Call Now failed to make payments on the Note, nor can it, given Call Now's more than $1 million payment as of December 31, 2010 on a Note not due until February 2012. (App. 42.) At the time of BDO's audit opinions, Penson made extensive disclosures concerning its efforts to restructure the Call Now margin loan and expressed its belief "that all amounts currently due under the Promissory Note will be collected pursuant to [its] terms." (App. 22, 42.) The most compelling inference to be drawn from Penson's disclosures, and Call Now's payment, is that the restructuring of the loan had value to Penson. Plaintiff's unsupported disagreement with these disclosures—and the lack of any particularized criticisms of BDO's audit work or facts indicating that BDO knew the Promissory Note had zero value—is utterly insufficient to create a strong inference that BDO intended to aid a fraud.

Where, as here, a plaintiff supports allegations of scienter with little more than disagreement with certain accounting decisions, dismissal is necessary. For example, in *Coates v. Heartland Wireless Commc'ns, Inc.*, plaintiffs claimed that a cable company and its officers and directors knew or should have known that certain accounts receivable were unlikely to be collected and should be written off, and that defendants' decision not to disclose that information in press releases indicated fraudulent or reckless intent. 26 F. Supp. 2d 910, 921 (N.D. Tex. 1998). The court disagreed; the defendants' public statements demonstrated that they believed the accounts could still be collected, and that belief "directly refute[d] plaintiffs' allegation that defendants must have known" that they would have to write off the accounts. *Id.* The court concluded that, although the plaintiffs "fault[ed] the timing of the markdowns," mere

18

"disagreement" with such decisions "do[es] not [establish scienter necessary to] state a claim under federal securities laws." *Id.* at 922 (granting defendants' motion to dismiss for failure to plead strong inference of scienter). If the allegations concerning the *company's* scienter in *Coates* were insufficient, then Plaintiff's allegations in this case concerning a disagreement with the timing of Penson's $43 million charge are plainly insufficient to infer scienter against the *outside auditor*, BDO.

### C.    BDO's knowledge of auditing standards (red flag "c") is not a red flag at all.

Another supposed "red flag" refers to BDO's awareness of auditing standards concerning related party transactions. (AC ¶ 110(c).) Red flags are "facts which come to the attention of an auditor [that] would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." *Dell*, 591 F. Supp. 2d at 904 (citation omitted). An auditor's awareness of auditing standards is not a red flag, as it does nothing to indicate that the audited company is committing a fraud on its investors. Indeed, if awareness of auditing standards were enough, an auditor's scienter would be established in every case of an alleged GAAP violation or auditing mistake. *Cf. ArthroCare*, 726 F. Supp. 2d at 724 ("it is well-settled that Sarbanes-Oxley certifications, standing alone, are not indicative of scienter—otherwise scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company").

### D.    Plaintiff's unsupported argument that Hall should have been disclosed as a related party (asserted as part of red flag "a") creates no inference of BDO's scienter.

Plaintiff's conclusory allegation that BDO "knew or ignored" that Hall was a related party to Penson is yet another attempt to fabricate a securities fraud claim against BDO from Plaintiff's disagreement with Penson's application of GAAP. (AC ¶¶ 9, 10, 110(a).) Plaintiff's

contention that Hall should have been disclosed as a related party to Penson is both incorrect and also insufficient to establish the strong inference that BDO intended to aid a fraud by Penson.

There is no allegation with sufficient particularity that Hall fits any of the definitions of a related party.  (AC ¶¶ 9-10.)  There is no allegation that Hall was (1) an affiliate of Penson (as there is no allegation that he controlled Penson or was under common control as Penson); (2) a principal owner of Penson (as there is no allegation that he, individually owned more than 5% of shares); or (3) had control or significant influence over the management or operations of Penson. (AC ¶¶ 9-10.)  Thus, to the extent Plaintiff bases his claim against BDO on his argument that Hall was a non-disclosed related party to Penson, the failure to allege these facts bars any such claim.  *See, e.g., In re PetSmart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 996 (D. Ariz. 1999) (related party claim must be pled with particularity).

More significantly, there is not a shred of detail in the Complaint suggesting, much less demonstrating, "a cogent and . . . compelling" inference, that Penson's non-disclosure of Hall as a related party amounts to BDO's intention to aid a fraud.  *Tellabs*, 551 U.S. at 314.  The lack of detail in the Complaint "count[s] against inferring scienter."  *Id.* at 326.  Indeed the disclosure of Call Now as a related party indicates the opposite of scienter—that there was no intention to defraud.  At best, Plaintiff's Hall allegations constitute an unsupported claim that Penson failed to follow GAAP and SEC Reg S-K, which cannot suffice to plead scienter against Penson's auditor.  *See, e.g., Dell,* 591 F. Supp. 2d at 902.

**E.  That BDO audited Call Now in 1997 (red flag "h") is hardly an indication that it intended to aid a fraud when it issued its opinions more than a decade later on Penson's financial statements.**

Plaintiff contends that BDO audited Call Now in 1997—more than a decade before the 2009 and 2010 Penson audits at issue—and that this fact somehow demonstrates scienter to commit the purported fraud.  (AC ¶ 110(h).)  There is no allegation that any individual within

20

BDO who participated in the Penson audit was aware that BDO audited Call Now more than a decade earlier. There is no allegation that, in the course of the Penson audits at issue, anyone at BDO had access to any documentation related to the 1997 Call Now audit, or that such documentation even existed at the time of the Penson audits. Even if Plaintiff could have alleged such access, such a claim is insufficient to establish a strong inference of an intent to defraud. *See, e.g., Dell*, 591 F. Supp. 2d at 901-02; *Arthrocare*, 726 F. Supp. 2d at 733. Furthermore, Plaintiff makes no effort to explain how the price at which Call Now purchased Retama bonds during or prior to 1997 is in any way relevant to Penson's judgment more than a decade later concerning the value of loans collateralized in part by those bonds. No inference of scienter can be drawn from this allegation.

> **F. Viewing the allegations as a whole, the Complaint falls far short of demonstrating that any individual at BDO possessed the requisite scienter.**

Whether considered individually or as a whole, Plaintiff's attempts to plead BDO's scienter do not satisfy the requirements of the PSLRA. Even viewed collectively, Plaintiff's allegations miss the mark by a long shot. Not only are the supposed "red flags" lacking in any supporting detail, Plaintiff also fails to plead any facts concerning how BDO conducted its audits or what any particular person at BDO knew at the time of its audit opinions.

Courts repeatedly dismiss claims for failure to plead scienter in these circumstances. For example, in *Schiller*, the plaintiff claimed that the auditor knew or should have known about red flags from its audits and reviews. 2002 WL 318441, at *15. The court held that the plaintiff failed to "match any of these general averments with any particularized facts that support the claim that [the auditor] knew or recklessly disregarded this information at the time it conducted its audits and quarterly reviews." *Id.* (granting auditor's motion to dismiss). Likewise, the court in *Dell* dismissed a plaintiff's claim against the auditor where the plaintiff failed to make any

allegations concerning the auditor's audit procedures. 591 F. Supp. 2d at 903; *see also Dynacq Healthcare, Inc.*, 2005 WL 1801946, at *4 (dismissing claim where the plaintiff alleged auditor knew or should have known about overstated revenue without providing particularized facts showing such knowledge).

As in *Schiller* and *Dell*, the Complaint is utterly silent concerning what audit procedures BDO performed or how the particulars of its audit performance give rise to a strong inference of scienter. (*See* AC ¶¶ 142, 149.) The Complaint contains zero details concerning BDO's audit procedures. It does not plead particular facts demonstrating that BDO's audit was "so deficient that the audit amounted to no audit at all." *Franklin Bank*, 782 F. Supp. 2d at 402.

Plaintiff's claim against BDO is also contrary to this circuit's bar against group pleading. *See Indiana Elec.*, 537 F.3d at 533-34. Plaintiff does not mention anyone at BDO who possessed the requisite mental state in order to impute that mental state to BDO. *See Southland*, 365 F.3d at 367; *Magruder*, 2009 WL 854656, at *17 (dismissing "any allegations based on group pleading, i.e., statements *or* scienter attributed to 'Defendants,' or 'Halliburton,' or 'Management'"). As in *Dynacq Healthcare, Inc.*, 2005 WL 1801946, at *3, the Complaint lacks "any suggestion that *individual members*" of the BDO audit team for Penson possessed the necessary fraudulent intent (emphasis added).

The lack of detail in the Complaint counters any inference of scienter. *Tellabs*, 551 U.S. at 314. The allegations fail even to support a claim that BDO was negligent, much less that it engaged in fraud. The more logical inference to be drawn from the allegations, BDO's audit opinions, and the detailed disclosures in Penson's public filings is that BDO conducted its audits and exercised its judgment with no intent to aid any alleged fraud. (App. 15, 36.) *See Dell*, 591 F. Supp. 2d at 901 (auditor "will rarely, if ever, have any rational economic incentive to

participate in its client's fraud") (citation omitted).  Accordingly, Plaintiff's claim against BDO must be dismissed for failure to plead a strong inference of scienter.

**II.    The claim against BDO must be dismissed for failure to plead with particularity that BDO's audit opinions constituted a misstatement.**

The Complaint does not plead an alleged misstatement by BDO with the particularity required by the PSLRA or Rule 9(b).  Instead, the Complaint merely (1) regurgitates the language of BDO's audit opinions (AC ¶¶ 140, 141, 145, 147); (2) makes unsupported and inaccurate allegations that Penson's financial statements violated GAAP; and (3) recites verbatim certain auditing standards (AC ¶¶ 151, 152, 155, 156, 157).  On this basis alone, Plaintiff concludes in the most general of terms that BDO's audit opinions for years ending December 31, 2009 and 2010 "were false and misleading" (AC ¶¶ 146, 147) because BDO *either* "failed to perform [an] audit" *or* "to the extent that BDO did [perform the] audits . . . its audits were not in conformity with [standards]" (AC ¶ 149).

Plaintiff "allege[s] no facts about [BDO's] audit, what it entailed, or how it was deficient."  *Dell*, 591 F. Supp. 2d at 903.  Because it lacks detail "about what [BDO's] procedures actually entailed" or "how the procedures specifically violated the standards," *id.*, the Complaint fails to state a claim that BDO misrepresented that its audits complied with the standards set forth by the PCAOB.  *See Lehman*, 799 F. Supp. 2d at 300.

Likewise, Plaintiff pleads no facts supporting any claim that BDO misrepresented its opinions that Penson's financial statements were, in all material respects, fairly presented in accordance with GAAP.  Plaintiff's conclusory allegations that Penson violated GAAP do not support any such claim.  *See id.* at 303.  To plead a material misstatement with sufficient particularity, "[i]t is not sufficient to simply allege certain facts that support a final conclusion, when those 'facts' themselves are conclusory."  *Capstead*, 258 F. Supp. 2d at 550.

Plaintiff pleads no detail whatsoever to support his claim that Penson should have recorded an additional $9 million in its allowance for doubtful accounts as of December 31, 2009 (AC ¶ 50) or that it should have recorded an additional $21 million as of December 31, 2010 (AC ¶ 64). These allegations are merely spun from whole cloth. Penson based its $43 million charge on "an updated evaluation of [the margin loans'] collectability based on new appraisals of the underlying collateral" and the impact on the collateral of the Texas Legislature's failure to enact the gaming legislation. (App. 60.) There is no explanation, much less a detailed or reasoned explanation, why, in Plaintiff's view, the $43 million should have been recorded in three separate periods—December 31, 2009 (AC ¶ 50), December 31, 2010 (AC ¶ 64), and March 31, 2011 (AC ¶ 67)—instead of in the second quarter of 2011. Though Plaintiff's allegations constitute an unexplained protest to the timing of the $43 million charge, the record supports a conclusion that Penson's decisions concerning its timing had a reasoned basis. "Plaintiffs cannot transform inherently nuanced conclusions" about how to apply accounting principles "into fraudulent misstatements or omissions simply by saying that there were abuses or misuses of the GAAP rules." *Magruder*, 2009 WL 854656, at *8 (citing *Indiana Elec.*, 537 F.3d at 536). Plaintiff's conclusory allegations are insufficient even to second guess BDO's audit judgment, never mind "to warrant a finding that [BDO] did not actually hold the opinion[s] it expressed" or show "that it knew that it had no reasonable basis for holding [them]." *Lehman*, 799 F. Supp. 2d at 303.

Additionally, the single sentence in the Complaint concerning the PCAOB's review of BDO's audit does not support any claim that BDO's opinions were misleading. (AC ¶ 165.) Nothing in the Complaint provides any support for a conclusion that the PCAOB's inspection rendered BDO's audit opinions erroneous or misleading in any way. Importantly, Plaintiff fails

to allege that the PCAOB review related in any way to, or found any deficiencies concerning, BDO's audit work related to the margin loans at issue. There is no link between the PCAOB's inspection and Plaintiff's bare conclusion that BDO's audits "were false and misleading." (AC ¶¶ 146, 147.) *See, e.g., Capstead*, 258 F. Supp. 2d at 557.

Finally, Plaintiff has not supported any claim that BDO made misstatements in its opinions concerning Penson's internal controls as of December 31, 2009 and December 31, 2010 with sufficient detail required by the PSLRA. The Complaint is entirely devoid of any detail suggesting that Penson's internal control over its financial reporting was deficient, much less that BDO failed to audit Penson's internal control. A "bare assertion that [an auditor] failed to detect weaknesses in [an audited entity's] internal controls" is insufficient. *Dell*, 591 F. Supp. 2d at 903. In *Dell*, the court noted that "even a properly planned audit may not detect a material misstatement" and the fact that the auditor did not find weaknesses in the audited entity's internal controls before a restatement acknowledged them "does not give rise to an inference [the auditor] did not conduct" its audit in accordance with standards. *Id.* (citation omitted).

## CONCLUSION

The courts within this Circuit have consistently dismissed claims against auditors where, as here, the plaintiff makes only conclusory allegations that the audited entity violated GAAP coupled with unspecific claims that the auditor ignored "red flags." *Schiller*, 2002 WL 318441, at *15-*16; *Dell*, 591 F. Supp. 2d at 903-905; *Arthrocare*, 726 F. Supp. 2d at 736; *Franklin Bank*, 782 F. Supp. 2nd at 402. As in these cases, Plaintiff's claims fall far short of the standards for pleading a strong inference of scienter or a material misstatement. Accordingly, Plaintiff's only claims against BDO should be dismissed with prejudice.

Dated April 17, 2012

BAKER BOTTS L.L.P.

By:  */s/ Robb L. Voyles*
Robb L. Voyles
Texas State Bar No. 20624100
Timothy W. Mountz
Texas State Bar No. 14604300
Jessica B. Pulliam
Texas State Bar No. 24037309
2001 Ross Avenue, Suite 600
Dallas, Texas  75201
Tel:  214.953.6500
Fax:  214.953.6503
robb.voyles@bakerbotts.com
t.mountz@bakerbotts.com
jessica.pulliam@bakerbotts.com

**ATTORNEYS FOR DEFENDANTS**
**BDO SEIDMAN, LLP AND BDO USA, LLP**

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of April 2012, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system for the Court.

Frederic S. Fox                      Laurence D. King
Jeffrey P. Campisi                   Mario M. Choi
Kaplan Fox & Kilsheimer LLP          Kaplan Fox & Kilsheimer LLP
850 Third Avenue, 14th Fl.           350 Sansome Street, Suite 400
New York, NY  10022                  San Francisco, CA  94104
Tel:    212.687.1980                 Tel:  415.772.4700
Fax:    212.687.7714                 Fax:  415.772.4707
ffox@kaplanfox.com                   lking@kaplanfox.com
jcampisi@kaplanfox.com               mchoi@kaplan.fox.com

Peter Schneider
Ryan R. C. Hicks
Schneider Wallace Cottrell
  Brayton Konecky LLP
3700 Buffalo Speedway #1100
Houston, TX  77098
Tel:     713.338.2560
Fax:     866.505.8036
pschneider@schneiderwallace.com
rhicks@schneiderwallace.com

Orrin L. Harrison III
M. Scott Barnard
Michelle A. Reed
Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Avenue, Suite 4100
Dallas, TX  75201
Tel:     214.969.2800
Fax:     214.969.4343
oharrison@akingump.com
sbarnard@akingump.com
mreed@akingump.com

Michael K. Hurst
Dena DeNooyer Stroh
Gruber Hurst Johansen Hail Shank LLP
1445 Ross Avenue, Suite 2500
Dallas, TX  75202
Tel:   214.855.6802
Fax:  214.855.6808
mhurst@ghjhlaw.com
dstroh@ghjhlaw.com

/s/  *Jessica B. Pulliam*
Jessica B. Pulliam

27