UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| REID FRIEDMAN, on behalf of himself and all others similarly situated, | § § § | |
| Lead Plaintiff, | § § | Case No. 11-cv-02098-O |
| vs. | § § § | |
| PENSON WORLDWIDE, INC., PHILIP A. PENDERGRAFT, KEVIN W. MCALEER, ROGER J. ENGEMOEN, DANIEL P. SON, THOMAS R. JOHNSON, BDO SEIDMAN, LLP AND BDO USA, LLP, | § § § § § § § | |
| Defendants. | § § | |

APPENDIX IN SUPPORT OF DEFENDANTS
BDO SEIDMAN, LLP AND BDO USA, LLP'S MOTION TO DISMISS
PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT AND BRIEF IN SUPPORT

Defendants BDO Seidman, LLP and BDO USA, LLP submit this Appendix in Support of

their Motion to Dismiss Plaintiff's Amended Class Action Complaint, pursuant to Northern

District of Texas Local Rule 7.1(i).

| Exhibit | Description | App. Page |
|---|---|---|
| A | Declaration of Jessica B. Pulliam | 1 |
| B | Excerpts from Penson 2009 Form 10-K (Filed with the SEC on March 05, 2010) | 4 |
| C | Excerpts from Penson 2010 Form 10-K (Filed with the SEC on March 04, 2011) | 23 |
| D | Excerpts from Penson Form 10-Q (Filed with the SEC on May 9, 2011) | 43 |
| E | Excerpts from Penson Form 8-K (Filed with the SEC on May 12, 2011) | 51 |

| | | |
|---|---|---|
| F | Excerpts from Penson Form 8-K<br>(Filed with the SEC on August 04, 2011) | 56 |
| G | Excerpts from Penson Form 10-Q<br>(Filed with the SEC on August 09, 2011) | 64 |
| H | *Magruder v. Halliburton, Co.*, No. 05-cv-1156, 2009 WL 854656 (N.D. Tex. Mar. 31, 2009). | 71 |
| I | *Schiller v. Physicians Resource Grp., Inc.*, No. 97-cv-3158, 2002 WL 318441 (N.D. Tex. Feb. 26, 2002). | 100 |
| J | *Simons v. Dynacq Healthcare, Inc.*, No. 03-5825, 2005 WL 1801946 (S.D. Tex. July 28, 2005). | 117 |

# EXHIBIT A

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **REID FRIEDMAN, on behalf of himself and all others similarly situated,** | § § § § § § § § § § § § § § § § | **Case No. 11-cv-02098-O** |
|      **Lead Plaintiff,** | | |
|         vs. | | |
| **PENSON WORLDWIDE, INC., PHILIP A. PENDERGRAFT, KEVIN W. MCALEER, ROGER J. ENGEMOEN, DANIEL P. SON, THOMAS R. JOHNSON, BDO SEIDMAN, LLP AND BDO USA, LLP,** | | |
|      **Defendants.** | | |

## DECLARATION OF JESSICA B. PULLIAM IN SUPPORT OF MOTION TO DISMISS CLAIMS AGAINST BDO SEIDMAN, LLP AND BDO USA, LLP IN THE AMENDED CLASS ACTION COMPLAINT

I, Jessica B. Pulliam, declare as follows:

1.    I am an attorney licensed to practice law in the State of Texas.  I am a partner at the law firm of Baker Botts L.L.P., counsel for the Defendants BDO Seidman, LLP and BDO USA, LLP in the above-captioned litigation.  I make this declaration in support of Defendants' Motion to Dismiss Plaintiff's Amended Class Action Complaint ("Complaint").

2.    Attached as Exhibit B at App. 4-22 are relevant excerpts from Defendant Penson Worldwide, Inc.'s ("Penson") Form 10-K for the fiscal year ended December 31, 2009, as filed with the SEC on March 05, 2010, and which is referenced in the Complaint and publically available.

3.      Attached as Exhibit C at App. 23-42 are relevant excerpts from Penson's Form 10-K for the fiscal year ended December 31, 2010, as filed with the SEC on March 04, 2011, and which is referenced in the Complaint and publically available.

4.      Attached as Exhibit D at App. 43-50 are relevant excerpts from Penson's Form 10-Q for the quarter ended March 31, 2011, as filed with the SEC on May 9, 2011, and which is referenced in the Complaint and publically available.

5.      Attached as Exhibit E at App. 51-55 are relevant excerpts from Penson's Form 8-K, as filed with the SEC on May 12, 2011, and which is referenced in the Complaint and publically available.

6.      Attached as Exhibit F at App. 56-63 are relevant excerpts from Penson's Form 8-K, as filed with the SEC on August 04, 2011, and which is referenced in the Complaint and publically available.

7.      Attached as Exhibit G at App. 64-70 are relevant excerpts from Penson's Form 10-Q for the quarter ended June 30, 2011, as filed with the SEC on August 09, 2011, and which is referenced in the Complaint and publically available.

Dated: April 17, 2012

Jessica B. Pulliam

# EXHIBIT B

Table of Contents

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2009**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**001-32878 (Commission File Number)**

# PENSON WORLDWIDE, INC.

*(Exact name of registrant as specified in its charter)*

| **Delaware** | **6211** | **75-2896356** |
|---|---|---|
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(Primary Standard Industrial Classification Code Number)* | *(I.R.S. Employer Identification No.)* |

**1700 Pacific Avenue, Suite 1400**
**Dallas, Texas 75201**
**(214) 765-1100**
*(Address, including zip code, and telephone number, including area code, of the registrant's principal executive offices)*

**Securities registered pursuant to Section 12(b) of the Act**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, par value $0.01 per share | NASDAQ Global Select Market |

**Securities registered pursuant to Section 12(g) of the Act**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☐    No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes ☐    No ☑

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☐    No ☐

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.  Yes ☑    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐        Accelerated filer ☑        Non-accelerated filer ☐        Smaller reporting company ☐

(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐    No ☑

The aggregate market value of the registrant's common stock held by non-affiliates as of June 30, 2009 (the last business day of the registrants' most recently completed second fiscal quarter) was $134,373,367.

The number of outstanding shares of the registrant's Common Stock, $0.01 par value, as of March 1, 2010 was 25,599,761.

### DOCUMENTS INCORPORATED BY REFERENCE

Certain portions of registrant's Definitive Proxy Statement relating to its 2010 annual meeting of stockholders are incorporated by reference into Part III.

Table of Contents

**Basis of Presentation**

In this Annual Report on Form 10-K, the term "Penson" refers to Penson Worldwide Inc., a Delaware corporation and its subsidiaries on a consolidated basis. Unless otherwise indicated, all references in this report to the "Company," "Penson," "we," "us" and "our" refer to Penson Worldwide, Inc. and our subsidiaries.

Penson Worldwide, Inc. ("PWI") is a holding company incorporated in Delaware. The Company conducts business through its wholly owned subsidiary SAI Holdings, Inc. ("SAI"). SAI conducts business through its principal direct and indirect operating subsidiaries, Penson Financial Services, Inc. ("PFSI"), Penson Financial Services Canada Inc. ("PFSC"), Penson Financial Services Ltd. ("PFSL"), Nexa Technologies, Inc. ("Nexa"), Penson GHCO ("Penson GHCO"), Penson Asia Limited ("Penson Asia") and Penson Financial Services Australia Pty Ltd ("PFSA"). Through these operating subsidiaries, the Company provides securities and futures clearing services including integrated trade execution, foreign exchange trading, custody services, trade settlement, technology services, risk management services, customer account processing and customized data processing services. The Company also participates in margin lending and securities lending and borrowing transactions, primarily to facilitate clearing and financing activities.

PFSI is a broker-dealer registered with the Securities and Exchange Commission ("SEC"), a member of the New York Stock Exchange ("NYSE") and a member of the Financial Industry Regulatory Authority ("FINRA"), and is licensed to do business in all fifty states of the United States of America and certain territories. PFSC is an investment dealer and is subject to the rules and regulations of the Investment Industry Regulatory Organization of Canada ("IIROC"). PFSL provides settlement services to the London financial community and is regulated by the Financial Services Authority ("FSA") and is a member of the London Stock Exchange. Penson GHCO is a registered Futures Commission Merchant ("FCM") with the Commodity Futures Trading Commission ("CFTC") and is a member of the National Futures Association ("NFA"), various futures exchanges and is regulated in the United Kingdom by the FSA. PFSA holds an Australian Financial Services License and is a market participant of the Australian Securities Exchange ("ASE") and a clearing participant of the Australian Clearing House.

As of the date of this Annual Report, Penson has one class of common stock and one class of convertible preferred stock. The common stock is currently held by public shareholders and certain directors, officers and employees of the Company. None of the preferred stock is issued and outstanding. As used in this Annual Report, the term "common stock" means the common stock, and the term "preferred stock" means the convertible preferred stock, in each case unless otherwise specified.

**Special Note Regarding Forward-Looking Statements**

This Annual Report and the information contained herein include forward-looking statements that involve both risk and uncertainty and that may not be based on current or historical fact. Although we believe our expectations to be accurate, forward-looking statements are subject to known and unknown risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements. Factors that could cause or contribute to such differences include but are not limited to:

- interest rate fluctuations;

- general economic conditions and the effect of economic conditions on consumer confidence;

- reduced margin loan balances maintained by our customers;

- fluctuations in overall market trading volume;

- our ability to successfully implement new product offerings;

- our ability to obtain future credit on favorable terms;

- reductions in per transaction clearing fees;

- legislative and regulatory changes;

- monetary and fiscal policy changes and other actions by the Board of Governors of the Federal Reserve System ("Federal Reserve");

1

Table of Contents

- our ability to attract and retain customers and key personnel; and

- those risks detailed from time to time in our press releases and periodic filings with the SEC.

Forward-looking statements can be identified by the use of forward-looking words such as "believes," "expects," "hopes," "may," "will," "plans," "intends," "estimates," "could," "should," "would," "continue," "seeks," "pro forma," or "anticipates" or other similar words (including their use in the negative), or by discussions of future matters such as the development of new technology, integration of acquisitions, possible changes in our regulatory environment and other statements that are not historical. Additional important factors that may cause our actual results to differ from our projections are detailed later in this report under the section entitled "Risk Factors." You should not place undue reliance on any forward-looking statements, which speak only as of the date hereof. Except as required by law, we undertake no obligation to publicly update or revise any forward-looking statement.

2

App. 7

Table of Contents

these revenues and represented 10.2% of our total correspondents and institutional clients represented 14.1% of these revenues and were 27.6% of our total correspondents. The remainder of these revenues was provided primarily by broker-dealers trading on a proprietary basis, broker-dealers specializing in option trading, futures trading, hedge funds, algorithmic traders and financial technology firms. See also Part II, Item 7, *Management's Discussion and Analysis of Financial Condition and Results of Operations*, for more information.

As an integral part of our securities clearing relationships, we maintain a significant margin lending business with our correspondents and their customers. Under these margin lending arrangements, we extend credit to our correspondents and their customers so that they may purchase securities on margin. As is typical in margin lending arrangements, we extend credit for a portion of the purchase price of the securities, which is collateralized by existing securities and cash in the accounts of our correspondents and their customers. We also earn interest income from both our securities and futures operations by investing customers' cash and we engage in securities lending activities as a means of financing our business and generating additional interest income. Over the past year, our net interest revenues decreased from $75.1 million in 2008 to $65.9 million in 2009, representing approximately 26% and 23% of our net revenues, respectively.

### Clients

Currently, our principal clients are online, direct access and traditional retail brokers. We are increasingly adding large banks, institutional brokers, financial technology companies and securities exchanges as clients. Online broker-dealers principally enable investors to perform trades through the broker via the Internet through browser-based technology. Direct access broker-dealers principally provide investors with dedicated software which executes orders through direct exchange interfaces and provides real-time high speed Level II market information. Traditional retail brokers usually engage in agency trades for their customers, which may or may not be online. Institutional brokers and hedge funds typically engage in algorithmic trading or other proprietary trading strategies for their own account or, at times, agency trades for others. Our bank clients typically are non-U.S. entities making purchases for their brokerage operations. The type of financial technology client that would most likely use our products and services is a financial data content or trading software firm that purchases our data or combines its offerings with our trading software. Through our acquisitions of Goldenberg Hehmeyer and Co. ("GHCO") and First Capitol Group LLC ("FCG") in 2007, we have added a number of futures related clients, including introducing brokers, non-clearing FCMs, commercial customers, customers who engage in hedging and risk management activities and other customers who trade futures and other instruments.

We have made significant investments in our U.S. and international data and execution infrastructure, as well as various types of multi-currency and multi-lingual trading software. We provide what we believe to be a flexible offering of infrastructure products and services to our clients, available both on an unbundled basis and as a fully-integrated solution. Our technology offerings are typically private-labeled to emphasize the client's branding. We seek to put our clients' interests first and we believe our position as the leading independent provider of U.S. securities clearing services is a significant differentiating factor. We believe we are well-positioned to take advantage of our significant investments in technology infrastructure to expand sales of our products and services to these and many other clients worldwide.

### Industry trends

We believe that the market for securities and futures processing products and services is influenced by several significant industry trends creating continuing opportunities for us to expand our business, including:

*Shift to outsourced solutions.* Broker-dealers are continuing to outsource their clearing functions. In addition, firms in the global securities and investment industry are expanding their use of third-party technology to manage their securities trading infrastructure.

*Increase in trading in multiple markets.* Investors increasingly seek to trade in multiple markets, asset classes and currencies at once. The technological challenges associated with clearing, settlement, and custody in multiple geographies, currencies, and asset classes are prompting correspondents to seek the most comprehensive and sophisticated service providers. We have sought to capitalize on this trend by expanding our product offering into high growth areas such as the futures market, where we have significantly expanded

6

App. 8

Table of Contents

applicable metrics to monitor ongoing compliance with the minimum capital requirements established by the ASE and ACH.

Our futures clearing business is subject to the capital and segregation rules of the CFTC, NFA, and futures exchanges in the U.S. and the FSA and futures exchanges in the U.K. Our acquisition of GHCO and FCG substantially increased our exposure to these rules as well as the capital requirements of applicable exchanges and clearing houses of which we are a clearing member. If we fail to maintain the required capital or violate the customer segregation rules, we may be subject to monetary fines and the suspension or revocation of our license to clear futures contracts and carry customer accounts. Any interruption in our ability to continue this business would impact our revenues and profitability.

The regulatory capital requirements that affect our regulated subsidiaries are stringent and subject to significant and uncontrollable change. Our inability to comply with any of the current requirements or any future changes to these requirements could cause us to suffer significant financial loss.

**Margin risk management**

Our margin lending activities expose our capital to significant risks. These risks include, but are not limited to, absolute and relative price movements, price volatility and changes in liquidity, over which we have virtually no control.

We attempt to minimize the risks inherent in our margin lending activities by retaining in our margin lending agreements the ability to adjust margin requirements as needed and by exercising a high degree of selectivity when accepting new correspondents. When determining whether to accept a new correspondent, we evaluate, among other factors, the correspondent's experience in the industry, its financial condition and the background of the principals of the firm. In addition, we have multiple layers of protection, including the balances in customers' accounts, correspondents' commissions on deposit, clearing deposits and equity in correspondent firms, in the event that a correspondent or one of its customers does not deliver payment for our services. We also maintain a bad debt reserve.

Our customer agreements and fully-disclosed clearing agreements require industry arbitration in the event of a dispute. Arbitration is generally less expensive and more timely than dispute resolution through the court system. Although we attempt to minimize the risk associated with our margin lending activities, there is no assurance that the assumptions on which we base our decisions will be correct or that we are in a position to predict factors or events which will have an adverse impact on any individual customer or issuer, or the securities markets in general.

**Local regulations**

PFSI is a broker-dealer authorized to conduct business in all 50 states, the District of Columbia and Puerto Rico under applicable local securities regulations. PFSC is authorized to conduct business in all major provinces and territories in Canada.

**Employees**

As of December 31, 2009, we had 1,031 employees, of whom 459 were employed in clearing operations, 320 in technology support and development, 54 in sales and marketing and 198 in finance and administration. Of our 1,031 employees, 722 are employed in the U.S., 58 in the U.K., 220 in Canada, 10 in Asia and 21 in Australia. Our employees are not represented by any collective bargaining organization or covered by a collective bargaining agreement. We believe that our relationship with our employees is good.

Our continued success depends largely on our ability to attract and retain highly skilled personnel. Competition for such personnel is intense, and should we be unable to recruit and retain the necessary personnel, the development, sale and performance of new or enhanced services would likely be delayed or prevented. In addition, difficulties we encounter in attracting and retaining qualified personnel may result in higher than anticipated salaries, benefits and recruiting costs, which could adversely affect our business.

23

App. 9

Table of Contents

*Our clearing operations could expose us to legal liability for errors in performing clearing functions and improper activities of our correspondents.*

Any intentional failure or negligence in properly performing our clearing functions or any mishandling of funds and securities held by us on behalf of our correspondents and their customers could lead to censures, fines or other sanctions by applicable authorities as well as actions in tort brought by parties who are financially harmed by those failures or mishandlings. Any litigation that arises as a result of our clearing operations could harm our reputation and cause us to incur substantial expenses associated with litigation and damage awards that could exceed our liability insurance by unknown but significant amounts. In the normal course of business, we purchase and sell securities as both principal and agent. If another party to the transaction fails to fulfill its contractual obligations, we may incur a loss if the market value of the security is different from the contract amount of the transaction.

In the past, clearing firms in the U.S. have been held liable for failing to take action upon the receipt of customer complaints, failing to know about the suspicious activities of correspondents or their customers under circumstances where they should have known, and even aiding and abetting, or causing, the improper activities of their correspondents. Although our correspondents provide us with indemnity under our contracts, we cannot assure you that our procedures will be sufficient to properly monitor our correspondents or protect us from liability for the acts of our correspondents under current laws and regulations or that securities industry regulators will not enact more restrictive laws or regulations or change their interpretations of current laws and regulations. If we fail to implement proper procedures or fail to adapt our existing procedures to new or more restrictive regulations, we may be subject to liability that could result in substantial costs to us and distract our management from our business.

*Continuing low, short-term interest rates have negatively impacted the profitability of our margin lending business.*

The profitability of our margin lending activities depends to a great extent on the difference between interest income earned on margin loans and investments of customer cash and the interest expense paid on customer cash balances and borrowings. While they are not linearly connected, if short-term interest rates fall, we generally expect to receive a smaller gross interest spread, causing the profitability of our margin lending and other interest-sensitive revenue sources to decline. Recent decreases in short-term interest rates have contributed to a decrease in our profitability and will continue to do so while lower rates continue to be in effect. Assuming constant customer balances, we expect that a 25 basis point change in the federal funds rate would affect our pre-tax income by approximately $1 million per quarter.

Short-term interest rates are highly sensitive to factors that are beyond our control, including general economic conditions and the policies of various governmental and regulatory authorities. In particular, decreases in the federal funds rate by the Federal Reserve usually lead to decreasing interest rates in the U.S., which generally lead to a decrease in the gross spread we earn. This is most significant when the federal funds rate is on the lower end of its historical range, as it is today. Interest rates in Canada and Europe are also subject to fluctuations based on governmental policies and economic factors and these fluctuations could also affect the profitability of our margin lending operations in these markets.

*Our margin lending business subjects us to credit risks and if we are unable to liquidate an investor's securities when the margin collateral becomes insufficient, the profitability of our business may suffer.*

We provide margin loans to investors; therefore, we are subject to risks inherent in extending credit. As of December 31, 2009, our receivables from customers and correspondents were $1.1 billion, which predominantly reflected margin loans. Our credit risks include the risk that the value of the collateral we hold could fall below the amount of an investor's indebtedness. This risk is especially great when the market is rapidly declining. Agreements with margin account investors permit us to liquidate their securities with or without prior notice in the event that the amount of margin collateral becomes insufficient. Despite those agreements and our house policies with respect to margin, which may be more restrictive than is required under applicable laws and regulations, we may be unable to liquidate the customers' securities for various reasons, including:

- the pledged securities may not be actively traded;

25

App. 10

Table of Contents

- there may be an undue concentration of securities pledged; or

- an order to stop transfer by the issuer of securities may be issued with regard to pledged securities.

In the U.S., our margin lending is subject to the margin rules of the Federal Reserve, NYSE and FINRA, whose rules generally permit margin loans of up to 50% of the value of the securities collateralizing the margin account loan at the time the loan is made, subject to requirements that the customer deposit additional securities or cash in its accounts so that the customer's equity in the account is at least 25% of the value of the securities in the account. We are also subject to rules and regulations in Canada and the U.K. with regard to our margin lending activities in those markets. In certain circumstances, we may provide a higher degree of margin leverage to our correspondents with respect to their proprietary trading businesses than otherwise permitted by the margin rules described above based on an exemption for correspondents that purchase a class of preferred stock of PFSI. In addition, for our portfolio margining accounts, we are able to extend substantially more credit to approved customers pursuant to a risk formula adopted by the SEC. As a result, we may increase the risks otherwise associated with margin lending with respect to these correspondent and customer accounts.

*We rely, in part, on third parties to provide and support the software and systems we use to provide our services. Any interruption or cessation of service by these third parties could harm our business.*

We have contracted with SunGard Data Systems and IBM Canada Limited ("IBM Canada") to provide a major portion of the software and systems necessary for our execution and clearing services. On September 25, 2008, we entered into an amendment to our current agreement with SunGard that requires SunGard to provide a dedicated processing platform for the processing of our U.S. clearing operations. Our current agreement with SunGard will expire in February, 2014, but can be terminated by SunGard upon written notice in the event that we breach the agreement. Our current agreement with IBM Canada expires in August, 2010; however, we have an option to retain IBM Canada's services for up to six months beyond that date to allow us to efficiently transition the processing of our Canadian clearing and execution operations to Broadridge, should we elect to exercise that option. The agreement with IBM Canada can be terminated by IBM Canada upon written notice in the event that we breach the agreement. In the past, we have experienced limited processing delays, occasional hardware and software outages with SunGard and IBM Canada. Any major interruption in our ability to process our transactions through SunGard or IBM Canada would harm our relationships with our clients and impact our growth. We also license many additional generally available software packages. Failures in any of these applications could also harm our business operations. We rely on similar systems for other subsidiaries, problems with each of which could cause similar problems and results in us suffering significant financial harm.

We rely on SunGard, IBM Canada and other third parties to enhance their current products, develop new products on a timely and cost-effective basis, and respond to emerging industry standards and other technological changes. If we consummate the Broadridge transaction, we will rely on Broadridge to be able to provide similar future product developments for our U.S., U.K. and Canadian securities operations. See "Business — Strategic Acquisitions" for a description of the proposed Broadridge transaction. Certain of our subsidiaries will continue to use SunGard to provide the software and systems necessary to provide services to our clients even if the Broadridge transaction is consummated, including Penson GHCO and PFSA. SunGard's provision of a dedicated processing platform allowed us to process our increased U.S. trade volume in 2009 and we anticipate it will be able to do so in 2010 and beyond. If in the future, however, enhancements or upgrades of third-party software and systems cannot be integrated with our technologies or if the technologies on which we rely fail to respond to industry standards or technological changes, we may be required to redesign our proprietary systems. Software products may contain defects or errors, especially when first introduced or when new versions or enhancements are released. The inability of third parties to supply us with software or systems on a reliable, timely basis or to allocate sufficient capacity to meet our trading volume requirements could harm relationships with our clients and our ability to achieve our projected level of growth.

26

Table of Contents

broker purchases a sufficient amount of the security to make full delivery on the fail position and that purchase clears and settles. If a clearing broker becomes subject to the borrowing penalty, the penalty will prohibit the clearing broker from effecting short sales in that security for its own account or for that of any introducing broker or customer unless the clearing broker has borrowed the securities in question or has entered into a bona fide arrangement to borrow the securities. Clearing broker-dealers are permitted to reasonably allocate the close-out requirement to an introducing broker that is responsible for the fail position. As the clearing broker-dealer, if we are unable to timely cover a fail position and cannot allocate the close-out responsibility to the broker-dealer that is responsible for the fail position, we would be subject to the borrowing penalty until such time as we have purchased a sufficient amount of the security to make full delivery on the fail position and that purchase has cleared and settled, which generally is three business days after the purchase. Foreign jurisdictions in which we operate also have restrictions on short selling. Because of the requirements of Rule 204 and foreign restrictions on short selling, our costs associated with handling short sales, including the costs associated with closing out fail positions and borrowing securities to facilitate short selling may increase significantly. In addition, if we become subject to the borrowing penalty, our customers may be less likely to use our securities lending department for short sale transactions and the scope of our securities lending business may significantly decrease, which will adversely affect our operations and financial conditions.

On February 24, 2010, the SEC adopted additional restrictions on short selling stock. These restrictions, known as the alternative uptick rule, restrict short selling in securities that have dropped more than 10% in one day. These changes and potential future regulatory changes related to short-selling of securities may have a negative impact on our ability to earn the spreads we have historically collected.

***General economic and political conditions and broad trends in business and finance that are beyond our control may contribute to reduced levels of activity in the securities markets, which could result in lower revenues from our business operations.***

Trading volume, market prices and liquidity are affected by general national and international economic and political conditions and broad trends in business and finance that result in changes in volume and price levels of securities transactions. These factors include:

- the availability of short-term and long-term funding and capital;
- the level and volatility of interest rates;
- legislative and regulatory changes;
- currency values and inflation; and
- national, state and local taxation levels affecting securities transactions.

These factors are beyond our control and may contribute to reduced levels of activity in the securities markets. Our largest source of revenues has historically been our revenues from clearing operations, which are largely driven by the volume of trading activities of the customers of our correspondents and proprietary trading by our correspondents. Our margin lending revenues and our technology revenues are also impacted by changes in the trading activities of our correspondents and clients. Accordingly, any significant reduction in activity in the securities markets would likely result in lower revenues from our business operations.

***Our quarterly revenue and operating results are subject to significant fluctuations.***

Our quarterly revenue and operating results may fluctuate significantly in the future due to a number of factors, including:

- changes in the proportion of clearing operations revenues and interest income;
- the lengthy sales and integration cycle with new correspondents;
- the gain or loss of business from a correspondent;
- reductions in per-transaction clearing fees;

33

Table of Contents

- changes in bad debt expense from margin lending as compared to historical levels;
- changes in the rates we charge for margin loans, changes in the rates we pay for cash deposits we hold on behalf of our correspondents and their customers and changes in the rates at which we can invest such cash deposits;
- changes in the market price of securities and our ability to manage related risks;
- fluctuations in overall market trading volume;
- the relative success and/or failure of third party clearing competitors, many of which have increasingly larger resources than we have as a result of recent consolidation in our industry;
- the relative success and/or failure of third party technology competitors including, without limitation, competitors to our Nexa business;
- our ability to manage personnel, overhead and other expenses; and
- the amount and timing of capital expenditures.

Our expense structure is based on historical expense levels and the expected levels of demand for our clearing, margin lending and other services. If demand for our services declines, we may be unable to adjust our cost structure on a timely basis in order to sustain our profitability.

Due to the foregoing factors, period-to-period comparisons of our historical revenues and operating results are not necessarily meaningful, and you should not rely upon such comparisons as indicators of future performance. We also cannot assure you that we will be able to sustain the rates of revenue growth we have experienced in the past, improve our operating results or sustain our profitability on a quarterly basis.

***Our involvement in futures and options markets subjects us to risks inherent in conducting business in those markets.***

We principally clear futures and options contracts on behalf of our correspondents and their respective customers. Trading in futures and options contracts is generally more highly leveraged than trading in other types of securities. This additional leverage increases the risk associated with trading in futures and options contracts, which in turn raises the risk that a correspondent, introducing broker, or customer may not be able to fully repay its creditors, including us, if it experiences losses in its futures and options contract trading business. In 2007, we acquired the partnership interests of GHCO, and the limited liability company interests of FCG, which substantially increased our operations in the futures markets. Because of this increased activity, we will face more exposure to the risks associated with the clearing of futures contracts.

***We may not be able to or determine not to hedge our foreign exchange risk.***

As a foreign exchange trade dealer, we enter into currency transactions with certain of our institutional clients or other institutions using modeled prices that we determine and may seek to hedge our risk by executing similar transactions on the various exchanges or electronic communication networks of which we are a participant. While we expect to be able to limit our risk in our transactions with our clients through hedging transactions on exchanges or ECNs or through other counterparty relationships, there is no guarantee that we will be able to enter into these transactions at prices similar to those which we entered into with our clients. In addition, while we may intend to enter into the hedging transactions after we enter into a transaction with our client or the relevant institution, it is possible that currency prices could fluctuate before we are able to enter into such hedging transactions or, for other reasons, we may determine not to hedge such risk.

***The securities and futures businesses are highly dependent on certain market centers that may be targets of terrorism.***

Our business is dependent on exchanges and market centers being able to process trades. Terrorist activities in September 2001 caused the U.S. securities markets to close for four days. This impacted our revenue and

34

App. 13

Table of Contents

### Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused the report to be signed on its behalf by the undersigned, thereunto duly authorized.

PENSON WORLDWIDE, INC.

By:  /s/  PHILIP A. PENDERGRAFT
    Name:    Philip A. Pendergraft
    Title:    Chief Executive Officer

*Date:* March 5, 2010

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed by the following persons in the capacities and on the dates indicated:

| Signature | Title | Date |
| --- | --- | --- |
| /s/  ROGER J. ENGEMOEN, JR.<br>Roger J. Engemoen, Jr. | Chairman | March 5, 2010 |
| /s/  PHILIP A. PENDERGRAFT<br>Philip A. Pendergraft | Chief Executive Officer<br>(Principal Executive Officer)<br>and Director | March 5, 2010 |
| /s/  DANIEL P. SON<br>Daniel P. Son | President and Director | March 5, 2010 |
| /s/  KEVIN W. MCALEER<br>Kevin W. McAleer | Executive Vice President & Chief Financial Officer (Principal Financial and Accounting Officer) | March 5, 2010 |
| /s/  JAMES S. DYER<br>James S. Dyer | Director | March 5, 2010 |
| /s/  DAVID JOHNSON<br>David Johnson | Director | March 5, 2010 |
| /s/  THOMAS R. JOHNSON<br>Thomas R. Johnson | Director | March 5, 2010 |
| /s/  DAVID M. KELLY<br>David M. Kelly | Director | March 5, 2010 |
| /s/  DAVID REED<br>David Reed | Director | March 5, 2010 |

App. 14

Table of Contents

### Report of independent registered public accounting firm

Board of Directors and Stockholders
Penson Worldwide, Inc.
Dallas, Texas

We have audited the accompanying consolidated statements of financial condition of Penson Worldwide, Inc. (the "Company") as of December 31, 2009 and 2008 and the related consolidated statements of income, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2009. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Penson Worldwide, Inc. at December 31, 2009 and 2008, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2009 in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Penson Worldwide, Inc.'s internal control over financial reporting as of December 31, 2009, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) and our report dated March 5, 2010, expressed an unqualified opinion thereon.

/s/  BDO SEIDMAN, LLP
BDO Seidman, LLP

Dallas, Texas
March 5, 2010

F-2

App. 15

Table of Contents

**Report of independent registered public accounting firm**

Board of Directors and Stockholders
Penson Worldwide, Inc.
Dallas, Texas

We have audited Penson Worldwide, Inc.'s (the "Company") internal control over financial reporting as of December 31, 2009, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying "Item 9A, Management's Report on Internal Control over Financial Reporting". Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Penson Worldwide, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated statements of financial condition of Penson Worldwide, Inc. as of December 31, 2009 and 2008, and the related consolidated statements of income, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2009 and our report dated March 5, 2010 expressed an unqualified opinion thereon.

/s/ BDO SEIDMAN, LLP
BDO Seidman, LLP

Dallas, Texas
March 5, 2010

F-3

App. 16

Table of Contents

Penson Worldwide, Inc.

Notes to the Consolidated Financial Statements — (Continued)

amortized over their estimated useful lives, generally 5 years. Other related primarily to the efutures.com domain name acquired with FCG which has an indefinite life and a non-compete agreement with an estimated useful life of 11 years. Intangible assets are included in other assets. Amortization expense related to intangible assets was approximately $3,136, $4,132 and $3,554 in 2009, 2008 and 2007, respectively. The Company estimates that amortization expense will be approximately $2,209 in 2010, $1,885 in 2011, $1,549 in 2012 and $1,535 in 2013 and 2014, respectively.

*Financing Costs* — Financing costs associated with the Company's debt financing arrangements are capitalized and amortized over the life of the related debt in compliance with the effective interest method of the FASB Codification.

*Operating Leases* — Rent expense is provided on operating leases evenly over the applicable lease periods taking into account rent holidays. Amortization of leasehold improvements is provided evenly over the lesser of the estimated useful life or expected lease terms.

*Stock-Based Compensation* — The Company's accounting for stock-based employee compensation plans focuses primarily on accounting for transactions in which an entity exchanges its equity instruments for employee services, and carries forward prior guidance for share-based payments for transactions with non-employees. The compensation cost is based upon the original grant-date fair value of the grant. The Company recognizes expense relating to stock-based compensation on a straight-line basis over the requisite service period which is generally the vesting period. Forfeitures of unvested stock grants are estimated and recognized as a reduction of expense.

*Management's Estimates and Assumptions* — The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the period. Actual results could differ from those estimates. The Company reviews all significant estimates affecting the consolidated financial statements on a recurring basis and records the effect of any necessary adjustments prior to their issuance.

*Cash and Cash Equivalents* — The Company considers cash equivalents to be highly liquid investments with original maturities of less than 90 days that are not held for sale in the ordinary course of business. Assets segregated for regulatory purposes are not included as cash and cash equivalents for purposes of the consolidated statements of cash flows because such assets are segregated for the benefit of customers only.

*Securities Owned and Securities Sold, Not Yet Purchased* — The Company has classified its investments in securities owned and securities sold, not yet purchased as "trading" and has reported those investments at their fair or market values in the consolidated statements of financial condition. Unrealized gains or losses are included in earnings.

*Fair Value of Financial Instruments* — The financial instruments of the Company are reported on the consolidated statements of financial condition at fair values, or at carrying amounts that approximate fair values because of the short maturity of the instruments. See Note 6 for a description of financial instruments carried at fair value.

*Allowance for Doubtful Accounts* — The Company generally does not lend money to customers or correspondents except on a fully collateralized basis. When the value of that collateral declines, the Company has the right to demand additional collateral. In cases where the collateral loses its liquidity, the Company might also demand personal guarantees or guarantees from other parties. In valuing receivables that become less than fully collateralized, the Company compares the market value of the collateral and any additional guarantees to the balance of the loan outstanding. To the extent that the collateral, the guarantees and any other rights the Company has against the customer or the related introducing broker are not sufficient to cover any potential losses, then the Company records an appropriate allowance for doubtful accounts. The Company monitors every account that is less

F-11

Table of Contents

**Penson Worldwide, Inc.**

**Notes to the Consolidated Financial Statements — (Continued)**

than fully collateralized with liquid securities every day. The Company reviews all such accounts on a monthly basis to determine if a change in the allowance for doubtful accounts is necessary. This specific, account-by-account review is supplemented by the risk management procedures that identify positions in illiquid securities and other market developments that could affect accounts that otherwise appear to be fully collateralized. The corporate and local country risk management officers monitor market developments on a daily basis. The Company maintains an allowance for doubtful accounts that represents amounts, in the judgment of management, necessary to adequately absorb losses from known and inherent losses in outstanding receivables. Provisions made to this allowance are charged to operations based on anticipated recoverability. The allowance for doubtful accounts was $9,705 and $8,160 at December 31, 2009 and 2008, respectively.

*Software Costs and Expenses* — Costs associated with software developed for internal use are capitalized based on guidance in the FASB Codification. Capitalized costs include external direct costs of materials and services consumed in developing or obtaining internal-use software and payroll for employees directly associated with, and who devote time to, the development of the internal-use software. Costs incurred in development and enhancement of software that do not meet the capitalization criteria, such as costs of activities performed during the preliminary and post-implementation stages, are expensed as incurred. Costs incurred in development and enhancements that do not meet the criteria to capitalize are activities performed during the application development stage such as designing, coding, installing and testing. The critical estimate related to this process is the determination of the amount of time devoted by employees to specific stages of internal-use software development projects. The Company reviews any impairment of the capitalized costs on a periodic basis. The Company amortizes such costs over the estimated useful life of the software, which is three to five years once the software has been placed in service. The Company capitalized software development costs of approximately $6,880, $5,491 and $2,049 in 2009, 2008 and 2007 respectively. Amortization expense related to capitalized software development costs was approximately $2,543, $719 and $322 for the years ended December 31, 2009, 2008 and 2007, respectively.

*Net Income Per Share* — Net income per common share is computed by dividing net income applicable to common shares by the weighted average number of common shares outstanding during each period presented. Basic earnings per share excludes any dilutive effects of options. Diluted net income per share considers the impact of potential dilutive common shares, unless the inclusion of such shares would have an antidilutive effect.

*Foreign Currency Translation Adjustments* — The Company has, in consolidation, translated the account balances of PFSL, PFSC, Penson Asia and PFSA from their functional currency to U.S. Dollars, the Company's reporting currency. Translation gains and losses are recorded as an accumulated balance, net of tax, in the consolidated statements of stockholders' equity. See Note 15.

*Reclassifications* — The Company has reclassified certain prior period amounts to conform to the current year's presentation. The reclassifications had no effect on the consolidated statements of operations or stockholders' equity as previously reported.

**Recent Accounting Pronouncements**

In June 2009, the Financial Accounting Standards Board ("FASB") issued the *FASB Accounting Standards Codification* (the "Codification"), the single source of accounting principles and the framework for selecting the principles used in the preparation of financial statements of nongovernmental entities that are presented in conformity with generally accepted accounting principles ("GAAP") in the United States. All guidance contained in the Codification carries an equal level of authority. The Codification supersedes all existing non-SEC accounting and reporting standards and was effective for the Company beginning July 1, 2009. The FASB will not issue new standards in the form of Statements, FASB Staff Positions, or Emerging Issues Task Force Abstracts; instead, it will issue Accounting Standards Updates. The FASB will not consider Accounting Standards Updates as authoritative in their own right; these updates will serve only to update the Codification, provide background information about the guidance, and provide the bases for conclusions on the changes in the Codification.

App. 18

Table of Contents

**Penson Worldwide, Inc.**

**Notes to the Consolidated Financial Statements — (Continued)**

8.  **Receivable from and payable to broker-dealers and clearing organizations**

Amounts receivable from and payable to broker-dealers and clearing organizations consists of the following:

| | December 31, | | |
| --- | --- | --- | --- |
| | 2009 | | 2008 |
| Receivable: | | | |
| Securities failed to deliver | $ 62,613 | $ | 75,022 |
| Receivable from clearing organizations | 162,517 | | 243,256 |
| | $ 225,130 | $ | 318,278 |
| Payable: | | | |
| Securities failed to receive | $ 51,695 | $ | 41,108 |
| Payable to clearing organizations | 284,361 | | 303,986 |
| | $ 336,056 | $ | 345,094 |

Receivables from broker-dealers and clearing organizations include amounts receivable for securities failed to deliver, amounts receivable from clearing organizations relating to open transactions, good-faith and margin deposits, and floor-brokerage receivables.

Payables to broker-dealers and clearing organizations include amounts payable for securities failed to receive, amounts payable to clearing organizations on open transactions, and floor-brokerage payables. In addition, the net receivable or payable arising from unsettled trades is reflected in these categories.

9.  **Receivable from and payable to customers and correspondents**

Receivable from and payable to customers and correspondents include amounts due on cash and margin transactions. Securities owned by customers and correspondents are held as collateral for receivables. Such collateral is not reflected in the consolidated financial statements. Payable to correspondents also includes commissions due on customer transactions.

F-19

Table of Contents

Penson Worldwide, Inc.

Notes to the Consolidated Financial Statements — (Continued)

For customers introduced on a fully-disclosed basis by other broker-dealers, the Company has the contractual right of recovery from such introducing broker-dealers in the event of nonperformance by the customer.

In addition, the Company has sold securities that it does not currently own and will therefore be obligated to purchase such securities at a future date. The Company has recorded these obligations in the financial statements at December 31, 2009, at fair values of the related securities and may incur a loss if the fair value of the securities increases subsequent to December 31, 2009.

## 17.    Related party transactions

The Company's chairman, Mr. Engemoen, is a significant stockholder (directly or indirectly) in, and serves as the Chairman of the Board for, SAMCO Holdings, Inc. ("SAMCO"), which owns all of the outstanding stock or equity interests, as applicable, of each of SAMCO Financial Services, Inc. ("SAMCO Financial"), SAMCO Capital Markets, Inc. ("SAMCO Capital Markets"), and SAMCO-BD, LLC ("SAMCO-BD"). SAMCO and its affiliated entities are referred to as the "SAMCO Entities." The Company currently provides technology support and other similar services to SAMCO and provides clearing services, including margin lending, to the customers of SAMCO Capital Markets. The Company had provided clearing and margin lending services to customers of SAMCO Financial prior to SAMCO Financial's termination of its broker-dealer status on December 31, 2006.

On July 18, 2006, three claimants filed separate arbitration claims with the NASD (which is now known as FINRA) against PFSI related to the sale of certain collateralized mortgage obligations by SAMCO Financial Services, Inc. ("SAMCO Financial") to its customers. In the ensuing months, additional arbitration claims were filed against PFSI and certain of our directors and officers based upon substantially similar underlying facts. These claims generally allege, among other things, that SAMCO Financial, in its capacity as broker, and PFSI, in its capacity as the clearing broker, failed to adequately supervise certain registered representatives of SAMCO Financial, and otherwise acted improperly in connection with the sale of these securities during the time period from approximately June 2004 to May 2006. Claimants have generally requested compensation for losses incurred through the depreciation in market value or liquidation of the collateralized mortgage obligations, interest on any losses suffered, punitive damages, court costs and attorneys' fees. In addition to the arbitration claims, on March 21, 2008, Ward Insurance Company, Inc., et al, filed a claim against PFSI and Roger J. Engemoen, Jr., the Company's Chairman of the Board, in the Superior Court of California, County of San Diego, Central District, based upon substantially similar facts. This case was filed after a FINRA arbitration panel had previously ruled against the claimant on substantially similar facts, but in that action, PFSI and Mr. Engemoen were not parties. Among other defenses asserted, the Company is seeking to have the court enforce the earlier arbitration panel determination.

Mr. Engemoen, the Company's Chairman of the Board, is the Chairman of the Board, and beneficially owns approximately 52% of the outstanding stock, of SAMCO Holdings, Inc., the holding company of SAMCO Financial and SAMCO Capital Markets, Inc. (SAMCO Holdings, Inc. and its affiliated companies are referred to as the "SAMCO Entities"). Certain of the SAMCO Entities received certain assets from the Company when those assets were split-off immediately prior to the Company's initial public offering in 2006 (the "Split-Off"). In connection with the Split-Off and through contractual and other arrangements, certain of the SAMCO Entities have agreed to indemnify the Company and its affiliates against liabilities that were incurred by any of the SAMCO Entities in connection with the operation of their businesses, either prior to or following the Split-Off. During the third quarter of 2008, the Company's management determined that, based on the financial condition of the SAMCO Entities, sufficient risk existed with respect to the indemnification protections to warrant a modification of these arrangements with the SAMCO Entities, as described below.

On November 5, 2008, the Company entered into a settlement agreement with certain of the SAMCO Entities pursuant to which the Company received a limited personal guaranty from Mr. Engemoen of certain of the indemnification obligations of various SAMCO Entities with respect to claims related to the underlying facts described above, and, in exchange, the Company agreed to limit the aggregate indemnification obligations of the SAMCO Entities with respect to certain matters described above to $2,965. Unpaid indemnification obligations of

F-26

App. 20

Table of Contents

**Penson Worldwide, Inc.**

**Notes to the Consolidated Financial Statements — (Continued)**

$800 were satisfied prior to February 15, 2009. Of the $800 obligation, $86 was satisfied through a setoff against an obligation owed to the SAMCO Entities by PFSI, with the balance paid in cash. Of the remaining $2,165 indemnity obligation, $600 was paid to the Company prior to June 15, 2009 and the remainder was paid in December, 2009. Effective as of December 31, 2009, the Company and the SAMCO entities entered into an amendment to the settlement agreement, whereby SAMCO Holdings, Inc. agreed to pay an additional $133 on the last business day of each of the first six calendar months of 2010 (a total of $800). In each of January and February, 2010, SAMCO Holdings, Inc. paid $133 to the Company pursuant to the terms of the amendment to the settlement agreement. The SAMCO Entities remain responsible for the payment of their own defense costs and any claims from any third parties not expressly released under the settlement agreement, irrespective of amounts paid to indemnify the Company. The settlement agreement only relates to the matters described above and does not alter the indemnification obligations of the SAMCO Entities with respect to unrelated matters.

In the event the exposure of the Company with respect to these claims exceeds the agreed limits on the indemnification obligations of the SAMCO Entities such excess amounts may be borne by the Company. While the Company believes it has good defenses, there can be no assurance that its defenses and indemnification protections will be sufficient to avoid all liabilities. Accordingly, to account for liabilities related to the aforementioned claims that may be borne by the Company, a pre-tax charge of $2,350 was recorded in the third quarter of 2008. The Company will continue to monitor its financial exposure with respect to these matters and there can be no assurance that the Company's ultimate costs with respect to these claims will not exceed the amount of this liability.

In the general course of business, the Company and certain of its officers have been named as defendants in other various pending lawsuits and arbitration and regulatory proceedings. These other claims allege violation of federal and state securities laws, among other matters. The Company believes that resolution of these claims will not result in any material adverse effect on its business, financial condition, or results of operation.

Technology support and similar services are provided to SAMCO pursuant to the terms of a Transition Services Agreement entered into between the Company and SAMCO on May 16, 2006. That agreement was entered into at arm's length and the Company believes it to be on market terms. Clearing services are provided to SAMCO Capital Markets pursuant to the terms of a clearing agreement entered into between the Company and SAMCO Capital Markets on May 19, 2005, as amended effective December 31, 2009. That agreement, as amended, was also entered into at arm's length and is similar to clearing agreements the Company enters into from time to time with other similarly situated correspondents. The Company believes the terms to be no more favorable to SAMCO Capital Markets than what the Company would offer similarly situated correspondents. In 2009 the Company generated $105 in revenue from providing technology support and similar services to SAMCO and approximately $687 in revenue from the Company's clearing relationship with SAMCO Capital Markets.

The Company sublets space to SAMCO Capital Markets at the Company's principal offices at 1700 Pacific Avenue in Dallas, Texas and at One Penn Plaza, in New York, NY. For each sublease, SAMCO Capital Markets is required to pay the percentage of the rental expense the Company incurs equal to the percentage of space SAMCO Capital Markets occupies. The Company believes each sublease to be on market terms. In 2009, for occupying the 20th floor of the Company's Dallas office, SAMCO Capital Markets made payments totaling $120 the landlord of that property. For occupying half of Suite 5120 in the Company's New York office, SAMCO Capital Markets made payments totaling $450 to the landlord of that property.

Mr. Thomas R. Johnson, a member of the Company's Board of Directors, is also a member of the board of directors and the President, CEO and a stockholder of Call Now, Inc. ("Call Now"), a publicly traded company. Over the past several years, the Company has, through PFSI, its U.S. securities clearing broker-dealer subsidiary, extended margin credit to Call Now, among other of the Company's related parties. Such credit has been extended in the ordinary course of business, on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with unaffiliated third parties and had not involved more than normal risk of collectability or presented other unfavorable features.

F-27

App. 21

Table of Contents

**Penson Worldwide, Inc.**

**Notes to the Consolidated Financial Statements — (Continued)**

The Company's management recently determined that certain municipal bonds underlying Call Now's margin position had suffered reduced liquidity, and began working with Call Now to restructure the margin loan. As part of the restructuring, on February 25, 2010, Call Now converted $13,922 of its outstanding margin loan into a Promissory Note in favor of the Company accumulating interest at a rate of 10% per year. The Company's management currently believes that all amounts due under the Promissory Note will be collected pursuant to the terms of the Promissory Note. As of February 28, 2010, the total balance due under the loan, including accrued interest, was approximately $13,934, which is the largest balance that Call Now has owed under the Promissory Note. The unpaid principal balance of the Promissory Note, together with all accrued and unpaid interest, is due no later than February 25, 2012. Should Call Now default on its obligations under the Promissory Note, the principal balance together with all accrued and unpaid interest will become immediately due and payable. As of February 28, 2010, Call Now has made no interest or principal payments with respect to the Promissory Note. As part of the restructuring, Call Now has assigned to the Company certain of its economic interests and in connection with the Promissory Note, pledged its interest in certain partnerships together with all assets held in the Call Now margin account to serve as additional collateral securing the loan. Mr. Thomas Johnson has no interest in the Call Now margin account or the Promissory Note, except to the extent of his approximately 3.2% ownership interest in Call Now. Mr. Johnson abstained from voting on all matters on behalf of the Company.

**18.    Employee benefit plan**

The Company sponsors a defined contribution 401(k) employee benefit plan (the "Plan") that covers substantially all U.S. employees. Under the Plan, the Company may make a discretionary contribution. All U.S. employees are eligible to participate in the Plan, based on meeting certain age and term of employment requirements. The Company contributed approximately $1,963, $1,278 and $1,044 during 2009, 2008 and 2007, respectively.

**19.    Stock-based compensation**

The Company grants awards of stock options and restricted stock units ("RSUs") under the Amended and Restated 2000 Stock Incentive Plan, as amended in May 2009 (the "2000 Stock Incentive Plan"), under which 4,466 shares of common stock have been authorized for issuance. Of this amount, options and RSUs to purchase 2,477 shares of common stock, net of forfeitures have been granted and 1,989 shares remain available for future grants at December 31, 2009. The Company also provides an employee stock purchase plan ("ESPP").

The 2000 Stock Incentive Plan includes three separate programs: (1) the discretionary option grant program under which eligible individuals in the Company's employ or service (including officers, non-employee board members and consultants) may be granted options to purchase shares of common stock of the Company; (2) the stock issuance program under which such individuals may be issued shares of common stock directly or stock awards that vest over time, through the purchase of such shares or as a bonus tied to the performance of services; and (3) the automatic grant program under which grants will automatically be made at periodic intervals to eligible non-employee board members. The Company's Board of Directors or its Compensation Committee may amend or modify the 2000 Stock Incentive Plan at any time, subject to any required stockholder approval.

***Stock options***

During 2007, the Company granted stock options to employees. The grant price of the options was the quoted market value of the common stock at the date of grant. The options have a term of seven years and vest quarterly over four years. Additionally, the Company granted stock options to its non-employee directors. Options issued to non-employee directors have a term of ten years and vest quarterly over three years.

F-28

App. 22

# EXHIBIT C

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# Form 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

    FOR THE FISCAL YEAR ENDED DECEMBER 31, 2010

### OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**001-32878**
**(Commission File Number)**

# PENSON WORLDWIDE, INC.

*(Exact name of registrant as specified in its charter)*

| Delaware | 6211 | 75-2896356 |
|---|---|---|
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(Primary Standard Industrial Classification Code Number)* | *(I.R.S. Employer Identification No.)* |

**1700 Pacific Avenue, Suite 1400**
**Dallas, Texas 75201**
**(214) 765-1100**

*(Address, including zip code, and telephone number, including area code, of the registrant's principal executive offices)*

**Securities registered pursuant to Section 12(b) of the Act**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, par value $0.01 per share | NASDAQ Global Select Market |

**Securities registered pursuant to Section 12(g) of the Act**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☐   No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes ☐   No ☑

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☐   No ☐

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.  Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐    Accelerated filer ☑    Non-accelerated filer ☐    Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐   No ☑

The aggregate market value of the registrant's common stock held by non-affiliates as of June 30, 2010 (the last business day of the registrants' most recently completed second fiscal quarter) was $86,553,301.

App. 24

Table of Contents

**Basis of Presentation**

In this Annual Report on Form 10-K, the term "Penson" refers to Penson Worldwide, Inc., a Delaware corporation and its subsidiaries on a consolidated basis. Unless otherwise indicated, all references in this report to the "Company," "Penson," "we," "us" and "our" refer to Penson Worldwide, Inc. and our subsidiaries.

Penson Worldwide, Inc. ("PWI") is a holding company incorporated in Delaware. The Company conducts business through its wholly owned subsidiary SAI Holdings, Inc. ("SAI"). SAI conducts business through its principal direct and indirect operating subsidiaries, Penson Financial Services, Inc. ("PFSI"), Penson Financial Services Canada Inc. ("PFSC"), Penson Financial Services Ltd. ("PFSL"), Nexa Technologies, Inc. ("Nexa"), Penson Futures, formerly known as Penson GHCO ("Penson Futures"), Penson Asia Limited ("Penson Asia") and Penson Financial Services Australia Pty Ltd ("PFSA"). Through these operating subsidiaries, the Company provides securities and futures clearing services including integrated trade execution, foreign exchange trading, custody services, trade settlement, technology services, risk management services, customer account processing and customized data processing services. The Company also participates in margin lending and securities lending and borrowing transactions, primarily to facilitate clearing and financing activities.

PFSI is a broker-dealer registered with the Securities and Exchange Commission ("SEC"), a member of the New York Stock Exchange ("NYSE") and a member of the Financial Industry Regulatory Authority ("FINRA"), and is licensed to do business in all fifty states of the United States of America and certain territories. PFSC is an investment dealer registered in all provinces and territories in Canada and is a dealer member of the Investment Industry Regulatory Organization of Canada ("IIROC"). PFSL provides settlement services to the London financial community and is regulated by the Financial Services Authority ("FSA") and is a member of the London Stock Exchange. Penson Futures is a registered Futures Commission Merchant ("FCM") with the Commodity Futures Trading Commission ("CFTC") and is a member of the National Futures Association ("NFA"), various futures exchanges and is regulated in the United Kingdom by the FSA. PFSA holds an Australian Financial Services License and is a market participant of the Australian Securities Exchange ("ASX") and a clearing participant of the Australian Clearing House.

As of the date of this Annual Report, Penson has one class of common stock and one class of convertible preferred stock. The common stock is currently held by public shareholders and certain directors, officers and employees of the Company. None of the preferred stock is issued and outstanding. As used in this Annual Report, the term "common stock" means the common stock, and the term "preferred stock" means the convertible preferred stock, in each case unless otherwise specified.

**Special Note Regarding Forward-Looking Statements**

This Annual Report and the information contained herein include forward-looking statements that involve both risk and uncertainty and that may not be based on current or historical fact. Although we believe our expectations to be accurate, forward-looking statements are subject to known and unknown risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements. Factors that could cause or contribute to such differences include but are not limited to:

- interest rate fluctuations;

- general economic conditions and the effect of economic conditions on consumer confidence;

- reduced margin loan balances maintained by our customers;

- fluctuations in overall market trading volume;

- our ability to successfully implement new product offerings;

- our ability to obtain future credit on favorable terms;

- reductions in per transaction clearing fees;

- legislative and regulatory changes;

1

App. 25

Table of Contents

- monetary and fiscal policy changes and other actions by the Board of Governors of the Federal Reserve System ("Federal Reserve");

- our ability to attract and retain customers and key personnel; and

- those risks detailed from time to time in our press releases and periodic filings with the SEC.

Forward-looking statements can be identified by the use of forward-looking words such as "believes," "expects," "hopes," "may," "will," "plans," "intends," "estimates," "could," "should," "would," "continue," "seeks," "pro forma," or "anticipates" or other similar words (including their use in the negative), or by discussions of future matters such as the development of new technology, integration of acquisitions, possible changes in our regulatory environment and other statements that are not historical. Additional important factors that may cause our actual results to differ from our projections are detailed later in this report under the section entitled "Risk Factors." You should not place undue reliance on any forward-looking statements, which speak only as of the date hereof. Except as required by law, we undertake no obligation to publicly update or revise any forward-looking statement.

2

App. 26

Table of Contents

PART I

Item 1.  *Business*

Overview

We are a leading provider of a broad range of critical securities and futures processing infrastructure products and services to the global financial services industry. Our products and services include securities and futures clearing and execution, financing and cash management technology and other related offerings, and we provide tools and services to support trading in multiple markets, asset classes and currencies. Unlike most other major clearing providers, we are not affiliated with a large financial institution and we generally do not compete with our clients in other lines of business. We believe that our position as the leading independent provider in Canada, Australia and the United States is a significant differentiating factor relative to our competitors. We supply a flexible offering of infrastructure and related products and services to our clients, available both on an unbundled basis and as a fully-integrated platform encompassing all of our products and services. We believe our ability to integrate our technology offerings into our products and services is a key advantage in our effort to expand our sales and attract new clients.

Clearing is the verification of information between two parties in a securities or futures transaction and the subsequent settlement of that transaction, either as a book-entry transfer or through physical delivery of certificates, in exchange for payment. Custody services are the safe-keeping and managing of another party's assets, such as physical securities, as well as customer account maintenance and customized data processing services. Clients for whom we provide securities clearing and custody services are generally referred to as our "correspondents."

Since starting our business in 1995 with three correspondents, we have grown to be a leading provider of clearing services. Based on the number of correspondents as of December 31, 2010, we are the largest independent clearing broker in the U.S., and among the top two clearing brokers overall in the U.S., the largest independent clearing broker in Canada, the largest independent clearing broker in Australia and the second largest in the U.K. We have grown both organically and through acquisitions. As of December 31, 2010, we had 430 active correspondents worldwide, compared to 290 correspondents as of December 31, 2009. As of December 31, 2010, our pipeline of new correspondents under contract was 30, the majority of which we expect to begin clearing with us by June 30, 2011.

With operations based in the U.S., Canada, U.K., Asia and Australia, we have established a worldwide presence primarily focused on the global markets for equities, options, futures, fixed income and foreign exchange products. We believe that international markets offer an important target market as certain characteristics of the U.S. market, including significant increases in retail, self-directed and online trading, and increased trading volumes and executions, continue to expand globally. We are organized into operating segments based on geographic regions (See Note 22 to our consolidated financial statements).

Our non-interest revenues include: fees from our correspondents for transaction processing and clearing; fees for providing technology solutions; and fees for providing other non-trading activities and services, including execution services, trade aggregation, prime brokerage, foreign exchange and fixed income. Clearing and commission fees are based principally on the number of trades we process. We also earn licensing and development fees from clients for their use of our technology solutions.

Our interest revenues are generated from customer-related balances and from our stock borrowing transactions. Interest revenues from customers are generated from margin lending, securities lending and the reinvestment of customer funds. We also derive net interest revenue from our stock conduit borrowing activities, which consist of borrowing securities from one broker-dealer and lending the same securities to another broker-dealer on a matched book basis.

For the year ended December 31, 2010, we generated net revenues of $288.3 million. Clearing and commission fees, net interest income, technology revenues and other revenues comprised 53%, 24%, 7% and 16% of our net revenues, respectively. Approximately 40% of our securities correspondents generate both clearing and technology revenue. In addition, some of our customers generate revenue from both securities and futures trading, and trade in

5

multiple global markets. The following table represents the percentages of net revenues and total correspondents by correspondent type:

| Correspondent Type | Percentage of Net Revenues | Percentage of Total Correspondents |
|---|---|---|
| Direct market access | 14.4% | 8.8% |
| Retail | 15.5% | 36.2% |
| Online | 15.7% | 7.8% |
| Institutional | 17.0% | 30.4% |
| Other | 37.4% | 16.8% |

The Other category consists of broker-dealers trading on a proprietary basis, broker-dealers specializing in option trading, futures trading, hedge funds, algorithmic traders and financial technology firms. See also Part II, Item 7, *Management's Discussion and Analysis of Financial Condition and Results of Operations*, for more information.

As an integral part of our securities clearing relationships, we maintain a significant margin lending business with our correspondents and their customers. Under these margin lending arrangements, we extend credit to our correspondents and their customers so that they may purchase securities on margin. As is typical in margin lending arrangements, we extend credit for a portion of the purchase price of the securities, which is collateralized by existing securities and cash in the accounts of our correspondents and their customers. We also earn interest income from both our securities and futures operations by investing customers' cash and we engage in securities lending activities as a means of financing our business and generating additional interest income. Over the past year, our net interest revenues increased from $65.9 million in 2009 to $68.5 million in 2010, representing approximately 23% and 24% of our aggregate net revenues, respectively.

## Clients

Currently, our principal clients are online, direct access, institutional and traditional retail brokers. We are increasingly adding large banks, institutional brokers, financial technology companies and securities exchanges as clients. Online broker-dealers principally enable investors to perform trades through the broker via the Internet through browser-based technology. Direct access broker-dealers principally provide investors with dedicated software which executes orders through direct exchange interfaces and provides real-time high speed Level II market information. Traditional retail brokers usually engage in agency trades for their customers, which may or may not be online. Institutional brokers and hedge funds typically engage in algorithmic trading or other proprietary trading strategies for their own account or, at times, agency trades for others. Our bank clients typically are non-U.S. entities making purchases for their brokerage operations. The type of financial technology client that would most likely use our products and services is a financial data content or trading software firm that purchases our data or combines its offerings with our trading software. Through our acquisitions of Goldenberg Hehmeyer and Co. ("GHCO") and First Capitol Group LLC ("FCG") in 2007, which both operate within Penson Futures, we added a number of futures related clients, including introducing brokers, non-clearing FCMs, commercial customers, customers who engage in hedging and risk management activities and other customers who trade futures and other instruments.

We have made significant investments in our U.S. and international data and execution infrastructure, as well as various types of multi-currency and multi-lingual trading software. We provide what we believe to be a flexible offering of infrastructure products and services to our clients, available both on an unbundled basis and as a fully-integrated solution. Our technology offerings are typically private-labeled to emphasize the client's branding. We seek to put our clients' interests first and we believe our position as the leading independent provider of U.S. securities clearing services is a significant differentiating factor. We believe we are well-positioned to take advantage of our significant investments in technology infrastructure to expand sales of our products and services to these and many other clients worldwide.

6

App. 28

Table of Contents

**Margin risk management**

Our margin lending activities expose our capital to significant risks. These risks include, but are not limited to, absolute and relative price movements, price volatility and changes in liquidity, over which we have virtually no control.

We attempt to minimize the risks inherent in our margin lending activities by retaining in our margin lending agreements the ability to adjust margin requirements as needed and by exercising a high degree of selectivity when accepting new correspondents. When determining whether to accept a new correspondent, we evaluate, among other factors, the correspondent's experience in the industry, its financial condition and the background of the principals of the firm. In addition, we have multiple layers of protection, including the balances in customers' accounts, correspondents' commissions on deposit, clearing deposits and equity in correspondent firms, in the event that a correspondent or one of its customers does not deliver payment for our services. We also maintain a bad debt reserve.

Our customer agreements and fully-disclosed clearing agreements require industry arbitration in the event of a dispute. Arbitration is generally less expensive and more timely than dispute resolution through the court system. Although we attempt to minimize the risk associated with our margin lending activities, there is no assurance that the assumptions on which we base our decisions will be correct or that we are in a position to predict factors or events which will have an adverse impact on any individual customer or issuer, or the securities markets in general.

**Local regulations**

PFSI is a broker-dealer authorized to conduct business in all 50 states, the District of Columbia and Puerto Rico under applicable local securities regulations. PFSC is authorized to conduct business in all major provinces and territories in Canada.

**Employees**

As of December 31, 2010, we had 985 employees, of whom 416 were employed in clearing operations, 275 in technology support and development, 60 in sales and marketing and 234 in finance and administration. Of our 985 employees, 689 are employed in the U.S., 58 in the U.K., 196 in Canada, 10 in Asia and 32 in Australia. Our employees are not represented by any collective bargaining organization or covered by a collective bargaining agreement. We believe that our relationship with our employees is good.

Our continued success depends largely on our ability to attract and retain highly skilled personnel. Competition for such personnel is intense, and should we be unable to recruit and retain the necessary personnel, the development, sale and performance of new or enhanced services would likely be delayed or prevented. In addition, difficulties we encounter in attracting and retaining qualified personnel may result in higher than anticipated salaries, benefits and recruiting costs, which could adversely affect our business.

**Public reporting**

Once filed with the SEC, our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act are available free of charge at www.penson.com. The information found on our website is not part of this or any other report we file with or furnish to the SEC. Any materials we file with the SEC may be read and copied at the SEC's Public Reference Room at 100 F Street, NE, Washington, D.C. 20549. The SEC maintains a website at www.sec.gov that contains the reports we file with the SEC. We also make available on our website, free of charge, our Code of Business Conduct and Ethics, our Corporate Business Principles and Governance Guidelines, and the charters for our Nominating and Corporate Governance, Audit and Compensation Committees. Any stockholder who so requests may obtain a printed copy of any of these documents, free of charge, by writing to us at 1700 Pacific Avenue, Suite 1400, Dallas, Texas 75201, Attention: Corporate Secretary.

App. 29

Table of Contents

decrease in the gross spread we earn. This is most significant when the federal funds rate is on the lower end of its historical range, as it is today. Interest rates in Canada, the U.K. and Australia are also subject to fluctuations based on governmental policies and economic factors and these fluctuations could also affect the profitability of our margin lending operations in these markets.

***Our margin lending business subjects us to credit risks and if we are unable to liquidate an investor's securities when the margin collateral becomes insufficient, the profitability of our business may suffer.***

We provide margin loans to investors; therefore, we are subject to risks inherent in extending credit. As of December 31, 2010, our receivables from customers and correspondents were $2.3 billion, which predominantly reflected margin loans. The Company generally recognizes interest income on an accrual basis as it is earned. At December 31, 2010 and 2009, the Company had approximately $97.4 million and $52.4 million in receivables, respectively, primarily from customers and correspondents, that were substantially collateralized and considered collectable, for which interest income was being recorded only when received. Our credit risks include the risk that the value of the collateral we hold could fall below the amount of an investor's indebtedness. This risk is especially great when the market is rapidly declining. Agreements with margin account investors permit us to liquidate their securities with or without prior notice in the event that the amount of margin collateral becomes insufficient. Despite those agreements and our house policies with respect to margin, which may be more restrictive than is required under applicable laws and regulations, we may be unable to liquidate the customers' securities for various reasons, including:

- the pledged securities may not be actively traded;
- there may be an undue concentration of securities pledged; or
- an order to stop transfer by the issuer of securities may be issued with regard to pledged securities.

In the U.S., our margin lending is subject to the margin rules of the Federal Reserve, NYSE and FINRA, whose rules generally permit margin loans of up to 50% of the value of the securities collateralizing the margin account loan at the time the loan is made, subject to requirements that the customer deposit additional securities or cash in its accounts so that the customer's equity in the account is at least 25% of the value of the securities in the account. We are also subject to rules and regulations in Canada and the U.K. with regard to our margin lending activities in those markets. In certain circumstances, we may provide a higher degree of margin leverage to our correspondents with respect to their proprietary trading businesses than otherwise permitted by the margin rules described above based on an exemption for correspondents that purchase a class of preferred stock of PFSI. In addition, for our portfolio margining accounts, we are able to extend substantially more credit than permitted by the margin rules described above to approved customers pursuant to a risk formula adopted by the SEC. As a result, we may increase the risks otherwise associated with margin lending with respect to these correspondent and customer accounts.

***We rely, in part, on third parties to provide and support the software and systems we use to provide our services. Any interruption or cessation of service by these third parties could harm our business.***

We have contracted with SunGard Data Systems and, more recently, Broadridge to provide a major portion of the software and systems necessary for our execution and clearing services. On September 25, 2008, we entered into an amendment to our current agreement with SunGard that requires SunGard to provide a dedicated processing platform for the processing of our U.S. clearing operations. Our current agreement with SunGard will expire in February, 2014, but can be terminated by SunGard upon written notice in the event that we breach the agreement. In the past, we have experienced limited processing delays, occasional hardware and software outages with third party service providers, including SunGard. Any major interruption in our ability to process our transactions through SunGard or Broadridge would harm our relationships with our clients and impact our growth. We also license many additional generally available software packages. Failures in any of these applications could also harm our business operations. We rely on similar systems for other subsidiaries, problems with each of which could cause similar problems and results in us suffering significant financial harm.

We rely on SunGard, Broadridge and other third parties to enhance their current products, develop new products on a timely and cost-effective basis, and respond to emerging industry standards and other technological changes. Now that we have converted our Canadian operations and as we continue to transition our United States operations to Broadridge's

27

Table of Contents

*General economic and political conditions and broad trends in business and finance that are beyond our control may contribute to reduced levels of activity in the securities markets, which could result in lower revenues from our business operations.*

Trading volume, market prices and liquidity are affected by general national and international economic and political conditions and broad trends in business and finance that result in changes in volume and price levels of securities transactions. These factors include:

- the availability of short-term and long-term funding and capital;
- the level and volatility of interest rates;
- legislative and regulatory changes;
- currency values and inflation; and
- national, state and local taxation levels affecting securities transactions.

These factors are beyond our control and may contribute to reduced levels of activity in the securities markets. Our largest source of revenues has historically been revenues from clearing operations, which are largely driven by the volume of trading activities of the customers of our correspondents and proprietary trading by our correspondents. Our margin lending revenues and technology revenues are also impacted by changes in the trading activities of our correspondents and customers. Accordingly, any significant reduction in activity in the securities markets would likely result in lower revenues from our business operations.

*Our quarterly revenue and operating results are subject to significant fluctuations.*

Our quarterly revenue and operating results may fluctuate significantly in the future due to a number of factors, including:

- changes in the proportion of clearing operations revenues and interest income;
- the lengthy sales and integration cycle with new correspondents;
- the gain or loss of business from a correspondent;
- changes in per-transaction clearing fees;
- changes in bad debt expense from margin lending as compared to historical levels;
- changes in the rates we charge for margin loans, changes in the rates we pay for cash deposits we hold on behalf of our correspondents and their customers and changes in the rates at which we can invest such cash deposits;
- changes in the market price of securities and our ability to manage related risks;
- fluctuations in overall market trading volume;
- the relative success and/or failure of third party clearing competitors, many of which have increasingly larger resources than we have as a result of recent consolidation in our industry;
- the relative success and/or failure of third party technology competitors including, without limitation, competitors to our Nexa business;
- our ability to manage personnel, overhead and other expenses; and
- the amount and timing of capital expenditures.

Our expense structure is based on historical expense levels and the expected levels of demand for our clearing, margin lending and other services. If demand for our services declines, we may be unable to adjust our cost structure on a timely basis in order to achieve profitability.

Due to the foregoing factors, period-to-period comparisons of our historical revenues and operating results are not necessarily meaningful, and you should not rely upon such comparisons as indicators of future performance. We

35

App. 31

also cannot assure you that we will be able to sustain the rates of revenue growth we have experienced in the past, or improve our operating results.

### Our involvement in futures and options markets subjects us to risks inherent in conducting business in those markets.

We principally clear futures and options contracts on behalf of our correspondents and their respective customers. Trading in futures and options contracts is generally more highly leveraged than trading in other types of securities. This additional leverage increases the risk associated with trading in futures and options contracts, which in turn raises the risk that a correspondent, introducing broker, or customer may not be able to fully repay its creditors, including us, if it experiences losses in its futures and options contract trading business.

### We may not be able to or determine not to hedge our foreign exchange risk.

As a foreign exchange trade dealer, we enter into currency transactions with certain of our institutional clients or other institutions using modeled prices that we determine and may seek to hedge our risk by executing similar transactions on the various exchanges or electronic communication networks of which we are a participant. While we expect to be able to limit our risk in our transactions with our clients through hedging transactions on exchanges or ECNs or through other counterparty relationships, there is no guarantee that we will be able to enter into these transactions at prices similar to those which we entered into with our clients. In addition, while we may intend to enter into the hedging transactions after we enter into a transaction with our client or the relevant institution, it is possible that currency prices could fluctuate before we are able to enter into such hedging transactions or, for other reasons, we may determine not to hedge such risk.

### The securities and futures businesses are highly dependent on certain market centers that may be targets of terrorism.

Our business is dependent on exchanges and market centers being able to process trades. Terrorist activities in September 2001 caused the U.S. securities markets to close for four days. This impacted our revenue and profitability for that period of time. If future terrorist incidents cause interruption of market activity, our revenues and profits may be negatively impacted.

### Extreme market volatility may cause investors to avoid participation in equity markets, which could lead to substantially reduced trading volumes.

On May 6, 2010, the Dow Jones Industrial Average plunged over 900 points and then rapidly rebounded. This "Flash Crash" caused many investors and traders to reduce their trading activity in equity markets, or to suspend all trading activity. Any further market disruptions that cause investors and traders to reduce trading activity could lead to significantly reduced trading volumes, which could adversely affect our revenue and profitability.

### Risks related to government regulation

### All aspects of our business are subject to extensive government regulation. If we fail to comply with these regulations, we may be subject to disciplinary or other action by regulatory organizations, and we could suffer significant reputational and financial loss.

The securities industry in the U.S. is subject to extensive regulation under both federal and state laws. In addition to these laws, we must comply with rules and regulations of the SEC, NYSE, FINRA, the CFTC, the NFA, various stock and futures exchanges, state securities commissions and other regulatory bodies charged with safeguarding the integrity of the securities markets and other financial markets and protecting the interests of investors participating in these markets. Broker-dealers and FCMs are subject to regulations covering all aspects of the securities and futures businesses, including:

- sales methods;
- trade practices among broker-dealers and FCMs;
- use and safekeeping of investors' funds and securities;

Table of Contents

previously granted awards that were not vested, and the vested portion of all new stock option grants and restricted stock. The compensation cost is based upon the original grant-date fair market value of the grant. The Company recognizes expense relating to stock-based compensation on a straight-line basis over the requisite service period which is generally the vesting period. Forfeitures of unvested stock grants are estimated and recognized as a reduction of expense.

## Item 7A.  *Quantitative and Qualitative Disclosure about Market Risk*

Prior to the fourth quarter of 2007, we did not have material exposure to reductions in the targeted federal funds rate. Beginning in the fourth quarter of 2007, there were significant decreases in these rates. We encountered a 50 basis point decrease in the federal funds rate in the fourth quarter of 2007. Actual rates fell approximately 400 basis points during 2008, to a federal funds rate of approximately .25% as of December 31, 2008, which is the current rate as of December 31, 2010. Based upon the December quarter average customer balances, assuming no increase, and adjusting for the timing of these rate reductions, we believe that each 25 basis point increase or decrease will affect pretax income by approximately $1.3 million per quarter. Despite such interest rate changes, we do not have material exposure to commodity price changes or similar market risks. Accordingly, we have not entered into any derivative contracts to mitigate such risk. In addition, we do not maintain material inventories of securities for sale, and therefore are not subject to equity price risk.

We extend margin credit and leverage to our correspondents and their customers, which is subject to various regulatory and clearing firm margin requirements. Margin credit is collateralized by cash and securities in the customers' accounts. Our directors and executive officers and their associates, including family members, from time to time may be or may have been indebted to one or more of our operating subsidiaries or one of their respective correspondents or introducing brokers, as customers, in connection with margin account loans. Such indebtedness is in the ordinary course of business, is on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with unaffiliated third parties who are not our employees and does not involve more than normal risk of collectability or present other unfavorable features. Leverage involves securing a total potential future obligation with a proportional amount of cash or securities. The risks associated with margin credit and leverage increase during periods of fast market movements or in cases where leverage or collateral is concentrated and market movements occur. During such times, customers who utilize margin credit or leverage and who have collateralized their obligations with securities may find that the securities have a rapidly depreciating value and may not be sufficient to cover their obligations in the event of liquidation. Although we monitor margin balances on an intra-day basis in order to control our risk exposure, we are not able to eliminate all risks associated with margin lending.

We are also exposed to credit risk when our correspondents' customers execute transactions, such as short sales of options and equities, which can expose them to risk beyond their invested capital. We are indemnified and held harmless by our correspondents from certain liabilities or claims, the use of margin credit, leverage and short sales of their customers. However, if our correspondents do not have sufficient regulatory capital to cover such conditions, we may be exposed to significant off-balance sheet risk in the event that collateral requirements are not sufficient to fully cover losses that customers may incur and those customers and their correspondents fail to satisfy their obligations. Our account level margin credit and leverage requirements meet or exceed those required by Regulation T of the Board of Governors of the Federal Reserve, or similar regulatory requirements in other jurisdictions. The SEC and other self-regulated organizations ("SROs") have approved new rules permitting portfolio margining that have the effect of permitting increased leverage on securities held in portfolio margin accounts relative to non-portfolio accounts. We began offering portfolio margining to our clients in 2007. We intend to continue to meet or exceed any account level margin credit and leverage requirements mandated by the SEC, other SROs, or similar regulatory requirements in other jurisdictions as we expand the offering of portfolio margining to our clients.

The profitability of our margin lending activities depends to a great extent on the difference between interest income earned on margin loans and investments of customer cash and the interest expense paid on customer cash balances and borrowings. If short-term interest rates fall, we generally expect to receive a smaller gross interest spread, causing the profitability of our margin lending and other interest-sensitive revenue sources to decline. Short-term interest rates are highly sensitive to factors that are beyond our control, including general economic conditions

64

Table of Contents

and the policies of various governmental and regulatory authorities. In particular, decreases in the federal funds rate by the Federal Reserve System usually lead to decreasing interest rates in the U.S., which generally lead to a decrease in the gross spread we earn. This is most significant when the federal funds rate is on the low end of its historical range, as is the case now. Interest rates in Canada, Europe and Australia are also subject to fluctuations based on governmental policies and economic factors and these fluctuations could also affect the profitability of our margin lending operations in these markets.

Given the volatility of exchange rates, we may not be able to manage our currency transaction and/or translation risks effectively, or volatility in currency exchange rates may expose our financial condition or results of operations to a significant additional risk.

**Item 8.** *Financial Statements and Supplementary Data*

The Company's consolidated financial statements and supplementary data are included in pages F-2 through F-41 of this Annual Report on Form 10-K. See accompanying "Item 15. Exhibits and Financial Statement Schedules" and Index to the consolidated financial statements on page F-1.

## Quarterly results of operations (unaudited)

| Quarter Ended | Dec. 31, 2010 | Sep. 30, 2010 | Jun. 30, 2010 | Mar. 31, 2010 | Dec. 31, 2009 | Sep. 30, 2009 | Jun. 30, 2009 | Mar. 31, 2009 |
|---|---|---|---|---|---|---|---|---|
| | (In thousands, except per share data) | | | | | | | |
| **Revenues:** | | | | | | | | |
| Clearing and commission fees | $42,901 | $ 37,818 | $38,103 | $34,366 | $34,826 | $36,911 | $38,183 | $35,125 |
| Technology | 5,167 | 4,661 | 5,207 | 5,384 | 5,410 | 6,266 | 6,432 | 5,665 |
| Interest, gross | 27,105 | 22,995 | 20,078 | 20,590 | 22,246 | 25,096 | 30,841 | 22,036 |
| Other | 11,768 | 9,345 | 12,575 | 12,554 | 19,266 | 12,551 | 11,809 | 11,477 |
| Total revenues | 86,941 | 74,819 | 75,963 | 72,894 | 81,748 | 80,824 | 87,285 | 74,303 |
| Interest expense from securities operations | 6,924 | 5,024 | 4,854 | 5,467 | 7,328 | 8,601 | 10,804 | 7,546 |
| Net revenues | 80,017 | 69,795 | 71,109 | 67,427 | 74,420 | 72,223 | 76,481 | 66,757 |
| **Expenses:** | | | | | | | | |
| Employee compensation and benefits | 29,063 | 31,125 | 31,927 | 27,634 | 27,780 | 27,204 | 29,188 | 28,929 |
| Floor brokerage, exchange and clearance fees | 11,395 | 10,320 | 9,559 | 9,088 | 7,666 | 8,544 | 8,759 | 7,416 |
| Communications and data processing | 18,935 | 17,802 | 12,134 | 11,397 | 11,572 | 11,745 | 11,568 | 10,557 |
| Occupancy and equipment | 8,278 | 8,181 | 7,928 | 7,804 | 7,385 | 7,422 | 7,365 | 7,245 |
| Other expenses | 7,746 | 8,018 | 11,676 | 6,725 | 8,823 | 7,652 | 7,700 | 9,181 |
| Interest expense on long-term debt | 9,530 | 9,315 | 7,429 | 4,555 | 4,303 | 3,480 | 1,876 | 685 |
| | 84,947 | 84,761 | 80,653 | 67,203 | 67,529 | 66,047 | 66,456 | 64,013 |
| Income (loss) before income taxes | (4,930) | (14,966) | (9,544) | 224 | 6,891 | 6,176 | 10,025 | 2,744 |
| Income tax expense (benefit) | (1,726) | (5,552) | (2,176) | 85 | 2,550 | 2,309 | 3,910 | 1,056 |
| Net income (loss) | $(3,204) | $ (9,414) | $(7,368) | $  139 | $ 4,341 | $ 3,867 | $ 6,115 | $ 1,688 |
| Earnings (loss) per share — basic | $  (0.11) | $   (0.33) | $  (0.29) | $  0.01 | $   0.17 | $   0.15 | $   0.24 | $   0.07 |
| Earnings (loss) per share — diluted | $  (0.11) | $   (0.33) | $  (0.29) | $  0.01 | $   0.17 | $   0.15 | $   0.24 | $   0.07 |
| Weighted average shares outstanding — basic | 28,394 | 28,295 | 25,830 | 25,573 | 25,491 | 25,411 | 25,329 | 25,260 |
| Weighted average shares outstanding — diluted | 28,394 | 28,295 | 25,830 | 25,704 | 25,651 | 25,765 | 25,614 | 25,300 |

App. 34

Table of Contents

**Signatures**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused the report to be signed on its behalf by the undersigned, thereunto duly authorized.

PENSON WORLDWIDE, INC.

By: /s/ PHILIP A. PENDERGRAFT
    _____
    Name:    Philip A. Pendergraft
    Title:    Chief Executive Officer

*Date:* March 3, 2011

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed by the following persons in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ ROGER J. ENGEMOEN, JR. <br> Roger J. Engemoen, Jr. | Chairman | March 3, 2011 |
| /s/ PHILIP A. PENDERGRAFT <br> Philip A. Pendergraft | Chief Executive Officer (Principal Executive Officer) and Director | March 3, 2011 |
| /s/ DANIEL P. SON <br> Daniel P. Son | Non Executive Vice Chairman and Director | March 3, 2011 |
| /s/ KEVIN W. MCALEER <br> Kevin W. McAleer | Executive Vice President & Chief Financial Officer (Principal Financial and Accounting Officer) | March 3, 2011 |
| /s/ JAMES S. DYER <br> James S. Dyer | Director | March 3, 2011 |
| /s/ DAVID JOHNSON <br> David Johnson | Director | March 3, 2011 |
| /s/ THOMAS R. JOHNSON <br> Thomas R. Johnson | Director | March 3, 2011 |
| /s/ DAVID M. KELLY <br> David M. Kelly | Director | March 3, 2011 |
| /s/ DAVID A. REED <br> David A. Reed | Director | March 3, 2011 |

69

App. 35

Table of Contents

**Report of independent registered public accounting firm**

Board of Directors and Stockholders
Penson Worldwide, Inc.
Dallas, Texas

We have audited the accompanying consolidated statements of financial condition of Penson Worldwide, Inc. (the "Company") as of December 31, 2010 and 2009 and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2010. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Penson Worldwide, Inc. at December 31, 2010 and 2009, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2010 in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Penson Worldwide, Inc.'s internal control over financial reporting as of December 31, 2010, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) and our report dated March 3, 2011, expressed an unqualified opinion thereon.

/s/ BDO USA, LLP
BDO USA, LLP

Dallas, Texas
March 3, 2011

F-2

App. 36

Table of Contents

### Report of independent registered public accounting firm

Board of Directors and Stockholders
Penson Worldwide, Inc.
Dallas, Texas

We have audited Penson Worldwide, Inc.'s (the "Company") internal control over financial reporting as of December 31, 2010, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying "Item 9A, Management's Report on Internal Control over Financial Reporting". Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Penson Worldwide, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2010, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated statements of financial condition of Penson Worldwide, Inc. as of December 31, 2010 and 2009, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2010 and our report dated March 3, 2011 expressed an unqualified opinion thereon.

/s/ BDO USA, LLP
BDO USA, LLP

Dallas, Texas
March 3, 2011

F-3

Table of Contents

**Penson Worldwide, Inc.**

**Notes to the Consolidated Financial Statements — (Continued)**

Customer related intangible assets represents customer contracts obtained as part of acquired businesses and are amortized on a straight-line basis over their estimated useful lives, ranging from 10 to 15 years. Purchased technology represents software and technology intangible assets acquired as part of acquired businesses and are amortized over their estimated useful lives, generally five years. Other is related primarily to the efutures.com domain name acquired with First Capitol Group LLC ("FCG") which has an indefinite life and a non-compete agreement with an estimated useful life of 11 years. Intangible assets are included in other assets. Amortization expense related to intangible assets was approximately $3,247, $3,136 and $4,132 in 2010, 2009 and 2008, respectively. The Company estimates that amortization expense will be approximately $4,081 in 2011, $3,744 in 2012, $3,729 in 2013 and 2014 and $3,718 in 2015.

*Financing Costs* — Financing costs associated with the Company's debt financing arrangements are capitalized and amortized over the life of the related debt in compliance with the effective interest method of the FASB Codification.

*Operating Leases* — Rent expense is provided on operating leases evenly over the applicable lease periods taking into account rent holidays. Amortization of leasehold improvements is provided evenly over the lesser of the estimated useful life or expected lease terms.

*Stock-Based Compensation* — The Company's accounting for stock-based employee compensation plans focuses primarily on accounting for transactions in which an entity exchanges its equity instruments for employee services, and carries forward prior guidance for share-based payments for transactions with non-employees. The compensation cost is based upon the original grant-date fair value of the grant. The Company recognizes expense relating to stock-based compensation on a straight-line basis over the requisite service period which is generally the vesting period. Forfeitures of unvested stock grants are estimated and recognized as a reduction of expense.

*Management's Estimates and Assumptions* — The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the period. Actual results could differ from those estimates. The Company reviews all significant estimates affecting the consolidated financial statements on a recurring basis and records the effect of any necessary adjustments prior to their issuance.

*Cash and Cash Equivalents* — The Company considers cash equivalents to be highly liquid investments with original maturities of less than 90 days that are not held for sale in the ordinary course of business. Assets segregated for regulatory purposes are not included as cash and cash equivalents for purposes of the consolidated statements of cash flows because such assets are segregated for the benefit of customers only.

*Securities Owned and Securities Sold, Not Yet Purchased* — The Company has classified its investments in securities owned and securities sold, not yet purchased as "trading" and has reported those investments at their fair values in the consolidated statements of financial condition. Unrealized gains or losses are included in earnings.

*Fair Value of Financial Instruments* — The financial instruments of the Company are reported on the consolidated statements of financial condition at fair values, or at carrying amounts that approximate fair values because of the short maturity of the instruments. See Note 6 for a description of financial instruments carried at fair value.

*Allowance for Doubtful Accounts* — The Company generally does not lend money to customers or correspondents except on a fully collateralized basis. When the value of that collateral declines, the Company has the right to demand additional collateral. In cases where the collateral loses its liquidity, the Company might also demand personal guarantees or guarantees from other parties. In valuing receivables that become less than fully collateralized/unsecured balances, the Company compares the market value of the collateral and any additional guarantees to the balance of the loan outstanding and evaluates the collectability based on various qualitative

F-11

App. 38

Table of Contents

Penson Worldwide, Inc.

Notes to the Consolidated Financial Statements — (Continued)

factors. To the extent that the collateral, the guarantees and any other rights the Company has against the customer or the related introducing broker are not sufficient to cover any potential losses, then the Company records an appropriate allowance for doubtful accounts. In the ordinary course of business the Company carries less than fully collateralized/unsecured balances for which no allowance has been recorded due to the Company's judgment that the amounts are collectable. The Company monitors every account that is less than fully collateralized with liquid securities every day. The Company reviews all such accounts on a monthly basis to determine if a change in the allowance for doubtful accounts is necessary. This specific, account-by-account review is supplemented by the risk management procedures that identify positions in illiquid securities and other market developments that could affect accounts that otherwise appear to be fully collateralized. The corporate and local country risk management officers monitor market developments on a daily basis. The Company maintains an allowance for doubtful accounts that represents amounts, in the judgment of management, necessary to adequately absorb losses from known and inherent losses in outstanding receivables. Provisions made to this allowance are charged to operations based on anticipated recoverability. . The changes in the allowance for doubtful accounts during 2010, 2009 and 2008 were as follows:

| | |
|---|---:|
| Balance, December 31, 2007 | $ 6,493 |
| Bad debt expense | 2,302 |
| Write-offs | (635) |
| Balance, December 31, 2008 | 8,160 |
| Bad debt expense | 1,752 |
| Write-offs | (207) |
| Balance, December 31, 2009 | 9,705 |
| Bad debt expense | 5,185 |
| Write-offs | (713) |
| Balance, December 31, 2010 | $14,177 |

*Software Costs and Expenses* — Costs associated with software developed for internal use are capitalized based on guidance in the FASB Codification. Capitalized costs include external direct costs of materials and services consumed in developing or obtaining internal-use software and payroll for employees directly associated with, and who devote time to, the development of the internal-use software. Costs incurred in development and enhancement of software that do not meet the capitalization criteria, such as costs of activities performed during the preliminary and post-implementation stages, are expensed as incurred. Costs incurred in development and enhancements that do not meet the criteria to capitalize are activities performed during the application development stage such as designing, coding, installing and testing. The critical estimate related to this process is the determination of the amount of time devoted by employees to specific stages of internal-use software development projects. The Company reviews any impairment of the capitalized costs on a periodic basis. The Company amortizes such costs over the estimated useful life of the software, which is three to five years once the software has been placed in service. The Company capitalized software development costs of approximately $5,611, $6,880 and $5,491 in 2010, 2009 and 2008 respectively. Amortization expense related to capitalized software development costs was approximately $4,821, $2,543 and $719 for the years ended December 31, 2010, 2009 and 2008, respectively.

*Net Income (Loss) Per Share* — Net income (loss) per common share is computed by dividing net income (loss) applicable to common shares by the weighted average number of common shares outstanding during each period presented. Basic earnings (loss) per share exclude any dilutive effects of any potential common shares. Diluted net income (loss) per share considers the impact of potentially dilutive common shares, unless the inclusion of such shares would have an antidilutive effect.

F-12

App. 39

Table of Contents

**Penson Worldwide, Inc.**

**Notes to the Consolidated Financial Statements — (Continued)**

The Company deposits customers' margin account securities with lending institutions as collateral for borrowings. If a lending institution does not return a security, the Company may be obligated to purchase the security in order to return it to the customer. In such circumstances, the Company may incur a loss equal to the amount by which the market value of the security on the date of nonperformance exceeds the value of the loan from the institution.

In the event a customer fails to satisfy its obligations, the Company may be required to purchase or sell financial instruments at prevailing market prices to fulfill the customer's obligations. The Company seeks to control the risks associated with its customer activities by requiring customers to maintain margin collateral in compliance with various regulatory and internal guidelines. The Company monitors required margin levels on an intra-day basis and, pursuant to such guidelines, requires customers to deposit additional collateral or to reduce positions when necessary. Although the Company monitors margin balances on an intra-day basis in order to control our risk exposure, the Company is not able to eliminate all risks associated with margin lending.

Securities purchased under agreements to resell are collateralized by U.S. government or U.S. government-guaranteed securities. Such transactions may expose the Company to off-balance-sheet risk in the event such borrowers do not repay the loans and the value of collateral held is less than that of the underlying contract amount. A similar risk exists on Canadian government securities purchased under agreements to resell that are a part of other assets. These agreements provide the Company with the right to maintain the relationship between market value of the collateral and the contract amount of the receivable.

The Company's policy is to regularly monitor its market exposure and counterparty risk. The Company does not anticipate nonperformance by counterparties and maintains a policy of reviewing the credit standing of all parties, including customers, with which it conducts business.

For customers introduced on a fully-disclosed basis by other broker-dealers, the Company has the contractual right of recovery from such introducing broker-dealers in the event of nonperformance by the customer.

In addition, the Company has sold securities that it does not currently own and will therefore be obligated to purchase such securities at a future date. The Company has recorded these obligations in the financial statements at December 31, 2010, at fair values of the related securities and may incur a loss if the fair value of the securities increases subsequent to December 31, 2010.

**17.    Related party transactions**

The Company's chairman, Mr. Engemoen, is a significant stockholder (directly or indirectly) in, and serves as the Chairman of the Board for, SAMCO Holdings, Inc. ("SAMCO"), which owns all of the outstanding stock or equity interests, as applicable, of each of SAMCO Financial Services, Inc. ("SAMCO Financial"), SAMCO Capital Markets, Inc. ("SAMCO Capital Markets"), and SAMCO-BD, LLC ("SAMCO-BD"). SAMCO and its affiliated entities are referred to as the "SAMCO Entities." The Company currently provides technology support and other similar services to SAMCO and provides clearing services, including margin lending, to the customers of SAMCO Capital Markets. The Company had provided clearing and margin lending services to customers of SAMCO Financial prior to SAMCO Financial's termination of its broker-dealer status on December 31, 2006.

On July 18, 2006, three claimants filed separate arbitration claims with the NASD (which is now known as FINRA) against PFSI related to the sale of certain collateralized mortgage obligations by SAMCO Financial Services, Inc. ("SAMCO Financial") to its customers. In the ensuing months, additional arbitration claims were filed against PFSI and certain of our directors and officers based upon substantially similar underlying facts. These claims generally allege, among other things, that SAMCO Financial, in its capacity as broker, and PFSI, in its capacity as the clearing broker, failed to adequately supervise certain registered representatives of SAMCO Financial, and otherwise acted improperly in connection with the sale of these securities during the time period from approximately June 2004 to May 2006. Claimants have generally requested compensation for losses incurred through the depreciation in market value or liquidation of the collateralized mortgage obligations, interest on any

F-27

App. 40

Table of Contents

**Penson Worldwide, Inc.**

**Notes to the Consolidated Financial Statements — (Continued)**

losses suffered, punitive damages, court costs and attorneys' fees. In addition to the arbitration claims, on March 21, 2008, Ward Insurance Company, Inc., et al, filed a claim against PFSI and Roger J. Engemoen, Jr., the Company's Chairman of the Board, in the Superior Court of California, County of San Diego, Central District, based upon substantially similar facts. The Company has now settled, or agreed in principle to settle, all claims with respect to this matter of which the Company is aware. No further claims based on this matter are expected at this time.

Mr. Engemoen, the Company's Chairman of the Board, is the Chairman of the Board, and beneficially owns approximately 52% of the outstanding stock, of SAMCO Holdings, Inc., the holding company of SAMCO Financial and SAMCO Capital Markets, Inc. (SAMCO Holdings, Inc. and its affiliated companies are referred to as the "SAMCO Entities"). Certain of the SAMCO Entities received certain assets from the Company when those assets were split-off immediately prior to the Company's initial public offering in 2006 (the "Split-Off"). In connection with the Split-Off and through contractual and other arrangements, certain of the SAMCO Entities have agreed to indemnify the Company and its affiliates against liabilities that were incurred by any of the SAMCO Entities in connection with the operation of their businesses, either prior to or following the Split-Off. During the third quarter of 2008, the Company's management determined that, based on the financial condition of the SAMCO Entities, sufficient risk existed with respect to the indemnification protections to warrant a modification of these arrangements with the SAMCO Entities, as described below.

On November 5, 2008, the Company entered into a settlement agreement with certain of the SAMCO Entities pursuant to which the Company received a limited personal guaranty from Mr. Engemoen of certain of the indemnification obligations of various SAMCO Entities with respect to claims related to the underlying facts described above, and, in exchange, the Company agreed to limit the aggregate indemnification obligations of the SAMCO Entities with respect to certain matters described above to $2,965. Unpaid indemnification obligations of $800 were satisfied prior to February 15, 2009. Of the $800 obligation, $86 was satisfied through a setoff against an obligation owed to the SAMCO Entities by PFSI, with the balance paid in cash by December 31, 2009. Effective as of December 31, 2009, the Company and the SAMCO entities entered into an amendment to the settlement agreement, whereby SAMCO Holdings, Inc. agreed to pay an additional $133 on the last business day of each of the first six calendar months of 2010 (a total of $800). SAMCO Holdings, Inc. fully satisfied its obligations under the amendment. The SAMCO Entities remain responsible for the payment of their own defense costs and any claims from any third parties not expressly released under the settlement agreement, irrespective of amounts paid to indemnify the Company. The settlement agreement only relates to the matters described above and does not alter the indemnification obligations of the SAMCO Entities with respect to unrelated matters.

To account for liabilities related to the aforementioned claims that may be borne by the Company, a pre-tax charge of $2,350 was recorded in the third quarter of 2008 and $1.0 million in the second quarter of 2010. The Company does not anticipate further liabilities with respect to this matter.

In the general course of business, the Company and certain of its officers have been named as defendants in other various pending lawsuits and arbitration and regulatory proceedings. These other claims allege violation of federal and state securities laws, among other matters. The Company believes that resolution of these claims will not result in any material adverse effect on its business, financial condition, or results of operation.

Technology support and similar services are provided to SAMCO pursuant to the terms of a Transition Services Agreement entered into between the Company and SAMCO on May 16, 2006. That agreement was entered into at arm's length and the Company believes it to be on market terms. Clearing services are provided to SAMCO Capital Markets pursuant to the terms of a clearing agreement entered into between the Company and SAMCO Capital Markets on May 19, 2005, as amended effective December 31, 2009. That agreement, as amended, was also entered into at arm's length and is similar to clearing agreements the Company enters into from time to time with other similarly situated correspondents. The Company believes the terms to be no more favorable to SAMCO Capital Markets than what the Company would offer similarly situated correspondents. In 2009 the Company generated $105 in revenue from providing technology support and similar services to SAMCO and approximately $241 in revenue from the Company's clearing relationship with SAMCO Capital Markets.

Table of Contents

**Penson Worldwide, Inc.**

**Notes to the Consolidated Financial Statements — (Continued)**

The Company sublets space to SAMCO Capital Markets at the Company's principal offices at 1700 Pacific Avenue in Dallas, Texas and at One Penn Plaza, in New York, NY. For each sublease, SAMCO Capital Markets is required to pay the percentage of the rental expense the Company incurs equal to the percentage of space SAMCO Capital Markets occupies. The Company believes each sublease to be on market terms. In 2010, for occupying the 20th floor of the Company's Dallas office, SAMCO Capital Markets made payments totaling $122 the landlord of that property. For occupying a portion of Suite 5120 in the Company's New York office, SAMCO Capital Markets made payments totaling $169 to the landlord of that property.

Mr. Thomas R. Johnson, a member of the Company's Board of Directors, is also a member of the board of directors and the President, CEO and a stockholder of Call Now, Inc. ("Call Now"), a publicly traded company. Over the past several years, the Company has, through PFSI, its U.S. securities clearing broker-dealer subsidiary, extended margin credit to Call Now, among other of the Company's related parties. Such credit has been extended in the ordinary course of business, on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with unaffiliated third parties and had not involved more than normal risk of collectability or presented other unfavorable features.

The Company's management recently determined that certain municipal bonds underlying Call Now's margin position had suffered reduced liquidity, and began working with Call Now to restructure the margin loan. As part of the restructuring, on February 25, 2010, Call Now converted $13,922 of its outstanding margin loan into a Promissory Note in favor of the Company accumulating interest at a rate of 10% per year. On September, 16, 2010 the Promissory Note was amended and restated to reflect an additional temporary advance of $400 and certain changes consequent upon such advance. The additional advance was repaid on November 12, 2010, together with certain additional prepayments of principal and accrued interest in an aggregate amount of $1,006. The outstanding principal amount of the Promissory Note as of December 31, 2010, was $13,322 and the largest balance that Call Now has owed under the Promissory Note, including accrued interest, was $15,330. While the Company's management anticipates that all amounts currently due under the Promissory Note will be collected pursuant to the terms of the Promissory Note, effective January 1, 2011, management has determined to record interest income from Call Now obligations only on interest payments received. The unpaid principal balance of the Promissory Note, together with all accrued and unpaid interest, is due no later than February 25, 2012. Should Call Now default on its obligations under the Promissory Note, the Company may declare the principal balance together with all accrued and unpaid interest to be immediately due and payable. In connection with the Promissory Note, Call Now has assigned to the Company certain of its economic interests and in connection with the Promissory Note, pledged its interest in certain partnerships together with all assets held in the Call Now margin account to serve as additional collateral securing the loan. Mr. Thomas Johnson has no interest in the Call Now margin account or the Promissory Note, except to the extent of his approximately 4.7% ownership interest in Call Now. Mr. Johnson abstained from voting on all matters on behalf of the Company.

Effective September 1, 2010, we entered into a consulting agreement with Holland Consulting, LLC, a company controlled by our former president, Mr. Daniel P. Son. The consulting agreement was filed as Exhibit 10.2 to Form 10-Q, which was filed with the Securities and Exchange Commission on November 9, 2010. Pursuant to the terms of the consulting agreement, Mr. Son will provide consulting services through December 31, 2012, at a rate of approximately $15 per month. We believe we entered into the consulting agreement on market terms, given Mr. Son's expertise in our industry and his knowledge of our company's operations. In 2010, the Company paid approximately $58 to Holland Consulting, LLC for consulting services rendered by Mr. Son.

**18.  Employee benefit plan**

The Company sponsors a defined contribution 401(k) employee benefit plan (the "Plan") that covers substantially all U.S. employees. Under the Plan, the Company may make a discretionary contribution. All U.S. employees are eligible to participate in the Plan, based on meeting certain age and term of employment

# EXHIBIT D

Table of Contents

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# Form 10-Q

---

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Quarterly Period Ended March 31, 2011**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to**

**Commission file number. 001-32878**

---

# Penson Worldwide, Inc.

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **75-2896356** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **1700 Pacific Avenue, Suite 1400 Dallas, Texas** | **75201** |
| *(Address of principal executive offices)* | *(Zip Code)* |

---

**(214) 765-1100**

*(Registrant's telephone number, including area code)*

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☐    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐       Accelerated filer ☑       Non-accelerated filer ☐       Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐    No ☑

As of May 6, 2011, there were 28,524,496 shares of the registrant's $.01 par value common stock outstanding.

App. 44

Table of Contents

**Penson Worldwide, Inc.**

**Notes to the Unaudited Condensed Consolidated Financial Statements**
**(in thousands, except per share data or where noted)**

### 1. Basis of Presentation

*Organization and Business* — Penson Worldwide, Inc. (individually or collectively with its subsidiaries, "PWI" or the "Company") is a holding company incorporated in Delaware. The Company conducts business through its wholly owned subsidiary SAI Holdings, Inc. ("SAI"). SAI conducts business through its principal direct and indirect wholly owned operating subsidiaries including among others, Penson Financial Services, Inc. ("PFSI"), Penson Financial Services Canada Inc. ("PFSC"), Penson Financial Services Ltd. ("PFSL"), Nexa Technologies, Inc. ("Nexa"), Penson Futures, formerly known as Penson GHCO ("Penson Futures"), Penson Asia Limited ("Penson Asia") and Penson Financial Services Australia Pty Ltd ("PFSA"). Through these operating subsidiaries, the Company provides securities and futures clearing services including integrated trade execution, clearing and custody services, trade settlement, technology services, foreign exchange trading services, risk management services, customer account processing and data processing services. The Company also participates in margin lending and securities borrowing and lending transactions, primarily to facilitate clearing and financing activities.

PFSI is a broker-dealer registered with the Securities and Exchange Commission ("SEC"), a member of the New York Stock Exchange ("NYSE") and a member of the Financial Industry Regulatory Authority ("FINRA"), and is licensed to do business in all fifty states of the United States of America and certain territories. PFSC is an investment dealer registered in all provinces and territories in Canada and is a dealer member of the Investment Industry Regulatory Organization of Canada ("IIROC"). PFSL provides settlement services to the London financial community and is regulated by the Financial Services Authority ("FSA") and is a member of the London Stock Exchange. Penson Futures is a registered Futures Commission Merchant ("FCM") with the Commodity Futures Trading Commission ("CFTC") and is a member of the National Futures Association ("NFA"), various futures exchanges and is regulated in the United Kingdom by the FSA. PFSA holds an Australian Financial Services License and is a market participant of the Australian Securities Exchange ("ASX") and a clearing participant of the Australian Clearing House.

The accompanying unaudited interim condensed consolidated financial statements include the accounts of PWI and its wholly owned subsidiary SAI. SAI's wholly owned subsidiaries include among others, PFSI, Nexa, Penson Execution Services, Inc., Penson Financial Futures, Inc. ("PFFI"), GHP1, Inc. ("GHP1"), which includes its subsidiaries GHP2, LLC ("GHP2") and Penson Futures, and Penson Holdings, Inc. ("PHI"), which includes its subsidiaries PFSC, PFSL, Penson Asia and PFSA. All significant intercompany transactions and balances have been eliminated in consolidation.

The unaudited interim condensed consolidated financial statements as of and for the three months ended March 31, 2011 and 2010 contained in this Quarterly Report (collectively, the "unaudited interim condensed consolidated financial statements") were prepared in accordance with accounting principles generally accepted in the United States ("U.S. GAAP") for all periods presented.

In the opinion of management, the accompanying unaudited interim condensed consolidated statements of financial condition and related statements of operations, cash flows, and stockholders' equity include all adjustments, consisting only of normal recurring items, necessary for their fair presentation in conformity with U.S. GAAP. Certain information and footnote disclosures normally included in financial statements prepared in accordance with U.S. GAAP have been condensed or omitted in accordance with rules and regulations of the SEC. These unaudited interim condensed consolidated financial statements should be read in conjunction with the Penson Worldwide, Inc. consolidated financial statements as of and for the year ended December 31, 2010, as filed with the SEC on Form 10-K. Operating results for the three months ended March 31, 2011 are not necessarily indicative of the results to be expected for the entire year.

In connection with the delivery of products and services to its clients and customers, the Company manages its revenues and related expenses in the aggregate. As such, the Company evaluates the performance of its business

6

**Penson Worldwide, Inc.**

**Notes to the Unaudited Condensed Consolidated Financial Statements — (Continued)**

activities and evaluates clearing and commission, technology, and interest income along with the associated interest expense as one integrated activity.

The Company's cost infrastructure supporting its business activities varies by activity. In some instances, these costs are directly attributable to one business activity and sometimes to multiple activities. As such, in assessing the performance of its business activities, the Company does not consider these costs separately, but instead, evaluates performance in the aggregate along with the related revenues. Therefore, the Company's pricing considers both the direct and indirect costs associated with transactions related to each business activity, the client relationship and the demand for the particular product or service in the marketplace. As a result, the Company does not manage or capture the costs associated with the products or services sold, or its general and administrative costs by revenue line.

*Management's Estimates and Assumptions* — The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the period. Actual results could differ from those estimates. The Company reviews all significant estimates affecting the financial statements on a recurring basis and records the effect of any necessary adjustments prior to their issuance.

**2. Acquisitions**

*Acquisition of Ridge*

On November 2, 2009, the Company entered into an asset purchase agreement ("Ridge APA") to acquire the clearing and execution business of Ridge Clearing & Outsourcing Solutions, Inc. ("Ridge") from Ridge and Broadridge Financial Solutions, Inc. ("Broadridge"), Ridge's parent company. The acquisition closed on June 25, 2010, and under the terms of the Ridge APA, as later amended, the Company paid $35,189. The acquisition date fair value of consideration transferred was $31,912, consisting of 2,456 shares of PWI common stock with a fair value of $14,611 (based on our closing share price of $5.95 on that date) and a $20,578 five-year subordinated note (the "Ridge Seller Note") with an estimated fair value of $17,301 on that date (see Note 10 for a description of the Ridge Seller Note discount), payable by the Company bearing interest at an annual rate equal to 90-day LIBOR plus 5.5%.

The Company recorded a liability of $4,089 attributable to the estimated fair value of contingent consideration to be paid 14 months and 19 months after closing (subject to extension in the event the dispute resolution procedures set forth in the Ridge APA are invoked). The amount of contingent consideration ultimately payable will be added to the Ridge Seller Note. The contingent consideration is primarily composed of two categories. The first category includes a group of correspondents that had not generated at least six months of revenue as of May 31, 2010 ("Stub Period Correspondents"). Twelve months after closing a calculation will be performed to adjust the estimated annualized revenues as of May 31, 2010 to the actual annualized revenues based on a six-month review period as defined in the Ridge APA ("Stub Period Revenues"). The Ridge Seller Note will be adjusted 14 months after closing based on .9 times the difference between the estimated and actual annualized revenues. As of December 31, 2010, all of the correspondents in this category had generated at least six months of revenues. The Company reduced its contingent consideration liability by $343, which was included in other expenses in the consolidated statements of operations for the year ended December 31, 2010. The second category includes a group of correspondents that had not yet begun generating revenues ("Non-revenue Correspondents") as of May 31, 2010. A calculation will be performed 15 months after closing to determine the annualized revenues, based on a six-month review period, for each such non revenue correspondent ("Non-revenue Correspondent Revenues"). The Ridge Seller Note will be adjusted 19 months after closing by an amount equal to .9 times the Non-revenue Correspondent Revenues. The estimated undiscounted range of outcomes for this category is $4,000 to $5,000. There is no limit to the consideration to be paid.

7

Table of Contents

**Penson Worldwide, Inc.**

**Notes to the Unaudited Condensed Consolidated Financial Statements — (Continued)**

6. **Receivable from and payable to broker-dealers and clearing organizations**

Amounts receivable from and payable to broker-dealers and clearing organizations consists of the following:

|  | March 31, 2011 | December 31, 2010 |
|---|---|---|
| Receivable: |  |  |
| Securities failed to deliver | $ 199,540 | $ 64,233 |
| Receivable from clearing organizations | 363,722 | 192,803 |
|  | $ 563,262 | $ 257,036 |
| Payable: |  |  |
| Securities failed to receive | $ 167,085 | $ 60,767 |
| Payable to clearing organizations | 404,436 | 67,769 |
|  | $ 571,521 | $ 128,536 |

Receivables from broker-dealers and clearing organizations include amounts receivable for securities failed to deliver, amounts receivable from clearing organizations relating to open transactions, good-faith and margin deposits, and floor-brokerage receivables.

Payables to broker-dealers and clearing organizations include amounts payable for securities failed to receive, amounts payable to clearing organizations on open transactions, and floor-brokerage payables. In addition, the net receivable or payable arising from unsettled trades is reflected in these categories.

7. **Receivable from and payable to customers and correspondents**

Receivable from and payable to customers and correspondents include amounts due on cash and margin transactions. Securities owned by customers and correspondents are held as collateral for receivables. This collateral includes financial instruments that are actively traded with valuations based on quoted prices and financial instruments in illiquid markets with valuations that involve considerable judgment. Such collateral is not reflected in the consolidated financial statements. Payable to correspondents also includes commissions due on customer transactions.

The Company generally does not lend money to customers or correspondents except on a fully collateralized basis. When the value of that collateral declines, the Company has the right to demand additional collateral. In cases where the collateral loses its liquidity, the Company might also demand personal guarantees or guarantees from other parties. In certain circumstances it may be necessary to acquire third party valuation reports for illiquid financial instruments held as collateral. These reports are used to assist management in its assessment of the collectability of its receivables. In valuing receivables that become less than fully collateralized/unsecured balances, the Company compares the market value of the collateral and any additional guarantees to the balance of the loan outstanding and evaluates the collectability based on various qualitative factors. To the extent that the collateral, the guarantees and any other rights the Company has against the customer or the related introducing broker are not sufficient to cover any potential losses, then the Company records an appropriate allowance for doubtful accounts. In the ordinary course of business the Company carries less than fully collateralized/unsecured balances for which no allowance has been recorded due to the Company's judgment that the amounts are collectable. The Company monitors every account that is less than fully collateralized with liquid securities every trading day. The Company reviews all such accounts on a monthly basis to determine if a change in the allowance for doubtful accounts is necessary. This specific, account-by-account review is supplemented by the risk management procedures that identify positions in illiquid securities and other market developments that could affect accounts that otherwise appear to be fully collateralized. The corporate and local country risk management officers monitor market developments on a daily basis. The Company maintains an allowance for doubtful accounts that

13

Penson Worldwide, Inc.

Notes to the Unaudited Condensed Consolidated Financial Statements — (Continued)

represents amounts, in the judgment of management, necessary to adequately absorb losses from known and inherent losses in outstanding receivables. Provisions made to this allowance are charged to operations based on anticipated recoverability.

The Company generally nets receivables and payables related to its customers' transactions on a counterparty basis pursuant to master netting or customer agreements. It is the Company's policy to settle these transactions on a net basis with its counterparties. The Company generally recognizes interest income on an accrual basis as it is earned. At March 31, 2011 and December 31, 2010, the Company had approximately $96,896 and $97,427 in receivables ("Nonaccrual Receivables"), respectively, primarily from customers and correspondents, that were substantially collateralized and considered collectable, for which interest income was being recorded only when received.

With respect to the Nonaccrual Receivables, at March 31, 2011, approximately $42,580 were collateralized by bonds issued by the Retama Development Corporation ("RDC") and certain other interests in the horse racing track and real estate project "(Project)" financed by the RDC's bonds. In each case these are owned by customers and pledged to the Company and/or its affiliates. Certain related parties to the Company own approximately $14,745 of RDC bonds that are pledged to the Company and/or its affiliates (see Note 17 to our December 31, 2010 consolidated financial statements as filed with the SEC on Form 10-K) . There are a number of factors potentially affecting the value of the Project and the Nonaccrual Receivables related thereto including potential legislation in the Texas Legislature that could expand gambling privileges at the Project. Should such legislation be enacted there should be a positive impact on the value of the Project and therefore upon the collateral underlying related Nonaccrual Receivables. However, should such legislation not be enacted, depending on other factors potentially impacting the Project and related Nonaccrual Receivables, it is possible that the value of the collateral associated with the Project and related Nonaccrual Receivables might be impaired, resulting in a write down of a portion of these receivables that could be material in amount.

8. **Securities owned and securities sold, not yet purchased**

Securities owned and securities sold, not yet purchased consist of trading and investment securities at quoted market if available, or fair values as follows:

|  | March 31, 2011 | December 31, 2010 |
|---|---|---|
| Securities Owned: |  |  |
| Corporate equity | $ 367 | $ 290 |
| Listed option contracts | 95 | 168 |
| Corporate debt | 88,464 | 79,404 |
| Certificates of deposit and term deposits | 26,732 | 24,432 |
| U.S. federal and agency securities | 49,867 | 49,997 |
| Canadian government obligations | 41,189 | 46,904 |
|  | $ 206,714 | $ 201,195 |
| Securities Sold, Not Yet Purchased: |  |  |
| Corporate equity | $ 580 | $ 264 |
| Listed option contracts | 158 | 287 |
| Corporate debt | 81,052 |  |
| U.S. federal | — | 90,870 |
| Canadian government obligations | 38,719 | 24,495 |
|  | $ 120,509 | $ 115,916 |

14

Table of Contents

Item 1A.   *Risk Factors*

*Expansion of our business into new markets and increasing diversification of our client base increases our exposure to risks associated with those markets and clients.*

Expansion of our business exposes us to an increasingly diversified client and counterparty base and to new asset classes and new markets. As we continue to expand our presence and operations in foreign markets, such as Australia, Asia and Europe, we will be increasingly exposed to market risks associated with those countries and, especially if we have significant local market share, to the local regulatory and legal authorities. Similarly, the diversification of our product offering increases our exposure to the risks associated with new markets. For example, the expansion of our futures business increases our exposure to risks associated with the volatility and leverage associated with the commodities market, as demonstrated by dramatic recent volatility in certain metal and oil commodities. We have also experienced an expansion of our retail and direct client business, which increases our exposure to the legal and regulatory risks associated with servicing a retail client base. This expansion and diversification of our business also diversifies the market, regulatory, compliance, currency and reputational risk that we need to monitor and manage. If we are unable to develop and implement effective additional procedures to manage such risks on a global basis, we could experience a negative impact on our risk profile.

*Our margin lending business subjects us to credit risks and if we are unable to liquidate an investor's securities when the margin collateral becomes insufficient, the profitability of our business may suffer.*

With respect to the Nonaccrual Receivables, at March 31, 2011, (see Note 7 to our unaudited interim condensed consolidated financial statements) approximately $42.6 million were collateralized by bonds issued by the Retama Development Corporation ("RDC") and certain other interests in the horse racing track and real estate project "(Project)" financed by the RDC's bonds. In each case these are owned by customers and pledged to the Company and/or its affiliates. Certain related parties to the Company own approximately $14.7 million of RDC bonds that are pledged to the Company and/or its affiliates (see Note 17 to our December 31, 2010 consolidated financial statements as filed with the SEC on Form 10-K) . There are a number of factors potentially affecting the value of the Project and the Nonaccrual Receivables related thereto including potential legislation in the Texas Legislature that could expand gambling privileges at the Project. Should such legislation be enacted there should be a positive impact on the value of the Project and therefore upon the collateral underlying related Nonaccrual Receivables. However, should such legislation not be enacted, depending on other factors potentially impacting the Project and related Nonaccrual Receivables, it is possible that the value of the collateral associated with the Project and related Nonaccrual Receivables might be impaired, resulting in a write down of a portion of these receivables that could be material in amount.

In addition to the other information set forth in this report and the risk factors discussed in this report, you should carefully consider the factors discussed under the heading "Risk Factors" in our Annual Report on Form 10-K filed with the SEC on March 3, 2011, which could materially affect our business operations, financial condition or future results. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial also may materially adversely affect our business operations and/or financial condition.

Item 2.   *Unregistered Sales of Equity Securities and Use of Proceeds*

The following table sets forth the repurchases we made during the three months ended March 31, 2011 for shares withheld to cover tax-withholding requirements relating to the vesting of restricted stock units issued to employees pursuant to the Company's shareholder-approved stock incentive plan:

| Period | Total Number of Shares Repurchased | | Average Price Paid per Share |
|---|---|---|---|
| January | 3,693 | $ | 4.88 |
| February | 12,030 | | 5.07 |
| March | 5,491 | | 6.68 |
| Total | 21,214 | $ | 5.46 |

36

Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

PENSON WORLDWIDE, INC.

/s/  Philip A. Pendergraft
_____
Philip A. Pendergraft
*Chief Executive Officer*
*and principal executive officer*

Date: May 9, 2011

/s/  Kevin W. McAleer
_____
Kevin W. McAleer
*Executive Vice President, Chief Financial Officer*
*and principal financial and accounting officer*

Date: May 9, 2011

38

App. 50

# EXHIBIT E

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

# FORM 8-K

### CURRENT REPORT
### PURSUANT TO SECTION 13 OR 15 (d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of Earliest Event Reported): May 12, 2011

# Penson Worldwide, Inc.
### (Exact Name of Registrant as Specified in Charter)

| | | |
|---|---|---|
| Delaware | 001-32878 | 75-2896356 |
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| | |
|---|---|
| 1700 Pacific Avenue, Suite 1400, Dallas, Texas | 75201 |
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code 214-765-1100

Check the appropriate box below if the Form 8-K is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions ( see General Instruction A.2. below):

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12(b) under the Exchange Act (17 CFR 240.14-12(b))

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 5.02  Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On May 12, 2011, Mr. Thomas R. Johnson delivered notice of his immediate resignation as a member of the Board of Directors of Penson Worldwide, Inc. (the "Company"). Mr. Johnson's resignation was not due to any disagreement with the Company on any matter related to the Company's operations, policies or practices.

**Item 7.01  Regulation FD Disclosure.**

On May 12, 2011, the Company issued a press release related to disclosure contained in its Form 10-Q, filed with the Securities and Exchange Commission on May 9, 2011.

Pursuant to General Instruction B.2 of Form 8-K, all of the information contained in this Item 7.01 shall be deemed to be "furnished" and not "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934, as amended, and, therefore, shall not be incorporated by reference in any filing under the Securities Act of 1933, as amended.

**Item 9.01.  Financial Statements and Exhibits.**

(d) *Exhibits*.

99.1       Press release, dated May 12, 2011.


SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

PENSON WORLDWIDE, INC.

Date: May 12, 2011

/s/ Philip A. Pendergraft
Name:  Philip A. Pendergraft
Title:    Chief Executive Officer

Exhibit 99.1

**Penson Worldwide, Inc. Says Market Activity Related to Non Accrual Receivables**

Dallas, TX, May 12, 2011 — Penson Worldwide, Inc. (NASDAQ: PNSN) today said it believes that the recent declines in its stock price appear to be related to its recent Form 10-Q disclosure of a concentrated collateral position associated with Retama Development Corporation related receivables. The Company currently expects to resolve this situation without a loss, but even if a loss were realized, Penson said it would have no impact on the Company's solid regulatory capital or sound financial condition.

As reported in the Company's Form 10-Q, as filed with the Securities and Exchange Commission on May 9, 2011, Penson has approximately $42.6 million in non accruing receivables collateralized by securities related to the Retama Development Authority, which have declined in liquidity.

The $42.6 million of receivables represent only 0.49% of Penson's $8.7 billion in average daily customer balances during the first quarter of 2011. Penson regularly reviews the value of the collateral, including a recent third party appraisal of the real estate underlying the Retama facility.

As of the end of March, Penson operating companies had more than $100 million in excess regulatory capital, which already reflects the deduction of these illiquid receivables. Penson companies also held more than $5.8 billion in cash or cash equivalents at the end of the March quarter.

"We believe the activity of the Company's stock related to the Retama related collateral is unwarranted. We hope this news release will aid in putting this issue to rest," said Philip A. Pendergraft, Chief Executive Officer. "Penson Worldwide remains strongly financed, with ample excess regulatory capital and a solid business, and none of this affects or involves any correspondents or their customers. We continue to move ahead with our 2011 plan, which calls for reducing quarterly losses and generating a small profit (excluding first quarter non-operating items) for the year."

The Company also announced the resignation of Thomas R. Johnson from its Board of Directors. Based on Mr. Johnson's position as chief executive officer of Call Now, Inc, a holder of a portion of the Retama related collateral, both Mr. Johnson and the Company felt it appropriate for him to resign his position at this time.

**About Penson Worldwide:** www.penson.com

The Penson Worldwide group of companies provides execution, clearing, custody, settlement and technology infrastructure products and services to financial services firms and others servicing the global financial services industry. The Penson Worldwide group of companies includes Penson Financial Services, Inc., Penson Financial Services Canada Inc., Penson Financial Services Ltd., Nexa Technologies, Inc., Penson Futures, Penson Asia Limited, and Penson Financial Services Australia Pty Ltd, among other companies. Headquartered in Dallas, Texas, Penson has served the clearing needs of the global financial services industry since 1995. Penson Worldwide — Building the Best Clearing and Execution Services Firm in the World.

Penson Financial Services, Inc. is a member of FINRA, New York Stock Exchange, NYSE Arca Exchange, NYSE Amex Equities, NYSE Amex Options, BATS Exchange, Direct Edge Exchanges (EDGA and EDGX), Chicago Board Options Exchange (CBOE), Chicago Stock Exchange, International Securities Exchange (ISE), NASDAQ OMX BX, NASDAQ OMX PHLX, NASDAQ Stock Market, NASDAQ LIFFE, LLC, National Stock Exchange, Options Clearing Corp. (OCC), Fixed Income Clearing Corp. (FICC), MSRB, National Securities Clearing Corp. (NSCC), DTC, ICMA, Euroclear, and SIPC. Penson Financial Services Canada Inc. is a participating organization with the Toronto Stock Exchange, the Montreal Exchange, the CNQ Exchange and the TSX Venture Exchange, is regulated by the Investment Industry Regulatory Organization of Canada, is a member of the CIPF, CDCC and CDS and subscribes to various Canadian Alternative Trading Systems. Penson Financial Services Ltd. is a member of the London Stock Exchange, Chi-X Europe, BATS

App. 54

Europe, NYSE Arca, NYSE Euronext, and SmartPool, and is authorized and regulated by the Financial Services Authority. Penson Financial Services Australia Pty Ltd holds an Australian Financial Services License and is a Participant of ASX Limited, Australian Clearing House Pty Limited, and ASX Settlement and Transfer Corporation Pty Limited. Penson Futures is a registered Futures Commission Merchant and clearing member at the Chicago Mercantile Exchange, Chicago Board of Trade, New York Mercantile Exchange, Kansas City Board of Trade, Minneapolis Board of Trade, NYSE Liffe US, NYSE Euronext LIFFE, ONEChicago, ICE Futures Europe and ICE Futures USA.

**Forward-Looking Statements**

Statements contained in this news release that are not based on current or historical fact are forward-looking in nature. Such forward-looking statements are based on current plans, estimates and expectations. Forward-looking statements are based on known and unknown risks, assumptions, uncertainties and other factors. Actual results, performance, or achievements may differ materially from any future results, performance, or achievements expressed or implied by such forward-looking statements. Penson undertakes no obligation to publicly update or revise any forward-looking statement.

**Contacts**

Gary Fishman (gary.fishman@anreder.com), Steven Anreder (steven.anreder@anreder.com), or Michael Shallo (michael.shallo@anreder.com), of Anreder & Company, at +1-212-532-3232

App. 55