# EXHIBIT F

<u>Table of Contents</u>

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

# FORM 8—K

### CURRENT REPORT
### Pursuant to Section 13 OR 15(d) of the Securities Exchange Act of 1934

**Date of Report (Date of Earliest Event Reported): August 4, 2011**

# Penson Worldwide, Inc.
#### (Exact Name of Registrant as Specified in Charter)

| Delaware | 001-32878 | 75-2896356 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| 1700 Pacific Avenue, Suite 1400, Dallas, Texas | 75201 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code (214) 765-1100

Not Applicable
(Former name and former address, if changed since last report)

Check the appropriate box below if the Form 8-K is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions ( <u>see</u> General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

App. 57

Table of Contents

**Item 1.01 Entry into a Material Definitive Agreement.**

On August 4, 2011, Penson Worldwide, Inc. (the "Company") entered into a Second Amendment (the "Second Amendment") to its Second Amended and Restated Credit Agreement, dated as of May 6, 2010, with Regions Bank, as Administrative Agent, Swing Line Lender and Letter of Credit Issuer, the lenders party thereto and other parties thereto (the "Credit Agreement"). The Second Amendment, among other things, reduces the aggregate commitments under the Credit Agreement to $50,000,000, revises certain financial covenants, adjusts the timing of the clean down provisions of the Credit Agreement that require a periodic pay down of outstanding loans, and provides for prepayments, subject to certain conditions set forth in the Second Amendment, upon certain dispositions and certain increases in capital. The Second Amendment also amends certain other covenants to provide additional flexibility for the realization, by the Company and its subsidiaries, upon collateral held by the Company or its subsidiaries.

**Item 2.02 Results of Financial Operations.**

Penson Worldwide, Inc. issued two press releases on August 4, 2011 reflecting earnings information for the quarter ended June 30, 2011 and a description of certain of the Company's strategic initiatives.

Pursuant to General Instruction B.2 of Form 8-K, the information contained in Item 2.02 of this Form 8-K and the accompanying exhibits reflecting the Company's earnings information shall be deemed to be "furnished" and not "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934, as amended, and, therefore, shall not be incorporated by reference in any filing under the Securities Act of 1933, as amended.

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On August 4, 2011, Mr. Bryce B. Engel was appointed as the President and Chief Operating Officer of the Company. In this capacity, Mr. Engel's responsibilities will include direct supervision of all of the Company's operating subsidiaries and global technology. In addition, Mr. Engel was appointed to the Company's Global Executive Committee. Prior to this appointment, Mr. Engel served as the Company's EVP — International Operations since joining the Company in March, 2009.

On August 4, 2011, Mr. C. William Yancey was also appointed to the Company's Global Executive Committee. Mr. Yancey will continue as the President and Chief Executive Officer of the Company's domestic securities clearing subsidiary, which position he has held since joining the Company in August, 2005.

**Item 9.01. Financial Statements and Exhibits.**

(d) *Exhibits*.

99.1        Press release, dated August 4, 2011.

99.2        Press release, dated August 4, 2011.

Table of Contents

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

PENSON WORLDWIDE, INC.

Date: August 4, 2011

/s/ Philip A. Pendergraft
Name:  Philip A. Pendergraft
Title:   Chief Executive Officer

Exhibit 99.1

**Penson Worldwide, Inc.**
1700 Pacific Avenue, Suite 1400
Dallas, Texas 75201
www.penson.com



**PRESS RELEASE**

**Penson Worldwide, Inc. Reports Results for Second Quarter Ended June 30, 2011**

DALLAS, TX, August 4, 2011 — Penson Worldwide, Inc. (NASDAQ: PNSN) announced results for the quarter ended June 30, 2011, including a substantial non-cash write down of nonaccrual receivables. Separately, the Company also announced a series of strategic initiatives already underway designed to reduce costs and debt, increase profitability and capital, better position the Company for growth, and enhance shareholder value. In conjunction with this news release, Penson intends to issue a news release with respect to these strategic initiatives.

**2Q11 Financial Summary**

Net revenues of $78.5 million declined 5% from the first quarter ended March 31, 2011, reflecting generally soft industry-wide trading volumes, partially offset by new business and increased stock lending activity. Operating expenses declined 3%, to $84.1 million, resulting in a loss from operations of $3.5 million net of tax, equal to ($0.12) per share.

In addition, the Company recorded a non-cash write down of $43.0 million, equal to $26.7 million or ($0.94) per share net of tax, against $96.6 million of nonaccrual receivables. The write down was recorded in conjunction with Penson's initiation of foreclosure proceedings on the majority of the collateral underlying these receivables, including, but not solely related to, certain assets associated with the Retama Development Corporation, and shares of Penson Worldwide stock. The write down resulted from an updated evaluation of these receivables' collectability based on new appraisals of the underlying collateral, and the impact on the collateral of the recent Texas Legislative Session, which ended on June 29, 2011 with no legislation passed to expand gaming activities at racetracks in the State. Because the nonaccrual receivables have already been fully deducted from regulatory capital, this write down of these receivables should not have any impact on the liquidity or capital resources of the Company's operating companies.

Including this non-cash write down, the net loss for the second quarter was $30.2 million, equal to ($1.06) per share, as compared to a net loss of $2.9 million, or ($0.10) per share, for the first quarter.

**CEO Comment**

"While we are very disappointed in our quarterly loss and the non-cash write down, I want to emphasize that these results have no effect on Penson's ability to continue our service to our correspondents and their customers, and that our Company remains solid, both operationally and financially," said Philip A. Pendergraft, Chief Executive Officer.

*For Immediate Release*

App. 60

"During the second quarter, Penson was profitable on a cash basis and generated more than $10 million in Adjusted EBITDA. On June 30, 2011, we had $138.6 million of excess regulatory capital worldwide. Nonetheless, we are determined to return Penson to profitability on a GAAP basis and to increase shareholder value, and so we have already begun implementing a series of strategic initiatives that we anticipate will bring this about."

*Additional 2Q11 Detail*

- The Company generated Adjusted EBITDA (earnings before interest, income taxes, depreciation, amortization, stock-based compensation and the non-cash write down of nonaccrual receivables) of $10.3 for the quarter and $22.2 million for the six months ended June 30, 2011.

- Operating expenses included $7.7 million of non-cash items, equal to $4.8 million net of tax. Excluding these items from operating results, Penson had a cash profit of $1.2 million for the quarter and $3.5 million for the six months ended June 30, 2011.

- Penson operating companies had excess regulatory capital of $138.6 million at June 30, 2011. Penson Financial Services, Inc., the Company's largest subsidiary, ended the quarter with $159.5 million in regulatory capital, approximately $109.3 million in excess of its regulatory requirements.

- Penson operating companies on June 30, 2011 had $6.4 billion in cash and cash equivalents, segregated cash and securities, and deposits with clearing organizations, up $47.5 million from March 31, 2011. Average customer balances were $9.1 billion, up $330.2 million on a sequential quarter basis.

- Penson continued to add new correspondents. The Company ended the quarter with 452 revenue-generating correspondents compared to 437 at the end of the first quarter. Penson securities clearing operations increased a net 15, for a total of 390, while Penson Futures remained level at 62. As of June 30, 2011, there was a "pipeline" of 34 new correspondents signed, but not yet contributing to revenues.

- Based on the size and composition of Penson's interest-earning and interest-paying average balances for the quarter, the Company estimates that each 25 basis point increase in the federal funds rate would increase net interest revenue by approximately $1.3 million per quarter.

*Conference Call*

Penson will host a conference call on Friday, August 5, 2011, at 10:00 AM Eastern Time (9:00 AM Central Time) to discuss this news release and other related subjects. The call will be accessible live via a webcast on the Penson Investor Relations section of www.penson.com along with supporting materials. A webcast replay will be available shortly thereafter. Access the webcast link in advance to download any necessary software.

**Non-GAAP Financial Measures**

The Company uses certain non-GAAP measures of financial performance to supplement the unaudited financial statements presented in accordance with GAAP. The Company presents non-GAAP measures when we believe that the additional information is useful and meaningful to investors. Non-GAAP measures do not have any standardized meaning and are therefore unlikely to be comparable to similar measures presented by other companies. The presentation of non-GAAP measures is not intended to be a substitute for, and should not be considered in isolation from, the financial measures reported in accordance with GAAP.

*Page 2 of 8*

EBITDAS (earnings before interest, taxes, depreciation, amortization and stock-based compensation) is considered a non-GAAP financial measure as defined by SEC Regulation G. The Company considers EBITDAS an important measure of our financial performance and of our ability to generate cash flows to service debt, fund capital expenditures and fund other corporate investing and financing activities. EBITDAS eliminates the non-cash effect of tangible asset depreciation and amortization, intangible asset amortization and stock-based compensation.

The Company also considers "Adjusted EBITDA" (another non-GAAP financial measure as defined by SEC Regulation G) an important measure of our financial performance and of our ability to generate cash flows to service debt, fund capital expenditures and fund other corporate investing and financing activities. "Adjusted EBITDA" eliminates the effect in the second quarter 2011 and six months ended June 30, 2011 of the non-cash write down of nonaccrual receivables and stock-based compensation. EBITDAS and "Adjusted EBITDA" should be considered in addition to, rather than as a substitute for, pre-tax income, net income and cash flows from operating activities.

**About Penson Worldwide**: www.penson.com

The Penson Worldwide group of companies provides execution, clearing, custody, settlement and technology infrastructure products and services to financial services firms and others servicing the global financial services industry. The Penson Worldwide group of companies includes Penson Financial Services, Inc., Penson Financial Services Canada Inc., Penson Financial Services Ltd., Nexa Technologies, Inc., Penson Futures, Penson Asia Limited, and Penson Financial Services Australia Pty Ltd, among other companies. Headquartered in Dallas, Texas, Penson has served the clearing needs of the global financial services industry since 1995. *Penson Worldwide — Building the Best Clearing and Execution Services Firm in the World.*

**Penson Financial Services, Inc.** is a member of FINRA, New York Stock Exchange, NYSE Arca Exchange, NYSE Amex Equities, NYSE Amex Options, BATS Exchange, Direct Edge Exchanges (EDGA and EDGX), Chicago Board Options Exchange (CBOE), Chicago Stock Exchange, International Securities Exchange (ISE), NASDAQ OMX BX, NASDAQ OMX PHLX, NASDAQ Stock Market, NASDAQ LIFFE, LLC, National Stock Exchange, Options Clearing Corp. (OCC), Fixed Income Clearing Corp. (FICC), MSRB, National Securities Clearing Corp. (NSCC), DTC, ICMA, Euroclear, and SIPC. **Penson Financial Services Canada Inc.** is a participating organization with the Toronto Stock Exchange, the Montreal Exchange, the CNSX Exchange and the TSX Venture Exchange, is regulated by the Investment Industry Regulatory Organization of Canada, is a member of the CIPF, CDCC and CDS and subscribes to various Canadian Alternative Trading Systems. **Penson Financial Services Ltd.** is a member of the London Stock Exchange, Chi-X Europe, BATS Europe, NYSE Arca, NYSE Euronext, and SmartPool, and is authorized and regulated by the Financial Services Authority. **Penson Financial Services Australia Pty Ltd** holds an Australian Financial Services License and is a Participant of ASX Limited, Australian Clearing House Pty Limited, and ASX Settlement and Transfer Corporation Pty Limited. **Penson Futures** is a registered Futures Commission Merchant and clearing member at the Chicago Mercantile Exchange, Chicago Board of Trade, New York Mercantile Exchange, Kansas City Board of Trade, Minneapolis Board of Trade, NYSE Liffe US, NYSE Euronext LIFFE, ONEChicago, ICE Futures Europe and ICE Futures USA.

*Page 3 of 8*

**Forward-Looking Statements**

Statements contained in this news release that are not based on current or historical fact are forward-looking in nature. Such forward-looking statements are based on current plans, estimates and expectations. Forward-looking statements are based on known and unknown risks, assumptions, uncertainties and other factors. Actual results, performance, or achievements may differ materially from any future results, performance, or achievements expressed or implied by such forward-looking statements. Penson undertakes no obligation to publicly update or revise any forward-looking statement.

**Contacts:** Gary Fishman (gary.fishman@anreder.com), Steven Anreder (steven.anreder@anreder.com), or Michael Shallo (michael.shallo@anreder.com), of Anreder & Company, at +1-212-532-3232

*Page 4 of 8*

# EXHIBIT G

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

---

# Form 10-Q

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Quarterly Period Ended June 30, 2011**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to**

**Commission file number. 001-32878**

---

# Penson Worldwide, Inc.
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **75-2896356** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **1700 Pacific Avenue, Suite 1400** | **75201** |
| **Dallas, Texas** | *(Zip Code)* |
| *(Address of principal executive offices)* | |

**(214) 765-1100**
*(Registrant's telephone number, including area code)*

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐        Accelerated filer ☑        Non-accelerated filer ☐        Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐   No ☑

As of August 5, 2011, there were 27,606,392 shares of the registrant's $.01 par value common stock outstanding.

Table of Contents

**Penson Worldwide, Inc.**

**Notes to the Unaudited Condensed Consolidated Financial Statements — (Continued)**

**6.  Receivable from and payable to broker-dealers and clearing organizations**

Amounts receivable from and payable to broker-dealers and clearing organizations consists of the following:

| | June 30, 2011 | December 31, 2010 |
|---|---|---|
| Receivable: | | |
| Securities failed to deliver | $142,588 | $ 64,233 |
| Receivable from clearing organizations | 271,453 | 192,803 |
| | $414,041 | $ 257,036 |
| Payable: | | |
| Securities failed to receive | $129,852 | $ 60,767 |
| Payable to clearing organizations | 530,369 | 67,769 |
| | $660,221 | $ 128,536 |

Receivables from broker-dealers and clearing organizations include amounts receivable for securities failed to deliver, amounts receivable from clearing organizations relating to open transactions, good-faith and margin deposits, and floor-brokerage receivables.

Payables to broker-dealers and clearing organizations include amounts payable for securities failed to receive, amounts payable to clearing organizations on open transactions, and floor-brokerage payables. In addition, the net receivable or payable arising from unsettled trades is reflected in these categories.

**7.  Receivable from and payable to customers and correspondents**

Receivable from and payable to customers and correspondents include amounts due on cash and margin transactions. Securities owned by customers and correspondents are held as collateral for receivables. This collateral includes financial instruments that are actively traded with valuations based on quoted prices and financial instruments in illiquid markets with valuations that involve considerable judgment. Such collateral is not reflected in the condensed consolidated financial statements. Payable to correspondents also includes commissions due on customer transactions.

Typically, the Company's loans to customers or correspondents are made on a fully collateralized basis because they are generally margin loans and the amount advanced is less than the then current value of the margin collateral. When the value of that collateral declines, when the collateral decreases in liquidity, or margin calls are not met, the Company may consider a variety of credit enhancements such as, but not limited to, seeking additional collateral or guarantees. In certain circumstances it may be necessary to acquire third party valuation reports for illiquid financial instruments held as collateral. These reports are used to assist management in its assessment of the collectability of its receivables. In valuing receivables that become less than fully collateralized, the Company compares the estimated fair value of the collateral, deposits and any additional credit enhancements to the balance of the loan outstanding and evaluates the collectability based on various qualitative factors such as, but not limited to, the creditworthiness of the counterparty, the potential impact of any outstanding litigation or arbitration and the nature of the collateral and available realization methods. To the extent that the collateral, the guarantees and any other rights the Company has against the customer or the related introducing broker are not sufficient to cover potential losses, the Company records an appropriate allowance for doubtful accounts. In the ordinary course of business the Company carries less than fully collateralized balances for which no allowance has been recorded due to the Company's judgment that the amounts are collectable. The Company monitors every account that is less than fully collateralized with liquid securities every trading day. The Company reviews these accounts on a monthly basis to determine if a change in the allowance for doubtful accounts is necessary. This specific, account-by-account review is supplemented by the risk management procedures that identify positions in illiquid securities and other

13

App. 66

**Penson Worldwide, Inc.**

**Notes to the Unaudited Condensed Consolidated Financial Statements — (Continued)**

market developments that could affect accounts that otherwise appear to be fully collateralized. The corporate and local country risk management officers monitor market developments on a daily basis. The Company maintains an allowance for doubtful accounts that represents amounts, in the judgment of the Company, necessary to adequately reflect anticipated losses in outstanding receivables. Typically, when a receivable is deemed not to be fully collectable, it is generally reserved at an amount correlating with the amount of the balance that is considered undersecured. Provisions made to this allowance are charged to operations based on anticipated recoverability.

The Company generally nets receivables and payables related to its customers' transactions on a counterparty basis pursuant to master netting or customer agreements. It is the Company's policy to settle these transactions on a net basis with its counterparties. The Company generally recognizes interest income on an accrual basis as it is earned. Interest on margin loans is typically accrued monthly and, therefore, increases the margin loan balance reflected on the Company's financial statements. However, there may be cases when the Company believes that, while the outstanding amount of the receivable is collectable, amounts greater than the current carrying value of the loan may not be collectable. At that point the Company may elect, even though the outstanding amount of the receivable is considered collectable, to recognize interest income only when received rather than reflecting any additional accrued interest in the receivable ("Nonaccrual Receivables").

Generally, when an account has been reserved, no additional interest is accrued. Margin loan payments are generally recorded against the outstanding loan balance, which includes accrued interest. The Company's policy with regard to loans with stated terms is to apply payments as set forth in the individual loan agreement. The accrual of interest does not resume until such time as the Company has determined that the amount is fully collectable. This would be evidenced by payments on margin loans resulting in the account becoming fully secured or loans with stated terms becoming current. Margin loans become delinquent at the point that margin calls are not met while loans with stated terms become delinquent in accordance with their stated terms. When either a margin loan or a loan with stated terms becomes delinquent, the Company undertakes a collectability review and generally requires customers to deposit additional collateral or to reduce positions.

The Nonaccrual Receivables that the Company presently has are secured by a variety of collateral, consisting principally of various municipal bonds. When assessing collectability of these Nonaccrual Receivables, the Company considers a variety of factors relating to such collateral such as, but not limited to, the macroeconomic environment, the underlying value of the projects associated with the bonds, the value of assets (often real estate) held in those projects and the liquidity of the collateral. Of the Nonaccrual Receivables, at June 30, 2011, approximately $42,580 were collateralized by bonds issued by the Retama Development Corporation ("RDC") and certain other interests in the horse racing track and real estate project ("Project") financed by the RDC's bonds. In each case these bonds are owned by customers and pledged to the Company and/or its affiliates. When evaluating the value of the RDC bonds in addition to third party pricing indications the Company looked at additional factors such as, but not limited to (i) the value of the real estate and racing license rights held by the issuer, which were supported by a recent third party appraisal of the Retama property, (ii) the potential for the issuer to find additional partners (such as, but not limited to, gaming companies); and (iii) the potential expansion of gaming in Texas.

Consistent with its policy for the evaluation of collateral securing receivables from customers and correspondents, the Company continues to monitor the collateral securing the Nonaccrual Receivables. As noted above, one factor the Company looked at when evaluating the RDC bonds was the potential for expanded gaming rights in Texas. With the adjournment of the Texas Legislature on June 29, 2011 without taking up the bills that had been proposed to permit such expansion, the Company determined that, since the prospects for further consideration of legislation before the next Texas legislative session in 2013 appeared unlikely, it would be appropriate to reevaluate the value of the RDC bonds and other collateral securing the Nonaccrual Receivables. Based upon the Company's re-assessment of the value of collateral securing the Nonaccrual Receivables, including review of recent appraisals of underlying real estate and the Retama Project, among other factors, the Company's determined that the carrying value of the Nonaccrual Receivables was not fully realizable and recorded a charge of $43,000. Consequently, at

14

App. 67

Table of Contents

**Penson Worldwide, Inc.**

**Notes to the Unaudited Condensed Consolidated Financial Statements — (Continued)**

June 30, 2011 and December 31, 2010, the Company had approximately $53,648 and $97,427 in Nonaccrual Receivables, net of reserves of $45,379 and $2,379 respectively.

The Company has also determined that it is appropriate at this time to commence enforcement action in respect of certain Nonaccrual Receivables. The Company has, therefore, exercised its rights against the most liquid collateral securing these Nonaccrual Receivables, including the Company's common stock, and intends to commence foreclosure actions against certain other collateral, including certain of the RDC bonds. There can be no assurances that the Company's enforcement and/or foreclosure plans, including anticipated funding and/or other actions by third parties, will be effectuated as currently contemplated, or that the Company will be able to realize the full value on the collateral securing the Nonaccrual Receivables as is currently contemplated. Given the illiquid nature of much of the collateral, the Company anticipates that ultimate realization upon the collateral may require investment of significant time and resources, including active participation in the restructuring of the investments, in order to execute upon a plan of liquidation. The Company anticipates that in the near future it may advance $400 to the RDC. The Company would advance these funds to assist RDC in its efforts to eventually arrange a financing transaction with a third party. The Company believes such a financing transaction by RDC with a third party could benefit the value of the Company's collateral. The Company is not legally committed to advance any funds. The Company's final determination regarding any advancement of funds will be subject to further evaluation of RDC's operations and the likelihood that RDC can complete a larger financing transaction.. The Company will continue to assess the collateral value as it continues with, and in light of, its efforts to, liquidate the collateral securing these Nonaccrual Receivables

The changes in the allowance for doubtful accounts during 2011 were as follows:

| | |
|---|---:|
| Balance, December 31, 2010 | 14,177 |
| Bad debt expense | 43,338 |
| Balance, June 30, 2011 | $57,515 |

15

Table of Contents

### Occupancy and equipment

Total expenses for occupancy and equipment increased $.1 million, or 1.2%, to $8.0 million from the quarter ended June 30, 2010 to the quarter ended June 30, 2011 primarily due to higher depreciation resulting from computer equipment and software associated with our conversion to the Broadridge technology platform.

### Bad debt expense

Bad debt expense increased approximately $43.1 million primarily due to a $43.0 million write down to certain Nonaccrual receivables. Typically, our loans to customers or correspondents are made on a fully collateralized basis because they are generally margin loans and the amount advanced is less than the then current value of the margin collateral. When the value of that collateral declines, or the collateral decreases in liquidity, we consider a variety of credit enhancements such as, but not limited to, seeking additional collateral or guarantees. When valuing receivables that become less than fully collateralized, we compare what we determine to be the market value of the collateral, deposits and any additional credit enhancements to the balance of the loan outstanding and evaluate the collectability based on various qualitative factors, such as, but not limited to, the creditworthiness of the counterparty, the potential impact of any outstanding litigation or arbitration and nature of the collateral and available realization methods. We monitor every account that is less than fully collateralized with liquid securities every trading day. This specific, account-by-account review is supplemented by the risk management procedures to identify illiquid securities and other market developments that it is anticipated would affect accounts that otherwise appear to be fully collateralized. The corporate and local country risk management officers monitor market developments on a daily basis. At the culmination of this review, we record an appropriate allowance for doubtful accounts, which in our judgment is necessary to reflect anticipated losses in outstanding receivables. When a receivable is deemed not to be collectable it is generally reserved at 100% as the applicable reserve would correlate with the amount of the balance that is unsecured.

Our review of accounts receivable is an active, continuing process during which, among other factors, we seek to assess the fair value and liquidity of the assets collateralizing the receivables. As discussed in Note 7 to our unaudited interim consolidated financial statements, following the failure of the Texas legislature to enact legislation expanding gaming rights, we determined to reassess the value of the collateral securing the Nonaccrual Receivables and in particular the value of the RDC bonds. This review resulted in our determination that the carrying value of the Nonaccrual Receivables was not fully realizable and we recorded a bad debt charge of $43.0 million for the three months ended June 30, 2011. We have commenced enforcement actions with respect to certain of the Nonaccrual Receivables and realized immediate benefits from some of the more liquid collateral. Determining the ultimate collectability of illiquid collateral with multiple interested parties is necessarily a subjective determination that requires a consideration of multiple realization strategies. There can be no assurances that our enforcement and/or foreclosure plans, including anticipated funding and/or other actions by third parties, will be effectuated as currently contemplated, or that we will be able to realize the full value on the collateral securing the Nonaccrual Receivables as is currently contemplated. We recognize that it may take a significant time and investment of resources to execute upon a plan of liquidation for such illiquid collateral. We anticipate that in the near future we may advance $400,000 to the RDC. We would advance these funds to assist RDC in its efforts to eventually arrange a financing transaction with a third party. We believe such a financing transaction by RDC with a third party could benefit the value of our collateral. We are not legally committed to advance any funds. Our final determination regarding any advancement of funds will be subject to further evaluation of RDC's operations and the likelihood that RDC can complete a larger financing transaction. We will continue to assess the collateral value as we continue with, and in light of, our efforts to, liquidate the collateral securing these Nonaccrual Receivables.

### Other expenses

Other expenses decreased $4.1 million, or 35.4%, to $7.5 million from the quarter ended June 30, 2010 to the quarter ended June 30, 2011, due primarily to $2.5 million of costs associated with the closing of the Ridge transaction and $1.5 million in legal expenses to conclude certain outstanding litigation in the second quarter of 2010 as well as lower professional fees of approximately $.6 million offset by higher amortization of $.5 million associated with the Ridge acquisition.

Table of Contents

processing costs of $.8 million in our futures business attributable to costs associated with higher maintenance fees associated with its trade processing system as well as higher communications line charges.

### Occupancy and equipment

Total expenses for occupancy and equipment increased $.8 million, or 5.2%, to $16.6 million from the six months ended June 30, 2010 to the six months ended June 30, 2011 primarily due to higher depreciation resulting from computer equipment and software associated with our conversion to the Broadridge technology platform.

### Bad debt expense

Bad debt expense increased approximately $43.3 million primarily due to a $43.0 million write down to certain Nonaccrual receivables. Typically, our loans to customers or correspondents are made on a fully collateralized basis because they are generally margin loans and the amount advanced is less than the then current value of the margin collateral. When the value of that collateral declines, or the collateral decreases in liquidity, we consider a variety of credit enhancements such as, but not limited to, seeking additional collateral or guarantees. When valuing receivables that become less than fully collateralized, we compare what we determine to be the market value of the collateral, deposits and any additional credit enhancements to the balance of the loan outstanding and evaluate the collectability based on various qualitative factors, such as, but not limited to, the creditworthiness of the counterparty, the potential impact of any outstanding litigation or arbitration and nature of the collateral and available realization methods. We monitor every account that is less than fully collateralized with liquid securities every trading day. This specific, account-by-account review is supplemented by the risk management procedures to identify illiquid securities and other market developments that it is anticipated would affect accounts that otherwise appear to be fully collateralized. The corporate and local country risk management officers monitor market developments on a daily basis. At the culmination of this review, we record an appropriate allowance for doubtful accounts, which in our judgment is necessary to reflect anticipated losses in outstanding receivables. When a receivable is deemed not to be collectable it is generally reserved at 100% as the applicable reserve would correlate with the amount of the balance that is unsecured.

Our review of accounts receivable is an active, continuing process during which, among other factors, we seek to assess the fair value and liquidity of the assets collateralizing the receivables. As discussed in Note 7 to our unaudited interim consolidated financial statements, following the failure of the Texas legislature to enact legislation expanding gaming rights, we determined to reassess the value of the collateral securing the Nonaccrual Receivables and in particular the value of the RDC bonds. This review resulted in our determination that the carrying value of the Nonaccrual Receivables was not fully realizable and we recorded a bad debt charge of $43.0 million for the six months ended June 30, 2011. We have commenced enforcement actions with respect to certain of the Nonaccrual Receivables and realized immediate benefits from some of the more liquid collateral. Determining the ultimate collectability of illiquid collateral with multiple interested parties is necessarily a subjective determination that requires a consideration of multiple realization strategies. There can be no assurances that our enforcement and/or foreclosure plans, including anticipated funding and/or other actions by third parties, will be effectuated as currently contemplated, or that we will be able to realize the full value on the collateral securing the Nonaccrual Receivables as is currently contemplated. We recognize that it may take a significant time and investment of resources to execute upon a plan of liquidation for such illiquid collateral. We anticipate that in the near future we may advance $400,000 to the RDC. We would advance these funds to assist RDC in its efforts to eventually arrange a financing transaction with a third party. We believe such a financing transaction by RDC with a third party could benefit the value of our collateral. We are not legally committed to advance any funds. Our final determination regarding advancement of funds will be subject to further evaluation of RDC's operations and the likelihood that RDC can complete a larger financing transaction. We will continue to assess the collateral value as we continue with, and in light of, our efforts to, liquidate the collateral securing these Nonaccrual Receivables.

### Other expenses

Other expenses decreased $2.2 million, or 11.9%, to $16.2 million from the six months ended June 30, 2010 to the six months ended June 30, 2011, due primarily to $3.0 million of costs associated with the closing of the Ridge transaction and $1.5 million in legal expenses to conclude certain outstanding litigation in the second quarter of

App. 70

# EXHIBIT H

Westlaw.

Page 1

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas,
Dallas Division.
Patricia A. MAGRUDER, on Behalf of Herself and
All Others Similarly Situated, Plaintiffs,
v.
HALLIBURTON COMPANY, and David J. Lesar,
Defendants.

Civil Action No. 3:05–CV–1156–M.
March 31, 2009.

West KeySummary**Securities Regulation 349B**
⛛**60.51(2)**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
               349Bk60.51 In General
                  349Bk60.51(2) k. Scienter. Most
Cited Cases

    Investors failed to meet the standard for pleading scienter with particularity, in a class action for securities fraud in violation of the Securities Exchange Act. The investors alleged that an officer, who also served as a director, had access to adverse undisclosed information about the corporation's financial condition and performance and that the knowing violations of Generally Accepted Accounting Principles (GAAP) were direct evidence of the corporation's scienter. Unsupported general allegations about the existence of corporate documents that revealed or contained information that was contrary to alleged misrepresentations were insufficient as allegations of scienter. The investors were required to specifically plead corroborating information, such as the specific contents of the allegedly contrary reports, who authored the reports, who received the reports, and when they were re-

ceived. 15 U.S.C.A. § 78.

Dennis D. Gibson, James M. McCoy, Gibson McClure Wallace & Daniels, Dallas, TX, Craig M. Walker, Walker Law, Stamford, CT, J. Allen Carney, Marcus N. Bozeman, Tiffany Wyatt Oldham, Cauley Bowman Carney & Williams PLLC, Little Rock, AR, for Plaintiffs.

Brian N. Hail, Michael K. Hurst, Gruber Hurst Johansen & Hail LLP, Donald E. Godwin, Jose L. Gonzalez, Marcos G. Ronquillo, Godwin PappasLangley Ronquillo, Jessica B. Pulliam, Robb L. Voyles, Rod Phelan, Baker Botts LLP, Dallas, TX, Rebecca Robertson, Jeffrey James McNabb, David D. Sterling, Baker Botts LLP, Houston, TX, for Defendants.

*MEMORANDUM OPINION AND ORDER*
BARBARA M.G. LYNN, District Judge.

    **\*1** Before the Court are the Motions to Dismiss filed by Defendants Lesar and Halliburton [Docket Entries # 18 and # 20]. Having considered the extensive briefing, oral argument, and applicable law, the Court hereby GRANTS the Motions, insofar as they request dismissal of the Complaint for failure to satisfy the stringent requirements for pleading an action based on securities fraud, but grants Plaintiffs leave to file an amended Complaint to comply with these requirements.

*PRELIMINARY ISSUES REGARDING CLASS DEFINITION*

    Because the parties dispute several preliminary matters, including the class period, the Court will address those arguments first, and then reach the issues relevant to the Motions to Dismiss.

**A. Class Period**

    The parties dispute the end date of the class period. Defendants claim that the class period should end on May 28, 2002. Plaintiffs seek a class period ending July 22, 2002. The original suit, Case No. 3:02–CV–1152–M, filed by Richard Moore on

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

June 3, 2002, alleged a class period of July 22, 1999, until May 28, 2002. A Complaint filed by John Kimble on August 29, 2003, was consolidated into the Moore suit. Kimble's Complaint alleged a class period of September 29, 1998, to July 24, 2002.

Class counsel in the consolidated case then trimmed the class period to end on December 7, 2001. On March 24, 2005, Magruder sought to intervene, referencing the later class periods in the Moore and Kimble Complaints. On May 3, 2005, the Court allowed "Patricia Magruder or any party purporting to be injured by actions of all or some of the Defendants *after December 7, 2001,*" to file a Complaint by May 9, 2005. In the event such a Complaint was filed, the Court set a deadline for the parties to propose "what type of notice should be given to the putative class included within the *post December 7, 2001 period.*"

On May 9, 2005, Plaintiff Magruder filed a Class Action Complaint with a class period from December 8, 2001, until July 22, 2002. The same day, the consolidated plaintiffs filed a Third Amended Complaint, alleging a class period from September 29, 1998, until December 7, 2001. On June 3, 2005, the Court severed the Magruder Complaint from the consolidated action and allowed Magruder to proceed separately.[FN1]

> FN1. This Court denied class certification of the claims of the consolidated plaintiffs on November 4, 2008. However, the Court is not now deciding the issue of class certification in this case.

Magruder's First Amended Complaint, filed on April 30, 2007, alleged the same class period she earlier sought—December 8, 2001, until July 22, 2002. Defendants argue that the class period should end on May 28, 2002, because the Moore Complaint and the Third Amended Complaint in the consolidated action alleged class periods ending on or before May 28, 2002.

Plaintiffs argue that their Complaint relates back to the Kimble Complaint, which alleged a class period lasting until July 24, 2002. The Court agrees. As a result, the applicable class period is December 8, 2001, until July 22, 2002.

**B. Other Issues Regarding Class Definition**
Defendants argue that any statements or events occurring prior to June 3, 1999, are time barred by the three year statute of repose. The Court determined in its March 14, 2006, Order in the consolidated action that "all claims asserted by Plaintiffs for actions of any Defendant predating June 3, 1999, are dismissed as barred by limitations." Both parties acknowledge that only statements or events within the class period are *actionable.* However, Defendants further argue that statements and events occurring outside the class period should be stricken from the Complaint. Because this issue is ultimately a matter of evidence, and the Plaintiffs argue that the alleged facts may be relevant to establish whether class period statements were false or misleading, the Court will not strike from the Complaint statements or events outside the class period which may provide relevant context and background. Their presence, however, will not somehow revive claims the Court has already determined are barred by limitations.

### *DEFENDANTS' MOTIONS TO DISMISS*
**A. Background**
**\*2** Plaintiffs filed this class action for alleged violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78 et seq. Defendant Halliburton ("Halliburton") seeks dismissal of Plaintiffs' Amended Class Action Complaint (the "Complaint") under Federal Rules of Civil Procedure 9(b) and 12(b)(6).[FN2] Halliburton argues that Plaintiffs have "failed to plead fraud, scienter, or loss causation with sufficient particularity." Halliburton further argues that "the statements challenged by Plaintiff are protected by the PSLRA's safe harbor." Defendant Lesar filed a separate Motion to Dismiss, alleging substantially similar grounds for dismissal.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

FN2. FED. R. CIV. P. 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED R. CIV. P. 12(b)(6) states: "a party may assert the following defenses by motion ... (6) failure to state a claim upon which relief can be granted ..."

**B. Legal Standard**
In the Complaint, Plaintiffs allege violations of § 10(b) of the Securities Exchange Act of 1934, and of Securities and Exchange Commission Rule 10b–5, which implements § 10(b). Section 10(b) prohibits, "in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."[FN3] Accordingly, Rule 10b–5 makes it unlawful:

FN3. 15 U.S.C. § 78j(b).

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.[FN4]

FN4. 17 CFR § 240 Rule 10b–5.

The basic elements of a securities fraud claim are:

(1) *a material misrepresentation or omission;*

(2) *scienter, i.e.,* a wrongful state of mind;

(3) *a connection with the purchase or sale of a security;*

(4) *reliance,* often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation;"

(5) *economic loss,* 15 U.S.C. § 78u–4(b)(4); and

(6) *"loss causation," i.e.,* a causal connection between the material misrepresentation and the loss.[FN5]

FN5. *Dura Pharm., Inc. et al., v. Broudo et al.,* 544 U.S. 336, 341, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (citations omitted) (emphasis in original); *see also Ind. Elec. Workers' Pension Trust Fund IBEW, et al., v. Shaw Grouping, et al.,* 537 F.3d 527, 532 (5th Cir.2008).

Normally a complaint must satisfy Rule 8 of the Federal Rules of Civil Procedure, which merely requires "a short and plain statement of the claim showing that the pleader is entitled to relief."[FN6] However, allegations of fraud, such as those brought under § 10(b), must be pled with particularity, pursuant to both the Private Securities Litigation Reform Act (PSLRA) and Rule 9(b) of the Federal Rules of Civil Procedure.[FN7]

FN6. FED. R. CIV. P. 8(a)(2).

FN7. *Tellabs, Inc., et al., v. Makor Issues & Rights, LTD., et al.,* 551 U.S. 308, 127 S.Ct. 2499, 2507, 168 L.Ed.2d 179 (2007) ("Prior to the enactment of the PSLRA, the sufficiency of a complaint for securities fraud was governed not by Rule 8, but by the heightened pleading standard set forth in Rule 9(b).").

Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circum-

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

stances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." [FN8] In addition, the PSLRA enhances the requirements of Rule 9(b) in two ways:

> FN8. FED. R. CIV. P. 9(b).

First, plaintiffs must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading .... " 15 U.S.C. § 78u4(b)(1)(B). Second, for "each act or omission alleged" to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). [FN9]

> FN9. *Ind. Elec. Workers' Pension Trust Fund IBEW,* 537 F.3d at 533.

**\*3** The Fifth Circuit summarized the requirements of both the PSLRA and Rule 9(b) in *Goldstein v. MCI Worldcom:*

[A] plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b–5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u–4(b)(1) & 78u–4(b)(3)(A):

(1) specify the [sic] each statement alleged to have been misleading, i.e., contended to be fraudulent;

(2) identify the speaker;

(3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, i.e., why the statement is

fraudulent. [FN10]

> FN10. *Goldstein v. MCI Worldcom,* 340 F.3d 238, 245 (5th Cir.2003) (citing *ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 350 (5th Cir.2002)).

"This is the 'who, what, when, where, and how' required under Rule 9(b) in our securities fraud jurisprudence and under the PSLRA." [FN11]

> FN11. *Id.*

Additionally, for allegations made on information and belief, the plaintiff must allege with particularity "all facts on which that belief is formed, *i.e.,* set forth a factual basis for such belief." [FN12] However, the plaintiff is not required to plead with particularity *every single fact* upon which its beliefs concerning false or misleading statements are based, but is required only to plead with particularity *sufficient facts* to support those beliefs. [FN13]

> FN12. *ABC Arbitrage Plaintiffs Group,* 291 F.3d at 350.

> FN13. *Id.* at 352.

Plaintiffs may attempt to satisfy these pleading requirements by relying on statements made by a third party (typically an analyst), rather than on statements actually made by a defendant, and by arguing that such statements should be attributed to a defendant. [FN14] "Generally, securities issuers are not liable for statements or forecasts disseminated by securities analysts or third parties unless they have 'sufficiently entangled [themselves] with the analysts' forecasts [so as] to render those predictions 'attributable to [the issuers].' " [FN15] Entanglement may exist if plaintiffs can demonstrate that (1) the defendants adopted the statements, or (2) the defendants used the analysts as a conduit, making the statements with the intent that the analysts would communicate them to the market. [FN16] Mere repetition by analysts of statements made by defendants will not suffice. [FN17] Entanglement and/or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

manipulation must be specifically pled.

> FN14. *Barrie et al., v. Intervoice–Brite, Inc., et al.,* 397 F.3d 249, 262 (5th Cir.2005); *Southland Sec. Corp. et al., v. Inspire Ins. Solutions Inc., et al.,* 365 F.3d 353, 373–74 (5th Cir.2004).

> FN15. *Southland Sec. Corp.,* 365 F.3d at 373.

> FN16. *Id.*

> FN17. *In re Odyssey Healthcare, Inc. Sec. Litig.,* 424 F.Supp.2d 880, 887 (N.D.Tex.2005) (Godbey, J.).

The Fifth Circuit explained the special pleading requirements for attributing statements made by third parties to defendants in *Southland Securities Corp.:*

> The plaintiff must plead with particularity ... *who supplied the information to the analyst, how the analyst received the information, and how the defendant was entangled with or manipulated the information and the analyst.* Since the allegation of entanglement is central to the overall allegation of securities fraud, it must be pleaded with the required degree of specificity. The pleading should (1) *identify the specific forecasts and name the insider who adopted them;* (2) point to *specific interactions between the insider and the analyst which allegedly gave rise to the entanglement;* and (3) state the *dates on which the acts which allegedly gave rise to the entanglement occurred.* FN18

> FN18. *Southland Sec. Corp.,* 365 F.3d at 373–74 (citations omitted) (emphasis added) ("However, analysts' statements that reflect their own opinions or forecasts may not be charged to the defendants because the plaintiffs have not sufficiently alleged entanglement and the adoption of such statements by the defendants.").

*4 Absent specific allegations of these facts in the complaint, plaintiffs will not be permitted to rely on statements made by third parties in a securities fraud action.

Liability for *fraudulent omissions* under Rule 10b–5 requires additional analysis. This Court, in the case of *In re Odyssey Healthcare, Inc. Securities Litigation,* observed that the usual requirements of the PSLRA and Rule 9(b) do not easily "fit" omissions as they do misrepresentations. FN19 The court held that where fraudulent omissions are alleged, "Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading." FN20 The court further required the plaintiffs to "specify the statement that is misleading due to the omission in the same manner as a misrepresentation, i.e., the who, what, when, and where." FN21 Finally, the court held that "if the misleading nature of the statement is not apparent from the content of the statement and the substance of the omissions, the factual allegations of the complaint must set forth [with particularity] an explanation of why the omission rendered the statement misleading." FN22

> FN19. *In re Odyssey Healthcare, Inc. Sec. Litig.,* 424 F.Supp.2d at 892.

> FN20. *Id.* (citing *United States ex rel. Riley v. St. Luke's Episcopal Hosp.,* 355 F.3d 370 (5th Cir.2004)).

> FN21. *Id.* at 893.

> FN22. *Id.* at 894 ("The Complaint should specify the inference or implication that allegedly arises from the statement and explain *why* that inference or implication arises from the statement. Finally, the Complaint should specify the omitted information that is contrary to the implication or inference arising from the allegedly misleading statements, and establish that

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

the omitted information was known to the speaker.").

These additional requirements arise because, generally, a corporation is not liable under § 10(b) merely because it failed to disclose all material information it possessed.[FN23] In fact, liability for nondisclosure can only arise if the plaintiff alleges facts that give rise to a duty to speak.[FN24] This court in *Kunzweiler v. Zero. net, Inc.* explained:

> FN23. *Ind. Elec. Workers' Pension Trust Fund IBEW,* 537 F.3d at 541.

> FN24. *Id.* (citing *Kaplan v. Utilicorp United, Inc.,* 9 F.3d 405, 407 (5th Cir.1993)).

Where a complaint alleges a material omission, "the materiality of the information claimed not to have been disclosed ... is not enough to make out a sustainable claim of securities fraud. Even if the information is material, there is no liability under Rule 10b–5 unless there was a duty to disclose it." (citations omitted) ... [A]n affirmative duty to disclose does arise when (1) a corporate insider trades on confidential information; (2) a corporation has made inaccurate, incomplete or misleading prior disclosures; or (3) a statute or regulation requires disclosure (citations omitted).[FN25]

> FN25. *Kunzweiler v. Zero.net, Inc.,* No. 3:00–cv–2553–P, 2002 U.S. Dist. LEXIS 12080 at *31–32 (N.D.Tex. July 3, 2002) (Solis, J.).

The Fifth Circuit explained that allegations of incomplete disclosures are sustainable only if what was said is actually misleading. "[I]n other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."[FN26] As a result, to survive a motion to dismiss where the plaintiff alleges fraudulent omissions or incomplete disclosures, the plaintiff must plead with particularity the facts that give rise to a duty to disclose the material information, or the failure to do so will not be actionable.

> FN26. *Ind. Elec. Workers' Pension Trust Fund IBEW,* 537 F.3d at 541.

The law mandates dismissal of any securities fraud claim that fails to satisfy either the PSLRA's pleading requirements or those of Rule 9(b).[FN27] In evaluating a motion to dismiss for failure to state a claim, this Court looks to each allegedly fraudulent statement and/or omission independently to determine whether all elements are alleged with the required particularity, and "cannot aggregate insufficient allegations/pleadings in order to arrive at a conclusion of sufficiency when [the complaint is] viewed as a whole."[FN28] Each allegation of fraud must individually meet the particularity requirements of the PSLRA.[FN29] This court has the authority to dismiss claims even on grounds that the defendants did not themselves raise. "Even if a party does not make a formal motion, the court on its own initiative may note the inadequacy of the complaint and dismiss it for failure to state a claim as long as the procedure employed is fair."[FN30]

> FN27. *In re Dell Inc., Sec. Litig.,* 591 F.Supp.2d 877, 892 (W.D.Tex.2008).

> FN28. *In re Alamosa Holdings, Inc. Sec. Litig.,* 382 F.Supp.2d 832, 845 n. 5 (N.D.Tex.2005).

> FN29. *Barrie,* 397 F.3d at 260.

> FN30. *Coates et al., v. Heartland Wireless Commc'ns, Inc. et al.,* 55 F.Supp.2d 628, 632 (N.D.Tex.1999) (Fitzwater, J.) ("The court concludes that because defendants move to dismiss on the ground that plaintiffs have failed adequately to plead scienter, the court may analyze plaintiffs' complaint on its own initiative and dismiss for reasons defendants did not give.").

*1. Material Misrepresentation, Incomplete Disclosure, or Omission*

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

**\*5** Rule 10b–5 requires a misrepresentation or omission to be material in order to be actionable. The United States Supreme Court addressed the issue of materiality in *Basic Inc. v. Levinson,* and explained that the materiality requirement applied not only to the misrepresentation or omission, but also to the underlying omitted fact. "[I]n order to prevail on a Rule 10b–5 claim, a plaintiff must show that the statements were misleading as to a material fact. It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant." [FN31] The Court explained that an omitted fact is material if there is a "substantial likelihood" that "disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." [FN32] In other words, a misstatement or omission is material "if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." [FN33]

> FN31. *Basic Inc., et al., v. Levinson,* 485 U.S. 224, 238, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

> FN32. *Id.* at 231; *Rosenzweig et al., v. Azurix Corp., et al.,* 332 F.3d 854, 865–66 (5th Cir.2003).

> FN33. *ABC Arbitrage Plaintiffs Group,* 291 F.3d at 359; *see also Southland Sec. Corp.,* 365 F.3d at 362 ("A fact is material if there is 'a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.' Materiality 'depends on the significance the reasonable investor would place on the withheld or misrepresented information.' " (citations omitted)).

Importantly, "vague and optimistic" statements that are mere puffery are not actionable because they are immaterial as a matter of law. [FN34] Generalized, positive statements about a company, i.e., the company's competitive strengths, experienced management, and future prospects, are immaterial. [FN35] This is because the market relies on *specific facts* in determining the price of a security, rather than vague and optimistic statements. No duty exists for a company to portray itself in a cautious or "pejorative" light, so long as its statements are "reasonably consistent with reasonably available data." [FN36]

> FN34. *Southland Sec.,* 365 F.3d at 372; *Nathenson et al., v. Zonagen Inc. et al.,* 267 F.3d 400, 422 (5th Cir.2001) ("We conclude that there is no 'substantial likelihood' that a reasonable investor would consider these statements about a believed discovery whose value was wholly speculative to have 'significantly altered the 'total mix' of information' about Zonagen, and that these statements respecting Immumax were hence immaterial as a matter of law." (citation omitted)).

> FN35. *Rosenzweig,* 332 F.3d at 869.

> FN36. *Id.* (citing *Abrams et al., v. Baker Hughes Inc., et al.,* 292 F.3d 424, 433 (5th Cir.2002)).

Along the same reasoning, "[a] statement of belief is only open to objection where the evidence shows that the speaker did not in fact hold that belief and the statement made asserted something false or misleading about the subject matter." [FN37] And a "predictive statement," where the speaker makes statements regarding the future, may be actionable in three circumstances: (1) the speaker does not genuinely believe the statement is accurate; or (2) there is no reasonable basis for that belief; or (3) the speaker is aware of undisclosed facts that would tend to seriously undermine the accuracy of the statement. [FN38] However, merely alleging that certain predictive statements did not have a reasonable basis-"that is, that were negligently made-would hardly suffice to state a claim under Rule 10b–5." [FN39]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
(Cite as: 2009 WL 854656 (N.D.Tex.))

Page 8

FN37. *Greenberg et al., v. Crossroads Systems, Inc. et al.,* 364 F.3d 657, 670 (5th Cir.2004).

FN38. *Rosenzweig,* 332 F.3d at 868 (5th Cir.2003) (citing *Rubinstein v. Collins,* 20 F.3d 160, 166 (5th Cir.1994)).

FN39. *Id.* at 870 (citing *Rubenstein,* 20 F.3d at 169).

Also, if the alleged misrepresentations or omissions rest on contingent or speculative information or events, "materiality 'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.' "FN40

FN40. *Basic Inc.,* 485 U.S. at 238.

Finally, this Court does not judge the materiality of misrepresented or omitted facts in the abstract, but in light of all surrounding circumstances. FN41

FN41. *Rosenzweig,* 332 F.3d at 866.

**2. Scienter**
**\*6** The United States Supreme Court addressed the scienter requirement in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*FN42 "To establish liability under § 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.' "FN43 Additionally, the PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," i.e., to allege the intent to deceive, manipulate, or defraud, or severe recklessness, with particularity.FN44

FN42. 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

FN43. *Tellabs, Inc.,* 127 S.Ct. at *2507.

FN44. 15 U.S.C. § 78u–4(b)(2).

In *Tellabs,* the Supreme Court provided a three step process for analyzing scienter in the context of a Rule 12(b)(6) motion to dismiss:

*First,* faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, *accept all factual allegations in the complaint as true* (citation omitted). *Second,* courts must *consider the complaint in its entirety,* as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice (citation omitted). The inquiry, as several Courts of Appeals have recognized, is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. *Third,* in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must *take into account plausible opposing inferences.*FN45

FN45. *Tellabs, Inc.,* 127 S.Ct. at *2509 (emphasis added); *see also Ind. Elec. Workers' Pension Trust Fund IBEW,* 537 F.3d at 533.

The Supreme Court emphasized the call for facts supporting a "strong" inference of scienter, rather than allowing plaintiffs to provide a mere factual basis for their allegations.FN46 The Court defined "strong" as "a powerful or cogent inference" or "persuasive, effective, and cogent."FN47 The Court further explained:

FN46. *Tellabs, Inc.,* 127 S.Ct. at *2510.

FN47. *Id.*

To determine whether the plaintiff has alleged facts that give rise to the requisite "strong infer-

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

ence" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the "smoking-gun" genre, or even the "most plausible of competing inferences," (citation omitted). Yet the inference of scienter must be more than merely "reasonable" or "permissible"-it must be cogent and compelling, thus strong in light of other explanations.[FN48]

> FN48. *Id.*

The Court held that a complaint will survive only if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[FN49]

> FN49. *Id.*

For securities fraud, the required state of mind that must be pled is either an "intent to deceive, manipulate, or defraud," or "severe recklessness."[FN50] "[A] securities fraud plaintiff must prove that the defendant either consciously misbehaved ... or was so severely reckless that it demonstrates that the defendant must have been aware of the danger of misleading the investing public."[FN51] The Fifth Circuit defines "severe recklessness" as:

> FN50. *Ind. Elec. Workers' Pension Fund IBEW,* 537 F.3d at 533 (citing *Rosenzweig,* 332 F.3d at 866).

> FN51. *Plotkin et al., v. IP AXESS INC., et al.,* 407 F.3d 690, 697 (5th Cir.2005).

**\*7** [L]imited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.[FN52]

> FN52. *Ind. Elec. Workers' Pension Trust Fund IBEW,* 537 F.3d at 533 (citing *Rosenzweig,* 332 F.3d at 866).

Importantly, in the Fifth Circuit plaintiffs must adequately allege scienter with respect to individual defendants, rather than relying on "group pleading," i.e., alleging that "defendants" or "management" acted with the required intent or severe recklessness.[FN53] The group pleading doctrine allows plaintiffs to rely on a presumption that statements in "prospectuses, registration statements, annual reports, press releases, or other group-published information," are the collective work of those individuals with direct involvement in the everyday business of the company.[FN54] The Fifth Circuit rejected this doctrine because it directly contravened the scienter requirement of the PSLRA, where particular facts giving rise to a strong inference that a particular defendant acted with the required state of mind must be alleged.[FN55] "Instead of being required to plead that a defendant actually made, authored or approved an offending statement in a corporate communication, the 'group pleading' doctrine in its broadest form allows unattributed corporate statements to be charged to one or more individual defendants based solely on their corporate titles ... [it] would allow the plaintiff to plead the first element of a section 10(b) case against an individual defendant without citing particular facts connecting the defendant to the alleged fraud."[FN56] The Fifth Circuit recently explained:

> FN53. *See Southland Sec. Corp.,* 365 F.3d at 365.

> FN54. *Id.* (citations omitted).

> FN55. *Id.*

> FN56. *Id.*

[T]his court has rejected the group pleading approach to scienter and instead looks to the state of mind of the individual corporate official or of-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

ficials "who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Consequently, "it is only necessary for us to address the allegations claimed to adequately show [scienter] on the part of the [named officers]" to determine whether the complaint sufficiently pleads scienter.*[FN57]

> FN57. *Ind. Elec. Workers' Pension Trust Fund IBEW,* 537 F.3d at 533 (emphasis added) (citing *Southland Sec. Corp.,* 365 F.3d at 367–68).

While a corporate defendant, like Halliburton in this case, may be *liable* for the false statements of its officers, the false statements must still be alleged with particularity to satisfy the PSLRA, and must therefore identify the individual corporate officer to whom the statement or omission is attributable.[FN58] "Corporate statements can be tied to officers if plaintiffs allege they signed the documents on which the statements were made or allege adequately their involvement in creating the documents."[FN59] The complaint must specifically tie individual defendants to the statements or omissions, or it will fail under the PSLRA's heightened-pleading standard.[FN60] As the Fifth Circuit explained, "[c]onsistent with our rejection of the 'group pleading' doctrine, we do not construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant *unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded.*"[FN61]

> FN58. *Barrie,* 397 F.3d at 262.

> FN59. *Fin. Acquisition Partners LP, et al., v. Blackwell et al.,* 440 F.3d 278, 287 (5th Cir.2006).

> FN60. *Id.*

> FN61. *Southland Sec. Corp.,* 365 F.3d at 365 (emphasis added).

**\*8** Consequently, a defendant *corporation* is deemed to have the required scienter for fraud only if the *individual corporate officer* making the statement has the required level of scienter, i .e., knows that the statement is false, or is at least severely reckless as to its falsity, at the time the statement or omission was made.

Conclusory allegations of scienter will not survive.[FN62] The Fifth Circuit has explained that "general allegations and conclusory statements, such as stating [defendants] knew ... adverse material" cannot support a strong inference of scienter.[FN63] However, direct evidence of intent or severe recklessness is not required, and Plaintiffs may rely on circumstantial evidence to demonstrate scienter.[FN64]

> FN62. *Plotkin,* 407 F.3d at 696 (citing *Southland Sec. Corp.,* 365 F.3d at 361).

> FN63. *Ind. Elec. Workers' Pension Trust Fund IBEW,* 537 F.3d at 538–39; *but see Plotkin,* 407 F.3d at 700 (where the Fifth Circuit allowed a general inference of scienter, stating: "Given the reasonableness of the inference that Plotkin possessed material facts casting doubt on its contracting partners' credibility, the district court was incorrect to fault Plotkin for failing to allege specific facts conclusively proving that IPaxess knew this information. *Cf. Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir.2000) (stating that an egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness).").

> FN64. *Ind. Elec. Workers' Pension Trust Fund IBEW,* 537 F.3d at 535.

Finally, scienter must exist at the time the mis-

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

representation or omission allegedly occurred.[FN65] The rule in the Fifth Circuit is that "a 'Plaintiff cannot charge Defendants with intentionally misleading their investors about facts Defendants may have become aware of after making allegedly misleading statements to the public.' "[FN66]

> FN65. *Kunzweiler,* 2002 U.S. Dist. LEXIS 12080 at *22.

> FN66. *Plotkin,* 407 F.3d at 698 (citing *Lain v. Evans,* 123 F.Supp.2d 344, 350 (N.D.Tex.2000)).

*a. Motive and Opportunity*

Allegations of motive and opportunity standing alone will not suffice to establish a strong inference of scienter.[FN67] But appropriate motive and opportunity allegations may "meaningfully enhance the strength of the inference of scienter."[FN68] Importantly, generalized financial motives will not support an inference of scienter. In *Abrams v. Baker Hughes Inc.* the Fifth Circuit explained:

> FN67. *Ind. Elec. Workers' Pension Trust Fund IBEW,* 537 F.3d at 533 (citing *Rosenzweig,* 332 F.3d at 867).

> FN68. *Id.* (citing *Southland Sec. Corp.,* 365 F.3d at 368).

[T]he motives alleged in the complaint are not the types of motive that support a strong inference of scienter. The plaintiffs allege that the defendants were motivated to commit fraud by *the need to raise capital, the desire for enhanced incentive compensation and the desire to sell stock at inflated prices.* This court has held that similar allegations were insufficient to support an inference of scienter ... Absent an allegation that the defendants profited from the inflated stock value or the offerings, such allegations fail.[FN69]

> FN69. *Abrams,* 292 F.3d at 434.

Suspicious sales of stock may support an inference of scienter, but only insider trading in suspi-

cious amounts or at suspicious times during the class period is probative of scienter. Plaintiffs must allege that stock sales were out of line with prior trading practices, or were made at times calculated to maximize personal profit. "[E]ven unusual sales by one insider do not give rise to a strong inference of scienter when other defendants do not sell some or all of their shares during the Class Period."[FN70] The fact that other defendants did not sell their shares during the relevant class period will also undermine plaintiffs' allegations of scienter .[FN71]

> FN70. *Id.* at 435.

> FN71. *Nathenson,* 267 F.3d at 421.

*b. Failure to follow Generally Accepted Accounting Principles (GAAP)*

Generally, the mere publication of inaccurate accounting figures, or the mere failure to follow GAAP, does not alone establish scienter.[FN72] "To plead scienter adequately, plaintiffs must state with particularity facts giving rise to a strong inference that the party knew that it was publishing materially false information, or that the party was severely reckless in publishing such information." [FN73] "Plaintiffs cannot transform inherently nuanced conclusions into fraudulent misstatements or omissions simply by saying that there were abuses or misuses of the GAAP rules ." [FN74] Simply put, accounting violations can easily arise from negligence, oversight, or mismanagement, none of which rise to the standard required to support a securities fraud action.[FN75]

> FN72. *In re Dell Inc., Securities Litigation,* 591 F.Supp.2d at 893 (citing *Ind. Elec. Workers' Pension Trust Fund IBEW,* 537 F.3d at 534 and *Abrams,* 292 F.3d at 432).

> FN73. *Id.* (citing *Ind. Elec. Workers' Pension Trust Fund IBEW,* 537 F.3d at 534).

> FN74. *Ind. Elec. Workers' Pension Trust Fund IBEW,* 537 F.3d at 536 (citing *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

Cir.1990), where the court observed, "[a]t one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. 'Must be' is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition.").

FN75. *In re Dell Inc., Sec. Litig.* 591 F.Supp.2d at 894 (citing *Abrams,* 292 F.3d at 433).

**\*9** However, even though GAAP violations alone are insufficient to establish scienter, "when the number, size, timing, nature, frequency, and context of the misapplication [of accounting principles] or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter."[FN76]

FN76. *Id.* (citing *In re Triton Energy Ltd. Sec. Lit.,* No. 5:98–CIV–256, 2001 WL 872019 at \* 11 (E.D.Tex. Mar.30, 2001)).

*c. Position with Company, or "Positional Scienter"*
"A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."[FN77] Corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pled.[FN78] "Without specific allegations the Individual Defendants themselves actually knew about a specific accounting violation or internal control problem, the pleadings are simply too vague to support a strong inference of scienter."[FN79]

FN77. *Abrams,* 292 F.3d at 432.

FN78. *Barrie,* 397 F.3d at 261.

FN79. *In re Dell Inc., Sec. Litig.,* 591

F.Supp.2d at 894. In *Dell,* the district court dismissed the complaint for insufficiently pled scienter because "the Plaintiffs state generally that the Individual Defendants oversaw accounting functions, had unfettered access to information, and approved high-level decisions, but allege nothing specific about what the Individual Defendants knew or intended, or even what 'fraudulent' decisions they approved."

Corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers, but only if specific factual allegations link the individual corporate officer to the statement at issue.[FN80] But unsupported general allegations about the existence of corporate reports that reveal or contain information contrary to statements made are insufficient to survive a motion to dismiss.[FN81] "Such allegations must have corroborating details regarding the contents of allegedly contrary reports, [and] their authors and recipients."[FN82] If the complaint fails to allege facts demonstrating that specific reports with specific information were available to specific individual defendants prior to the date the allegedly fraudulent statements were made, then the allegations of fraud must fail, unless other evidence of scienter is sufficiently pled.

FN80. *Ind. Elec. Workers' Pension Trust Fund IBEW,* 537 F.3d at 533 (citing *Abrams,* 292 F.3d at 432).

FN81. *Abrams,* 292 F.3d at 432.

FN82. *Id.*

*d. Magnitude or Duration of Violations*
Bare conclusory allegations that defendants *must have known* about fraudulent activity simply because of the magnitude of the allegedly fraudulent events, especially in the context of large companies, will not suffice under the PSLRA.[FN83] In fact, if the magnitude of the alleged violations is

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

App. 83

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

slight when compared to the overall size of the company, this fact will actually weigh against an inference of scienter.[FN84]

> FN83. *Goldstein*, 340 F.3d at 251.

> FN84. *In re Dell Inc., Sec. Litig.*, 591 F.Supp.2d at 894–95. In *Dell*, the company's net income was restated downward by less than 1% of the total net income for the period, in comparison to other cases where the court found sufficient evidence of scienter based on the magnitude and extent of the violations. The court concluded that "any weight given to an inference of scienter because of the duration of the accounting irregularities must be tempered by their relatively small magnitude."

In sum, to survive a motion to dismiss under the PSLRA and Rule 9(b), plaintiffs must allege specific facts that support a strong inference that individual corporate defendants possessed either the intent to defraud or exhibited severe recklessness in making misstatements or omissions regarding the defendant corporation at the time the misstatement or omission occurred.

### 3. Reliance

The Fifth Circuit analyzed the reliance requirement in *Nathenson v. Zonagen Inc.*, explaining:

> The element of reliance is the subjective counterpart to the objective element of materiality. Whereas materiality requires the plaintiff to demonstrate how a "reasonable" investor would have viewed the defendants' statements and omissions, *reliance requires a plaintiff to prove that it actually based its decisions upon the defendants' misstatements or omissions.* "Reliance is *causa sine qua non,* a type of 'but for' requirement: had the investor known the truth he would not have acted."[FN85]

> FN85. *Nathenson,* 267 F.3d at 413 (citations omitted) (emphasis added).

**\*10** The *Nathenson* court further explained that while materiality is determined by evaluating whether there is a substantial likelihood that the false or misleading statement "would have been viewed by the reasonable investor as having altered the 'total mix' of information made available," and thus looks to *likely potential,* reliance ultimately looks to what *actually* happened. Plaintiffs must adequately allege both materiality and reliance to survive a motion to dismiss.

The Supreme Court has approved of the use of the "fraud on the market" presumption to satisfy the reliance requirement in securities fraud cases.[FN86] To rely on this presumption, plaintiffs must "show that the defendant made material misrepresentations, the defendant's shares were traded in an efficient market, and the plaintiffs traded shares between the times the misrepresentations were made and the time the truth was revealed ."[FN87]

> FN86. *Luskin et al., v. Intervoice–Brite Inc., et al.,* No. 06–11251, 2008 WL 104273 at \*3 (5th Cir. Jan.8, 2008) (unpublished opinion) (citing *Basic,* 485 U.S. at 245–46).

> FN87. *Id.* (citing *Basic,* 485 U.S. at 245–46).

To utilize the presumption of reliance, the plaintiff must also adequately plead loss causation.[FN88] "Essentially, this circuit 'require[s] plaintiffs to establish loss causation in order to trigger the fraud-on-the-market presumption'... 'to trigger the presumption of reliance, plaintiffs must demonstrate that ... the cause of the decline in price is due to the revelation of the truth and not the release of the unrelated negative information.' "[FN89] The requirements of loss causation are addressed in greater detail below.

> FN88. *Id.*

> FN89. *Id.* (citing *Oscar Private Equity Invs. et al., v. Allegiance Telecom, Inc.,* et

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

al., 487 F.3d 261, 265 (5th Cir.2007)).

### 4. Economic loss

Plaintiffs must adequately allege actual economic loss to survive a motion to dismiss. Importantly, an "inflated purchase price will not itself constitute or proximately cause the relevant economic loss."[FN90] Therefore, this Court must dismiss the Complaint unless Plaintiffs adequately plead actual economic loss.

> FN90. *Dura Pharm., Inc. et al., v. Broudo et al.,* 544 U.S. 336, 342, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

### 5. Loss causation

Loss causation is the causal connection between the material misrepresentation or omission and the economic loss. The PSLRA requires plaintiffs to prove that the defendant's misrepresentations actually caused the loss for which the plaintiffs seek to recover.[FN91] While loss causation is a prerequisite to use of the fraud on the market presumption, it need not be established by a preponderance of the evidence until the class certification stage.[FN92] However, loss causation must be adequately pled by plaintiffs to survive a motion to dismiss.[FN93] "Because a plaintiff must prove proximate causation and economic loss in order to establish loss causation, a plaintiff must also adequately allege these requirements in the complaint."[FN94]

> FN91. 15 U.S.C. § 78u–4(b)(4).

> FN92. *Luskin,* 2008 WL 104273 at *3 (citing *Oscar Private Equity Invs.,* 487 F.3d at 265).

> FN93. *Dura Pharm., Inc.,* 544 U.S. at 346.

> FN94. *In re Dell Inc., Sec. Litig.,* 591 F.Supp.2d at 905 (citing *Dura Pharm., Inc.,* 544 U.S. at 346).

Essentially, plaintiffs are required to allege a causal relationship between the statement or omission and actual movement of the stock price.[FN95] "Loss causation cannot be satisfied simply by alleging in the complaint and subsequently establishing the price of the security on the date of purchase was inflated because of the misrepresentation."[FN96] However, it may be shown either by alleging an increase in stock price immediately following the release of fraudulently positive information, or by alleging actual negative movement in stock price following the release of the alleged truth of an earlier misrepresentation.[FN97]

> FN95. *Greenberg,* 364 F.3d at 663.

> FN96. *In re Dell Inc., Sec. Litig.,* 591 F.Supp.2d at 905 (citing *Dura Pharm., Inc.,* 544 U.S. at 338).

> FN97. *Greenberg,* 364 F.3d at 663 (citing *Nathenson,* 267 F.3d at 417–19).

**\*11** The Supreme Court in *Dura* indicated that the pleading requirements as they relate to loss causation need only comply with Rule 8, as opposed to the strict pleading requirements of Rule 9(b).[FN98] As a result, plaintiffs are required to allege a short and plain statement that provides the defendant with fair notice of what the plaintiffs' claim is and the grounds upon which it rests.[FN99] This Court agrees with the district court's analysis in *Dell,* and also notes that the Fifth Circuit's opinion in *Plotkin v. IP Axess, Inc.* stating that loss causation is subject to a heightened pleading standard followed the *Dura* opinion by only two days and made no note of it, and therefore *Dura,* even if somewhat equivocal in its "assumption" that neither the Rules nor the securities statutes impose special pleading requirements, controls.[FN100]

> FN98. *Dura Pharm., Inc.,* 544 U.S. at 346 ("[W]e assume, at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss. But, even so, the 'short and plain statement'

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)

**(Cite as: 2009 WL 854656 (N.D.Tex.))**

must provide the defendant with 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.' ").

FN99. *In re Dell Inc., Sec. Litig.,* 591 F.Supp.2d at 905 (citing *Dura Pharm., Inc.,* 544 U.S. at 346).

FN100. *See id.* at 906, addressing the Fifth Circuit's holding in *Plotkin,* 407 F.3d at 696.

To allege loss causation, securities fraud plaintiffs must identify a corrective disclosure. "[D]efendants in a securities fraud case may not be held liable for a decline in stock price before the fraud is disclosed."[FN101] Plaintiffs can satisfy this requirement by adequately pleading a "corrective disclosure" that reveals a previously concealed truth, which causes a decline in the defendant company's stock price.[FN102] The district court in *Dell* explained this requirement:

FN101. *See id.*

FN102. *Catogas v. Cyberonics, Inc.,* No. 07–20787, 2008 WL 4158923 at *3 (5th Cir. Sept.8, 2008) (unpublished opinion) (citing *Dura Pharm., Inc.,* 544 U.S. at 347) ("Plaintiffs must allege, therefore, the market reacted negatively to a corrective disclosure, which revealed the falsity of [defendant] Cyberonics' previous representations regarding the accounting for its stock options."); *see also In re Enron Corp. Sec. et al., v. Enron Corp. et al.,* 465 F.Supp.2d 687, 724 (S.D.Tex.2006) ( "Thus, as noted *supra,* under *Dura Pharmaceuticals,* one acceptable, but not the only, way to plead proximate cause and economic loss (the difference between the price the purchaser paid and the subsequent price to which the stock dropped) in fraud on the market cases is to allege that the price a plaintiff paid for a security 'fell significantly after the truth [of the ma-

terial misrepresentation or omission] becomes known' and that the disclosure of the misrepresentation or omission had a significant effect on the market price.").

*Dura* made clear there must be sufficient allegations the misrepresentations caused plaintiffs' loss; it is insufficient to simply allege the misrepresentation " 'touches upon' a later economic loss." *Plaintiffs must allege, therefore, the market reacted negatively to a corrective disclosure, which revealed the falsity of Dell's previous representations.*[FN103]

FN103. *In re Dell Inc., Sec. Litig.,* 591 F.Supp.2d at 906 (citations omitted) (emphasis added).

Under this standard, identifying a "corrective disclosure" requires, at a minimum, that the complaint identify the prior representations called into question, along with a disclosure that corrects them.[FN104] The corrective disclosure must reveal the fraud or the falsity of the prior representation, or it will not qualify as a "corrective" disclosure. Plaintiffs must further allege a decline in stock price following the revelation of the fraud.[FN105] Finally, the revelation of confirmatory information, or information already known to the market, cannot constitute a corrective disclosure.[FN106]

FN104. *Id.* at 908; *In re Odyssey Healthcare, Inc. Sec. Litig.,* 424 F.Supp.2d at 888 n. 4 ("In order for there to be a causal connection as required by *Dura,* however, the disclosure at [a] minimum must identify which prior representation is called into question.").

FN105. *In re Dell Inc., Sec. Litig.,* 591 F.Supp.2d at 908.

FN106. *Catogas,* 2008 WL 4158923 at *3; *Greenberg,* 364 F.3d at 665–66.

This court in *Odyssey Healthcare* further explained the requirement of alleging a corrective dis-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)

**(Cite as: 2009 WL 854656 (N.D.Tex.))**

closure:

> When the causal argument is, as here, that dis-
> closure of information puts the market on notice
> of the falsity of prior representations, then the
> disclosure must at [a] minimum be of a nature
> that would cause recipients to identify which rep-
> resentations were the false prior representations.
> In other words, loss causation would not be es-
> tablished if a defendant simply said "something
> we told you last year isn't true," because that is
> insufficient to show that stock prices were in-
> flated due to a specific misrepresentation and the
> market reacted when the misrepresentation be-
> came known.[FN107]

> > FN107. *In re Odyssey Healthcare, Inc.
> > Sec. Litig.,* 424 F.Supp.2d at 888; *see also
> > In re Alamosa Holdings, Inc. Sec. Litig.,*
> > 382 F.Supp.2d at 862–63 ("Because none
> > of the other alleged misrepresentations or
> > omissions beyond the May 1, 2002 sub-
> > scriber number projections were the sub-
> > ject of a corrective disclosure followed by
> > a drop in stock price, there can be no find-
> > ing that such misrepresentations or omis-
> > sions caused Plaintiffs' losses.").

**\*12** Accordingly, this Court will require
Plaintiffs to plead sufficient facts to give the De-
fendants fair notice of the claims against
them—this standard requires Plaintiffs to identify
the allegedly misleading statements or omissions,
and then allege either a correlative increase in stock
price following a falsely positive statement, or al-
lege a subsequent decline in stock price following a
corrective disclosure or revelation of the fraudulent
omission.

*6. Safe Harbor*

The PSLRA provides a "safe harbor" for for-
ward-looking statements when certain conditions
are met. The PSLRA defines "forward-looking
statements" as (i) projections of revenues, income,
earnings, or other financial items, (ii) plans and ob-

jectives for future operations, and (iii) statements of
future economic performance.[FN108] The Fifth Cir-
cuit provided the relevant test for invoking the pro-
tections of the safe harbor in *Southland Securities
Corp.:*

> FN108. *Plotkin,* 407 F.3d at 699 (citing 15
> U.S.C. § 78u–5(i)(1) (A)(C)).

The safe harbor has two independent prongs: one
focusing on the defendant's cautionary statements
and the other on the defendant's state of mind.
Under the first prong, there is no liability if, and
to the extent that, the forward-looking statement
is: (i) "identified as a forward-looking statement,
and is accompanied by meaningful cautionary
statements identifying important factors that
could cause actual results to differ materially
from those in the forward-looking statement," *or*
(ii) "immaterial." Under the second prong, there
is no liability if the *plaintiff fails to prove* that the
statement (i) if made by a natural person, was
made with *actual knowledge that the statement
was false or misleading,* or (ii) if made by a busi-
ness entity, was made by or with the approval of
an executive officer of that entity with actual
knowledge by that officer that the statement was
false or misleading .[FN109]

> > FN109. *Southland Sec. Corp.,* 365 F.3d at
> > 371–72 (citations omitted) (emphasis ad-
> > ded).

In this context, cautionary statements must be "
'substantive' company-specific warnings based on
a realistic description of the risks applicable to the
particular circumstances, not merely a boilerplate
litany of generally applicable risk factors."[FN110]
However, the cautionary language need not list the
specific risk factor alleged to have rendered the for-
ward-looking statement actually false.[FN111]

> FN110. *Id.* at 372.

> FN111. *In re Blockbuster Inc. Sec. Litig.,*
> No. 3:03–cv–398–M, 2004 WL 884308 at

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

*5 (N.D.Tex. Apr.26, 2004) (Lynn., J.).

The requirement of materiality is significant in the context of forward-looking statements, as explained by this Court in *Blockbuster Inc.*:

"Generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial." "Vague, loose optimistic allegations that amount to little more than corporate cheerleading are 'puffery,' projections of future performance not worded as guarantees, and are not actionable under federal securities law because no reasonable investor would consider such vague statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." FN112

FN112. *Id.* at *7 (citations omitted).

*13 In short, if a statement is forward-looking, Defendants may invoke the first prong of the safe harbor by showing (1) the statement was identified as forward-looking and accompanied by meaningful cautionary language, or (2) that the statement was immaterial, or mere "puffery." FN113 Then, to avoid the second prong of the safe harbor, Plaintiffs must plead facts showing the statement was made with actual knowledge of its falsity. FN114 Otherwise, the allegations should be dismissed.

FN113. *In re Dell Inc., Sec. Litig.*, 591 F.Supp.2d at 912.

FN114. *Id.*

**C. Analysis**

Plaintiffs allege misrepresentations or omissions with respect to three categories: (1) asbestos litigation, and specifically treatment of the Highlands insurance receivable; (2) the Barracuda Project; and (3) accounting practices, specifically alleged violations of GAAP. Defendants argue that each of these categories of allegations must be dis-

missed for failure to meet the strict pleading requirements of the PSLRA and Rule 9(b). Additionally, Defendants argue that the statements are protected by the safe harbor provision of the PSLRA. This Court will look to each of these claims in turn to determine if they meet the pleading requirements set forth above. However, the Court first addresses several of the basic pleading requirements for securities fraud allegations as they relate to the alleged misrepresentations and omissions *in this case.*

*1. Scienter*

The Complaint fails to meet the standard for pleading scienter with particularity, pursuant to the PSLRA and Rule 9(b). While Plaintiffs may rely on circumstantial evidence to allege scienter, they must still "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"—i.e., intent to defraud or severe recklessness. To establish scienter, Plaintiffs allege in ¶ 8 of the Complaint that:

Because of Lesar's position with the Company, he had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

Plaintiffs allege in ¶ 9 that:
[L]arge-scale construction contracts and asbestos-related liabilities represent central components of Halliburton's corporate operations ... Lesar, in his capacity as a key officer and director of the Company, is deemed to have intimate knowledge of those activities ... This observation applies with particular emphasis here, given that Lesar is a Certified Public Accountant. Undoubtedly, he

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

would take special notice of matters such as secret changes in accounting practices and the establishment of reserves to cover enormous legal liabilities, exactly the subject matter of the misrepresentations and omissions alleged in this Complaint, because these are issues that would—and did—directly affect Halliburton's financial statements and performance.

*14 Plaintiffs allege in ¶ 11 that "[b]ecause of his Board membership and executive and managerial positions with Halliburton, Lesar had access to the adverse undisclosed information about Halliburton's financial condition and performance ...," and in ¶ 155 that the "knowing and/or reckless violations of GAA[P] are direct evidence of Defendants' scienter."

The Fifth Circuit requires this Court to (1) accept all factual allegations in the Complaint as true, (2) consider the Complaint in its entirety, and (3) take into account plausible opposing inferences.[FN115] However, this Court is not to rely on conclusory allegations or impermissible group pleading. This Court looks to the Complaint to determine if the *facts* alleged, taken collectively, give rise to a strong inference of scienter. The Complaint in this case is almost entirely devoid of *facts* supporting an inference of scienter. Plaintiffs make vague and conclusory allegations that Lesar had access to or possessed adverse information because he was an officer of Halliburton. But the Fifth Circuit has made it abundantly clear that a pleading of scienter may not rely on the inference that defendants "must have" been aware of information or misstatements based on their positions within the company.[FN116]

> FN115. *Ind. Elec. Workers' Pension Trust Fund IBEW,* 537 F.3d at 533.
>
> FN116. *Id.* at 535; *Abrams,* 292 F.3d at 432; *Nathenson,* 267 F.3d at 424.

Unsupported general allegations about the existence of corporate documents that reveal or contain information that is contrary to alleged misrep-

resentations are insufficient as allegations of scienter.[FN117] Plaintiffs are required to specifically plead corroborating information, such as the specific contents of the allegedly contrary reports, who authored the reports, who received the reports, and when they were received.[FN118] Additionally, the mere publication of inaccurate accounting figures, or the failure to follow GAAP, does not alone establish scienter.[FN119] And the fact that Plaintiffs fail to allege suspicious sales of stock, i.e., insider trading in suspicious amounts and/or at suspicious times during the class period, undermines the Plaintiffs' allegations of scienter.[FN120]

> FN117. *Abrams,* 292 F.3d at 432.
>
> FN118. *Id.*
>
> FN119. *In re Dell Inc., Sec. Litig.,* 591 F.Supp.2d at 893 (citing *Ind. Elec. Workers' Pension Trust Fund IBEW,* 537 F.3d at 534).
>
> FN120. *See Nathenson,* 267 F.3d at 421. In this case, Plaintiffs' allegation in ¶ 194 that "the insider trades in 2000 of Individual Defendants and other top executives of a multi-million dollar size were made with inside information about the change in accounting policies and the potential of the asbestos liability" contribute to "a strong inference of scienter with respect to the statements made in the Halliburton 2000 and 2001 10–K's and other representations cited in this Complaint" is wholly unsupported by Fifth Circuit precedent. Insider trading will only support an inference of scienter if it occurs in suspicious amounts or at suspicious times, *during the class period.* Sales of stock before the class period began will contribute nothing to the inference of scienter regarding statements made during the class period.

The Court finds that, even accepting all factual allegations as true and viewing the Complaint in its

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

entirety, Plaintiffs do not meet the strict pleading requirements for scienter under the PSLRA.[FN121] For example, in ¶ 121 of the Complaint, Plaintiffs provide a list of excerpts from a "Responsibility for Financial Reporting" commitment, executed by Lesar, and claim that:

> FN121. The Court notes that Plaintiffs' allegations that "Halliburton and Lesar" knew a laundry list of facts in ¶¶ 187–193 are insufficient to establish scienter, as they fail to allege who knew these facts, when they learned them, or how they learned them. *See Ind. Elec. Workers Pension Trust Fund IBEW*, 537 F.3d at 542 (where the Fifth Circuit found the plaintiffs failed to state with particularity facts giving rise to a strong inference of scienter as to the defendants because the complaint did not "indicate how or when the officers [defendants] became aware of what the confidential source allegedly knew" regarding the fraudulently omitted information). In short, bare and conclusory allegations of knowledge and/or information cannot support a strong inference of scienter.

These statements were materially misleading because they failed to reveal that the internal controls at Halliburton were woefully inadequate because, at minimum, they (1) failed to cause correction of the 1998 accounting change for the treatment of Unapproved Claims which was in violation of GAAP, (2) did not compel disclosure of the dismal circumstances and significant losses surrounding the Barracuda project, and (3) allowed Defendants to pursue their course of deceptively minimizing the extent of Halliburton's asbestos liability.

**\*15** This conclusory allegation does not adequately plead scienter under the PSLRA. Plaintiffs fail to identify with particularity which statements in the commitment were misleading, and why. But more importantly, Plaintiffs do not plead any fact that supports an inference that Lesar acted with the intent to deceive investors, or with severe recklessness, in issuing the commitment. The PSLRA requires plaintiffs to plead specific facts that give rise to a strong inference of scienter, and conclusory allegations about the Defendants' general failure to reveal bad news to the market, when the Complaint fails to even allege knowledge of such news, are clearly insufficient to survive dismissal.[FN122]

> FN122. Plaintiffs cannot simply rely on the conclusory allegations of scienter found at the beginning of the Complaint to support a strong inference of scienter as to all statements identified as misrepresentations throughout the remainder of the Complaint, for the reasons stated above. Additionally, Plaintiffs allege in ¶ 175 that the New York Times published an article on May 22, 2002, which reported that the allegedly fraudulent accounting change regarding the recognition of claims and change orders was "specifically approved by David Lesar." However, this allegation alone is insufficient to establish scienter as to Lesar. First, Plaintiffs do not plead the factual basis for this report. They also fail to allege that because of Lesar's specific approval of the accounting change, any financial statements signed or approved by Lesar were intentionally fraudulent or made with severe recklessness. In short, Plaintiffs cannot simply point to a news article reporting that Lesar approved an accounting practice to support an inference of scienter as to all accounting statements made during the class period. Allowing such an allegation to substantiate a "strong inference" of scienter would essentially read the requirement out of the statute.

**2. Reliance and Loss Causation**

In ¶¶ 196–197, Plaintiffs allege that "the market for Halliburton's securities was an efficient mar-

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

ket," and that "the market for Halliburton's securities promptly digested current information regarding Halliburton from all publicly available sources and reflected such information in Halliburton's stock price." Plaintiffs thereby seek to establish the fraud-on-the-market presumption of reliance. The Supreme Court in *Basic* provided the test for the fraud-on-the-market presumption of reliance:

> [A] plaintiff must allege and prove: (1) that the defendant made public misrepresentations; (2) that the misrepresentations were material; (3) that the shares were traded on an efficient market; (4) that the misrepresentations would induce a reasonable, relying investor to misjudge the value of the shares; and (5) that the plaintiff traded the shares between the time the misrepresentations were made and the time the truth was revealed. FN123

> FN123. *Basic Inc.,* 485 U.S. at 248 n. 27.

The Fifth Circuit tightened the requirement for the presumption of reliance in *Oscar Private Equity Investments v. Allegiance Telecom, Inc.,* explaining that plaintiffs must prove "that the misstatement actually moved the market." FN124 Essentially, plaintiffs must adequately allege loss causation in order to rely on the presumption of reliance. FN125

> FN124. *Oscar Private Equity Invs.,* 487 F.3d at 265.

> FN125. *Id.*

This Court finds that the Plaintiffs' failure to properly allege loss causation presents another ground upon which the Complaint should be dismissed. While the Supreme Court in *Dura Pharmaceuticals* declined to adopt a heightened pleading standard for loss causation, FN126 a complaint must still provide the defendants with fair notice of what the plaintiffs' claims are and the grounds upon which they rest. Despite the myriad of statements identified in the subject Complaint, the Plaintiffs simply fail to connect the alleged misrepresenta-

tions with correlative corrective disclosures during the Class Period. A corrective disclosure, at a minimum, requires that the prior misrepresentation be identified, and that the fraud of the prior representation be revealed to the market, which subsequently reacts by adjusting the stock price thereby harming the plaintiffs.

> FN126. There, the Supreme Court applied the "short and plain statement" requirement of Federal Rule of Civil Procedure 8(a)(2) in evaluating the plaintiffs' allegations of loss causation. *Dura Pharm.,* 544 U.S. at 346; *see also In re Dell Inc., Sec. Litig.,* 591 F.Supp.2d at 906.

The *only* alleged drop in stock price is found in ¶ 136 of the Complaint. There, Plaintiffs allege a 25% decline in stock price following disclosures made on July 22, 2002, regarding Halliburton's likely net asbestos liability and a pretax loss incurred on the Barracuda Project due to unapproved claims. However, Plaintiffs fail to allege which prior representations were revealed to be fraudulent by these statements. This is especially important given that different types of negative news were released the same day, and the market's reaction could have been to either announcement, to both, or to other market forces. The Complaint is simply devoid of facts connecting a misrepresentation with a specific corrective disclosure and an accompanying market reaction. The Fifth Circuit requires more to establish the presumption of reliance.

**\*16** Plaintiffs allege in ¶ 154 that "[t]he devaluations traceable to the disclosures of the accounting change in May 2002, the offshore financing subsidiary in mid-July 2002, and the asbestos and Barracuda losses in mid-July 2002 demonstrate loss causation of a substantial magnitude—over one billion dollars." They also allege that "[t]he stock drops, the diminution of shareholders' equity, and the dilution of the stockholders' ownership are statistically significant, company specific losses not due to general stock market movements, changed economic conditions, changed investor expecta-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

tions, or company specific negative events unrelated to the alleged misrepresentations, non-disclosures, and cover-ups." But these conclusory allegations regarding loss causation are simply not enough to meet the pleading requirements for a securities fraud action.

Further, the Complaint in ¶ 181 lists statements from "pre-Class Period and Class Period SEC filings" that were allegedly fraudulent, because they certified that the accompanying financial statements were prepared in accordance with GAAP, when in fact Plaintiffs allege numerous violations of GAAP. However, in addition to the complete dearth of specificity in identifying exactly what portion of these statements was fraudulent and why, Plaintiffs also fail to allege a corrective disclosure during the Class Period. Plaintiffs do not allege an increase in stock price following the publication of these statements, and do not allege a decline in stock price following any correction of these statements.

Plaintiffs' allegation in ¶ 153 that "Defendant's [sic] materially false and misleading statements resulted in plaintiff and other members of the Class purchasing Halliburton's securities at artificially inflated prices, thus causing the damages complained of herein," is insufficient to establish loss causation, since the United States Supreme Court made clear in *Dura Pharmaceuticals* that "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss" in a securities fraud action. [FN127] Without adequately alleging a causal connection between a material misrepresentation and an economic loss, the Plaintiffs' allegations cannot survive at this stage of the litigation.

FN127. *See Dura Pharm., Inc.,* 544 U.S. at 342.

### 3. Economic Loss or Damages

Plaintiffs have not adequately pled economic loss. [FN128] The Complaint, in ¶¶ 13, 153, 154, and 197, states that the allegedly false and/or misleading statements identified in the Complaint resulted

in Plaintiffs "purchasing Halliburton's securities at artificially inflated prices, thus causing the damages complained of herein." Since an inflated purchase price alone is insufficient to constitute economic loss, the Complaint fails for failure to adequately plead economic loss. Notably, ¶ 154 states that "the sharp decline in the stock's price which accompanied the gradual disclosure of the truth resulted in enormous damages to the class," but the Complaint never specifically alleges when and in what amounts the stock price declined following identified corrective disclosures during the Class Period. Conclusory allegations of a decline in stock price without specific facts pled in support are insufficient. The Complaint must provide the Defendants with "notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation" alleged. [FN129] No such notice is given by the Plaintiffs, beyond a vague and conclusory allegation that a "gradual disclosure of truth" resulted in "enormous damages to the class." This is simply not enough to provide Defendants with the notice required by the Rules and the applicable securities law. Further, and importantly, Plaintiffs do not rely on this alleged "sharp decline" in claiming damages, but instead state that "all purchasers of Halliburton's securities during the Class Period suffered similar injury through their *purchase of Halliburton's securities at artificially inflated prices.*"[FN130] As a result, Plaintiffs have failed to adequately plead economic loss, and their claims must be dismissed.

FN128. *Id.*

FN129. *Id.* at 347.

FN130. See Plaintiffs' Amended Complaint at ¶ 197.

### 4. Group Pleading and Third Party Statements

*17 The Court finds that many of the statements Plaintiffs identify as misleading are pled using impermissible group pleading. For example, in ¶ 97 of the Complaint, Plaintiffs allege that "the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

Company continued to assure the public that clear skies were just ahead, and it repeated its stated belief that 'open asbestos claims will be resolved without a material adverse affect on our financial position or the results of operations.' " Plaintiffs allege that this statement was "materially misleading" in light of "Defendants' actual knowledge or reckless disregard" that the Company's actual asbestos exposure exceeded that reported to investors. However, the allegedly misleading statement is not attributed to any speaker. The prohibition against group pleading applies with equal force to misstatements attributed to "Defendants," as it does to allegations of scienter as to "Defendants." For example, in ¶ 109, Plaintiffs allege that a statement attributed to Douglas L. Foshee, Halliburton's Executive Vice President and Chief Financial Officer, was materially misleading in light of "Defendants' actual knowledge or reckless disregard" of adverse facts. The PSLRA specifically requires that facts supporting a strong inference of scienter as to particular defendants be pled, in addition to pleading the misrepresentation itself with particularity, and as a result any allegations using group pleading are insufficient.[FN131]

> FN131. *See Southland Securities Corp.,* 365 F.3d at 365.

The Court hereby grants Defendants' Motions to Dismiss as they pertain to any allegations based on group pleading, i.e., statements *or* scienter attributed to "Defendants," or "Halliburton," or "Management," without prejudice to Plaintiffs' repleading these allegations with the requisite particularity. Along with group pleading, bare and conclusory allegations of knowledge or recklessness will not stand, as the PSLRA requires Plaintiffs to plead specific facts giving rise to a strong inference of scienter. Should Plaintiffs choose to re-plead these allegations, they must do so with these stringent requirements in mind.

Plaintiffs also attempt to attribute certain statements made by third parties to the Defendants. For example, ¶ 98 points to a New York Times article

published on December 8, 2001, where the author, Neela Banerjee, hypothesized that fear generated from Enron's "rapid demise" contributed to the large volume of trading following press releases that revealed several recent adverse asbestos verdicts against Halliburton and/or its subsidiaries. Plaintiffs point to this article and claim that "Halliburton perpetuated the belief that the December 8, 2001 drop in the stock's price had more 'to do with Enron' than with any disclosures made by the Company."[FN132] However, Plaintiffs failed to allege any facts that would connect an individual Defendant with the opinions expressed by the author of the New York Times piece. Such allegations cannot stand.

> FN132. Plaintiffs also claim that Lesar's own statements in response to this theory, that "We couldn't be any more different from Enron," and "We're profitable, we have plenty of liquidity. It was a jury verdict of $30 million, and we intend to appeal," were "materially misleading in light of Defendants' actual knowledge or reckless disregard that the Company's actual exposure to asbestos liability exponentially exceeded that reported to investors." Not only does this allegation fail because it relies on group pleading and conclusory allegations of scienter, but Plaintiffs fail to identify with particularity anything actually false within this statement. As such, this allegation also fails.

The Court adheres to its holding in *Archdiocese of Milwaukee Supporting Fund v. Halliburton,*[FN133] that Plaintiffs are required to plead with particularity who participated in providing information to an analyst or a third party, when and where this information was provided, how any Defendant either adopted the opinion and/or how the Defendants were entangled with the opinion, or how the analyst or third party was a "conduit" for the Defendant. The Fifth Circuit has made clear that plaintiffs are required to allege with specificity any

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
(Cite as: 2009 WL 854656 (N.D.Tex.))

exceptions to the general rule that "securities is-suers are not liable for statements or forecasts dis-seminated by securities analysts or third parties."[FN134] As a result, the Court grants the Defendants' Motions to Dismiss, as they relate to any statements made by analysts or other third parties, without prejudice to Plaintiffs' re-pleading these statements with the requisite particularity. If Plaintiffs cannot cure this fatal defect, along with the impermissible group pleading and the lack of the requisite proof of a strong inference of scienter upon repleading, dismissal with prejudice is the likely next step.

> FN133. *Archdiocese of Milwaukee Supporting Fund, Inc., et al, v. Halliburton Co., et al,* Civil Action No. 3:02–CV–1152–M, March 14, 2006 Order on Motions to Dismiss, Docket Entry # 239.

> FN134. *Southland Securities,* 365 F.3d at 373.

*18 Although the Court has already identified a number of reasons why Defendants' Motions to Dismiss should be granted, it will still address those individual statements it could cull from the Complaint where a particular speaker was properly identified, to determine the sufficiency of these allegations.

### 5. Misrepresentations or Omissions

*a. Asbestos Litigation and the Highlands Receivable*

*i. December 11 and December 14, 2001 press releases*

The Complaint alleges in ¶ 105 that, with reference to Standard & Poor's recent downgrading of its debt rating on Halliburton, Lesar stated in a December 11, 2001 press release the following: "We are pleased to see that we continue to hold strong investment grade ratings with Standard & Poor's in light of all that has happened in the last few days," and stressed "the strength of our balance

sheet." Plaintiffs allege that the balance sheet statement was "false and misleading in light of the Company's actual asbestos liabilities ..."

This statement is not actionable. First, Plaintiffs must allege *facts* that give rise to a strong inference that Lesar spoke either with the intent to defraud or deceive investors, or with severe recklessness such that his statement qualified as a highly unreasonable misrepresentation that involved not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that it presented a danger of misleading buyers or sellers which was either known to Lesar or was so obvious that Lesar must have been aware of it.[FN135] But here, Plaintiffs do not allege *any facts* regarding scienter. Further, "vague, loose optimistic allegations that amount to little more than corporate cheerleading are 'puffery,' projections of future performance not worded as guarantees, and are not actionable under federal securities law because no reasonable investor would consider such vague statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts."[FN136]

> FN135. *See Ind. Elec. Workers' Pension Trust Fund IBEW,* 537 F.3d at 533.

> FN136. *In re Blockbuster Inc. Sec. Litig.,* 2004 WL 884308 at *7.

And for the same reasons, the statements from a December 14, 2001, press release identified in ¶ 106 of the Complaint are also deficient. There, Lesar repeated positive representations about Halliburton's balance sheet and strong investment rating, and opined that Halliburton was a "conservatively financed company with substantial resources." Lesar's discussion of Halliburton's strong balance sheet amounts to immaterial puffery, and the Complaint again fails to allege any facts that would support any inference of scienter. The same defects apply to Lesar's statement that Halliburton was a "conservatively financed company,"

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

as Plaintiffs fail to allege that Lesar made this statement with the intent to deceive or was severely reckless in doing so. A company is under no obligation to cast itself in a pejorative light, and Lesar's statements are not actionable merely because he spoke optimistically about Halliburton's future on these occasions.[FN137]

FN137. *See id.* at * 13.

*ii. January 23, 2002 press releases*

**\*19** The Complaint alleges in ¶ 110 that in a press release, referring to Halliburton's 2001 fourth quarter results, Lesar stated: "We were disappointed that excellent operational results were overshadowed by the market's overreaction to asbestos news, but believe that our patient investors will be rewarded." Plaintiffs allege this statement was "false and misleading" because:

> Lesar was aware of Harbison's precarious financial situation and Dresser's responsibility for the claims against it and Harbison, he knew that Halliburton was going to financially support Harbison's bankruptcy and that Dresser would seek to have all asbestos cases stayed by the bankruptcy court, and he knew that an expert was being retained to assess Halliburton's asbestos liability.

Once more, Plaintiffs fail to plead any specific facts giving rise to a strong inference of scienter, such as how and when Lesar became aware of specific information that rendered the above statement intentionally false or severely reckless. The only allegations pertaining to scienter are generalized assertions in the introductory portions of the Complaint that:

> Because of Lesar's position with the Company, he had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents ... conversations and connections with other corporate officers and employees, attendance at management and Board

of Directors meetings and committees thereof via reports and other information provided to them in connection therewith.

But these vague allegations amounts to nothing more than an impermissible assertion of positional scienter. It is well settled in the Fifth Circuit that a "pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."[FN138] Because the Complaint identifies no contemporaneous and specific facts that relate to Lesar and his knowledge of the Harbison bankruptcy proceedings, or to his retention of an expert to assess asbestos liability, this Court cannot find that the Complaint alleges facts giving rise to a strong inference of scienter.

FN138. *See e.g., Abrams,* 292 F.3d at 432.

Lesar's statement was also devoid of actual "facts" that are typically digested by the market in evaluating a company's worth, and statements that Halliburton had an "outstanding year" and that "our patient investors will be rewarded" are immaterial as a matter of law. Further, Plaintiffs have failed to allege anything actually false about Lesar's statement. As a result, the statement is not actionable.

Plaintiffs also point to a statement by Lesar issued on this date in response to Moody's downgrading of Halliburton's credit rating, that "Moody's has taken this step mainly because of concerns about asbestos-related litigation following several unusual awards that we believe will not be sustained by the appellate courts. Halliburton has successfully managed asbestos-related liabilities and settled more than 201,000 claims over a 25 year period at an average cost of $200." Plaintiffs claim that these statements were false and misleading "because they [the awards] were not unusual in that one decision confirmed a settlement agreement that Dresser disputed and Dresser was responsible for claims against it and Harbison." Plaintiffs also contend that "Lesar misleadingly tried to characterize the value of the current claims outstanding as being in

Page 25

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

a similar range [average cost of $200] when he knew that Halliburton was set to finance Harbison's bankruptcy and an expert was prepared to evaluate Halliburton's asbestos liability and that [ ] $125 million net liability reserve was materially inadequate."

**\*20** These allegations likewise fail. Plaintiffs' conclusory allegations that Lesar "knew" certain facts that would render the statements misleading are insufficient under the PSLRA. Plaintiffs must allege specific facts that create a strong inference that Lesar made these statements with the intent to deceive investors, or was severely reckless in doing so, and Plaintiffs fail to do so. Further, Lesar's statement that he believed the "unusual awards" would not be sustained by the appellate courts is a forward-looking statement of opinion. To be actionable, Plaintiffs must allege that Lesar knew this statement was false when he made it. No such facts are pled.

Plaintiffs return to this statement in ¶ 126, alleging that the 2002 1st Quarter SEC Form 10–Q, filed by Halliburton and signed by Douglas Foshee and Robert C. Muchmore (Halliburton's Controller), stated that "since 1976 Halliburton had closed 207,000 claims for a net (after insurance) cost of $309 per claim," and that "citation of a $309 per claim figure showed that its previously reported $200 per claim figure was false and misleading." While such allegations might otherwise constitute a corrective disclosure, Plaintiffs are still required to meet the scienter requirement of the PSLRA. Nothing about the Form 10–Q reveals anything fraudulent behind Lesar's prior statement, and the Plaintiffs do not allege any facts to support an inference that Lesar intentionally misstated the average cost of settling asbestos claims, or that he acted with severe recklessness in doing so. The small magnitude of the misstatement, relative to Halliburton's overall financial picture, also weighs against any inference of scienter.[FN139]

FN139. *See In re Dell Inc., Sec. Litig.,* 591 F.Supp.2d at 895 ("Therefore, any weight

given to an inference of scienter because of the duration of the accounting irregularities must be tempered by their relatively small magnitude.").

*iii. July 22, 2002 press release*

In ¶ 133 of the Complaint, Plaintiffs cite statements made by Lesar in a press release where Halliburton revealed that it would be taking a substantial charge based on a study of the company's asbestos liability, which had been commissioned by Halliburton earlier that year. However, Plaintiffs fail to allege that any of these statements actually correct any prior representations about Halliburton's asbestos liabilities, nor do they allege any fraud in the statements themselves. As a result, the Court will not treat these statements as either actionable misrepresentations, or corrective disclosures.

*iv. Omission of net asbestos liability*

In ¶ 143 of the Complaint Plaintiffs allege that "from at least the 3rd Quarter of 2001 through the end of the Class Period, Halliburton's executives, including, Lesar, had knowingly failed to disclose a billion dollar plus net asbestos liability." While a material omission is actionable under § 10(b), Plaintiffs must meet the pleading requirements of the PSLRA and Rule 9(b) to survive a motion to dismiss a claim of fraudulent omissions. Specifically, Plaintiffs must assert specific facts including: (1) the type of facts omitted; (2) the place in which the omissions should have appeared; (3) the way in which the omitted facts made identified representations misleading; (4) specify the statement that is misleading due to the omission in the same manner as a misrepresentation, i.e., the who, what, when, and where; and (5) if the misleading nature of the statement is not apparent from the content of the statement and the substance of the omissions, the factual allegations of the complaint must set forth an explanation of why the omission rendered the statement misleading with particularity.[FN140]

FN140. *See In re Odyssey Healthcare, Inc. Sec. Litig.,* 424 F.Supp.2d at 892.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

**\*21** While Plaintiffs allege the type of facts omitted—information regarding Halliburton's future asbestos liabilities—they fail to allege any other facts that would sustain a claim of fraudulent omission(s). Plaintiffs do not state when or how the information should have been revealed. Plaintiffs do not pinpoint any prior representations that were misleading because of the omission. At various points in the Complaint, Plaintiffs refer to prior statements in SEC filings relating to pending asbestos claims, but none related to *future liabilities*. Without identifying the representations rendered misleading by the alleged omission, Plaintiffs cannot maintain this allegation of securities fraud.

Further, Plaintiffs' conclusory allegation regarding Lesar's knowledge of net asbestos liability is insufficient to survive dismissal, as the PSLRA requires specific facts that support a strong inference that Lesar intentionally omitted the information or did so with severe recklessness. Such an inference is belied by the revelation in its 2002 1st quarter 10–Q that Halliburton had recently retained "a leading claim evaluation firm to assist us in making an estimate of our potential liability for asbestos claims that may be asserted against us in the future," and "it is likely that we will accrue a material liability for future claims that may be asserted against us." FN141 This revelation suggests that Halliburton was unsure about its potential asbestos liability, and was keeping investors apprised of the situation as information became available. Because Plaintiffs have failed to sufficiently plead the fraudulent omission with particularity, and have failed to adequately allege scienter, this claim also fails.

> FN141. *See* Plaintiffs' Amended Class Action Complaint at ¶ 126.

*v. The Highlands Receivable*

In ¶ 122 of the Complaint, Plaintiffs point to a misstatement in the form of Halliburton's inclusion of a $35 million receivable from Highlands insurance in its calculation of its asbestos reserve, in the March 12, 2002 Form 10–K. According to Plaintiffs, inclusion of the reserve was improper be-

cause a trial court had ruled against Halliburton with respect to the insurance coverage. Then in ¶ 123, Plaintiffs point to a March 14, 2002, press release following the Delaware Supreme Court's affirmance of the judgment against Halliburton in the dispute over the receivable, where Lesar stated that "we are surprised" and announcing that the expected insurance from Highlands of $80 million would have to be taken as a write-off.

The inclusion of the receivable in the Form 10–K is not actionable for a number of reasons. First, Plaintiffs fail to allege that the financial statement was made with the requisite scienter. In fact, Halliburton contemporaneously stated that "[w]e believe the Chancery Court is wrong and that the Delaware Supreme Court will reverse and return the case to the Chancery Court for a trial on the merits. We expect, based on an opinion from outside legal counsel, to ultimately prevail in the litigation." These statements undermine an inference that the Defendants included the receivable with the intent to mislead investors, or with severe recklessness. Also, Plaintiffs' allegations in ¶¶ 183–185 that inclusion of the Highlands receivable on its books was a violation of GAAP are insufficient to support a strong inference of scienter. Viewing the Complaint in its entirety, this Court cannot hold that Plaintiffs pled facts that give rise to a strong inference that the Defendants included the receivable with the intent to defraud investors or with severe recklessness. In addition to failing to adequately plead scienter, Plaintiffs also fail to allege any stock price decline following the March 14, 2002, press release revealing the write off. As such, loss causation has not been pled, and the allegation fails.

*b. The Barracuda Project*

*i. 12/31/01 SEC Form 10–K filed March 12, 2002*

**\*22** In ¶ 120 Plaintiffs allege that Lesar signed an SEC Form 10–K, but was "aware of cost overruns on the Barracuda project," and "did not disclose these losses or the virtual certainty of additional losses (which would ultimately reach over

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

$700 million and lead to the announcement that the Company would not again enter such fixed price contracts, or discuss the effect and potential effect on liquidity)." Therefore, Plaintiffs argue that "the March 12, 2002 10–K was false and misleading."

While Plaintiffs properly attribute the Form 10–K to Lesar, they fail to adequately allege scienter. Conclusory allegations regarding Lesar's knowledge of certain things will not suffice. Plaintiffs must provide specific facts that give rise to a strong inference that Lesar signed the Form 10–K with the intent to deceive investors, or with severe recklessness. There are no such facts pled with regard to the SEC form.

Additionally, when alleging fraudulent omissions, Plaintiffs must allege the type of facts omitted, where these omissions should have appeared, how the omitted facts rendered the representations misleading, identify which statements are misleading due to the omission in the same manner as a misrepresentation, and explain why the omission rendered the statements misleading with sufficient particularity.[FN142]

> FN142. *In re Odyssey Healthcare, Inc. Sec. Litig.,* 424 F.Supp.2d at 892.

Plaintiffs in this case fail to allege with specificity how the Form 10–K was misleading without the information regarding cost overruns, or specifically which information about the overruns should have been included. They do not allege how large the overruns were at the time of the filing of the Form 10–K, or how Lesar knew about them. Such vague allegations of knowledge and "fraud by hindsight" are insufficient under the PSLRA, and cannot survive here.

### c. Change in Accounting Practices and Violations of GAAP

#### i. 12/31/01 SEC Form 10–K filed March 12, 2002

In ¶ 120, Plaintiffs allege Lesar signed an SEC Form 10–K, but "Halliburton did not reveal that its

income had been artificially and improperly increased by virtue of the 1998 accounting change for Unapproved Claims." Therefore, Plaintiffs allege that the March 12, 2002, 10–K was "false and misleading." As set forth above, when alleging fraudulent omissions, Plaintiffs must plead the omission with particularity. That standard is not met here. First, Plaintiffs improperly rely on group pleading when alleging that "Halliburton" did not reveal the information. Plaintiffs additionally fail to allege with specificity any facts indicating who was aware of the cost overruns, or how they were aware of such information. Plaintiffs do not allege what specific facts regarding the unapproved claims should have been revealed, or where and when they should have been revealed. As a result, this claim cannot survive.

### 6. Section 20(a) Liability

Because the Court dismisses the Complaint for failure to meet the strict pleading requirements for a securities fraud action, liability cannot be independently maintained for control person liability under § 20(a), and these claims must likewise be dismissed.[FN143]

> FN143. *See Ind. Elec. Workers' Pension Trust Fund IBEW,* 537 F.3d at 545 ("Although the plaintiffs alleged that Bernhard and Belk are liable as control persons under Section 20(a) of the Securities Exchange Act of 1934, '[c]ontrol person liability is secondary only and cannot exist in the absence of a primary violation.' *Southland,* 365 F.3d at 383. Because we have found the pleadings of Section 10(b) and Rule 10b–5 liability inadequate, and because plaintiffs have furnished no independent briefing on this claim, it must be dismissed.").

### D. Conclusion

**\*23** The Court finds that Defendants Halliburton and Lesar's Motions to Dismiss should be GRANTED for: (1) failure to adequately plead scienter; (2) failure to plead reliance or loss causation;

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

App. 98

Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)
**(Cite as: 2009 WL 854656 (N.D.Tex.))**

(3) failure to allege economic loss; (4) impermissible use of group pleading; (5) impermissible conclusory allegations; and (6) immaterial puffery. All other grounds asserted for dismissal of the Complaint are hereby DENIED.[FN144]

> FN144. The Court notes that it did not address Defendants' argument that certain statements are protected by the safe harbor provision of the PSLRA. This Order shall in no way prejudice Defendants' ability to reassert this argument in a subsequent Motion to Dismiss should Plaintiffs choose to replead the allegations underlying this argument.

This dismissal is without prejudice to the Plaintiffs filing a Second Amended Complaint which complies with the strict pleading requirements set forth above. However, the Court warns Plaintiffs that should they file a Second Amended Complaint suffering from the same deficiencies, the Court will not grant leave to correct the same infirmities identified above. As observed by the Fifth Circuit:

A complaint can be long-winded, even prolix, without pleading with particularity. Indeed, such a garrulous style is not an uncommon mask for an absence of detail. This court has noted that "although the requirement for particularity in pleading fraud does not lend itself to refinement, and it need not in order to make sense, nevertheless, directly put, the who, what, when, and where must be laid out *before* access to the discovery process is granted." "In securities fraud suits, this heightened pleading standard provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs."[FN145]

FN145. *Southland Sec. Corp.,* 365 F.3d at

362 (citations omitted).

It is with these policy considerations in mind that this Court dismisses Plaintiffs claims, but allows them another chance to meet the stringent requirements set forth by the Federal Rules and the securities law discussed above.

**SO ORDERED.**

N.D.Tex.,2009.
Magruder v. Halliburton Co.
Not Reported in F.Supp.2d, 2009 WL 854656 (N.D.Tex.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT I

Westlaw.

Not Reported in F.Supp.2d, 2002 WL 318441 (N.D.Tex.), Fed. Sec. L. Rep. P 91,722
**(Cite as: 2002 WL 318441 (N.D.Tex.))**

▷

United States District Court, N.D. Texas, Dallas Division.
Jeffrey SCHILLER, et al., On Behalf of Themselves and All Others Similarly Situated, Plaintiffs,
v.
PHYSICIANS RESOURCE GROUP, INC., et al., Defendants.

No. Civ.A. 3:97–CV–3158–L.
Feb. 26, 2002.

MEMORANDUM OPINION AND ORDER
LINDSAY, J.
   *1 Before the court are the following five motions:

   1. Physician Resource Group's Motion to Dismiss Third Amended Complaint, filed February 5, 2001;

   2. Individual Defendants Emmett E. Moore, Richard M. Owen, and Richard J. D'Amico's Motion to Dismiss Plaintiff's Third Amended Complaint for Violations of the Securities Exchange Act of 1934, filed February 5, 2001;

   3. Defendant John N. Bingham's Motion to Dismiss Plaintiff's Third Amended Complaint, filed February 6, 2001;

   4. Defendant Arthur Andersen L.L.P.'s Motion to Dismiss Plaintiff's Third Amended Complaint, filed February 5, 2001; and,

   5. Plaintiffs' Motion to Strike Tabs I, J, K, filed March 22, 2001.[FN1]

      FN1. Plaintiffs move to strike three exhibits contained in Appendix A to Defendant PRG's Motion to Dismiss Third Amended Complaint, filed February 5, 2001. Tab I contains a chart that delineates certain of

the alleged misrepresentations and omissions with corresponding cautionary language taken from PRG's prospectuses. Tab J contains another chart that lists the alleged misrepresentations and omissions placed adjacent to the reasons why they are insufficient as a matter of law. Finally, Tab K contains a chart that categorizes the alleged misrepresentations and omissions into a number of subcategories. Plaintiffs contend that PRG uses Tabs I, J, and K to extend the number of pages of briefing beyond the page limits imposed by the court's October 2000 briefing order. The court has not relied on any information or briefing contained in the aforementioned appendices. The court, therefore, denies as moot plaintiffs' motion to strike.

   After careful consideration of the motions, responses, replies, and the applicable law, the court, for the reasons stated below, grants defendants' motions to dismiss.

I. Factual and Procedural Background
   Plaintiffs are a class of persons who purchased or otherwise acquired Defendant Physician Resource Group Inc.'s ("PRG") common stock during the period between September 15, 1995 and November 19, 1997 (the "class period"). They sue PRG, Emmett E. Moore ("Moore"), Richard M. Owen ("Owen"), Richard J. D'Amico ("D'Amico"), and John N. Bingham ("Bingham") (collectively, the "Individual Defendants").[FN2] Plaintiffs also sue Arthur Andersen L.L.P. ("Andersen"), PRG's independent auditor. Plaintiffs allege that PRG, the Individual Defendants, and Andersen violated § 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. The Plaintiffs further contend the Individual Defendants are liable as controlling persons pursuant to § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

App. 101

Not Reported in F.Supp.2d, 2002 WL 318441 (N.D.Tex.), Fed. Sec. L. Rep. P 91,722
**(Cite as: 2002 WL 318441 (N.D.Tex.))**

> FN2. During Class Period, Moore was Chief Executive Officer, President and Chairman of the Board of Directors; Owen was Chief Financial Officer and a director; D'Amico was Executive Vice President and Chief Administrative Officer; and Bingham was the Controller, Vice President, and Chief Accounting Officer. Plaintiffs' Third Amended Complaint [hereinafter "Third Am. Compl."] ¶ 21.

Defendant PRG is a publically traded corporation that acquired the assets of and provided management services to ophthalmic and optometric practices. PRG went public in June 1995, and over the following eighteen months, acquired more than 150 eye-care practices nationwide. In March 1996, PRG added nearly 70 individual eye-care practices with its acquisition of EyeCorp, Inc., and by October 1996, PRG had acquired its two primary competitors, American Ophthalmic and EquiMed. PRG hoped to integrate these individual practices, and under common ownership, use its management expertise, increased capital, and improved information and accounting systems to achieve economies of scale, synergies of operation, and increased earnings per share. During this period of growth by acquisition, PRG stock reached a class period high of just under $35 a share.

Plaintiffs allege that between approximately September 1995 and February 1997, PRG and the Individual Defendants issued false and misleading statements concerning their management expertise, their ability to integrate the acquired practices, and the success of their management information and accounting systems. These statements, among others, were purportedly made to artificially inflate the stock price, thereby enabling PRG to acquire practices using a combination of cash and stock as currency. Plaintiffs allege this "scheme" enabled PRG to acquire practices with fewer shares, maintain an appearance of profitability, and later market itself as an attractive acquisition candidate. During the class period, PRG and the Individual Defendants described the Company in press releases and other publically filed documents as a "preeminent leader," which had "successfully integrated" a number of practices, and was "ready to move forward with the future integration" of others. PRG and the Individual Defendants also asserted they had a "strong," "deep management team" that was able to integrate their acquisitions with "sophisticated management information systems" and "strong internal monitoring and controls."

**\*2** Plaintiffs claim that contrary to these statements, PRG lacked the management information and accounting systems necessary to manage its existing businesses and integrate the acquired practices. Plaintiffs also allege that PRG failed to conduct adequate due diligence before acquiring several of the eye-care practices, which resulted in the acquisition of practices with diminishing bottom lines, poor financial structures, and other legal liabilities. Plaintiffs maintain that Andersen participated in this "scheme" by issuing unqualified audit reports on PRG's financial statements for the years ending December 31, 1995 and December 31, 1996, and by reviewing year 1997 quarterly reports. In short, Plaintiffs charge that PRG, the Individual Defendants, and Andersen concealed the true financial condition of the corporation, failed to disclose material, adverse facts about its operations and finances, and used misrepresentations to make misleading forecasts about its earnings and growth potential.

Plaintiffs further base claims on representations contained in those financial statements filed with the SEC for the fourth quarter of 1995, all of 1996, and the first and second quarters of 1997. These representations were false and misleading, Plaintiffs allege, because the financial information contained therein was not prepared in conformity with GAAP and relevant SEC regulations. Specifically, Plaintiffs claim that Defendants overstated revenues, belatedly booked certain charges, and failed to establish adequate reserves for uncollectible receivables. Plaintiffs further allege that De-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 318441 (N.D.Tex.), Fed. Sec. L. Rep. P 91,722
**(Cite as: 2002 WL 318441 (N.D.Tex.))**

fendants overstated the assets acquired in the EquiMed acquisition, forcing them to incur a one time $31.75 million "asset valuation loss" in the third quarter of 1997. These revelations, among others, led to the eventual termination of Moore and Owen, and according to Plaintiffs, caused the price of the stock to fall more than ninety-three percent from its class period high.

Plaintiffs filed suit against PRG and the Individual Defendants in December 1997. Plaintiffs amended their complaint against PRG and several of the Individual Defendants in July 1998. In November 1998, Plaintiffs filed a separate action against Andersen, which was transferred to this court in December 1998, and consolidated with Plaintiffs' initial action on October 4, 2001. In June 1999, Plaintiffs again amended their complaint, adding Andersen as a defendant, and amending their previous claims against PRG and the several of the Individual Defendants. Plaintiffs' Third Amended Complaint was filed on December 21, 2000. Defendants, collectively, now move to dismiss Plaintiffs' Third Amended Complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6), for failure to plead fraud with particularity pursuant to Fed.R.Civ.P. 9(b), and for failure to plead scienter as required by the Private Securities Litigation Reform Act of 1995 ("PSLRA").

II. Applicable Pleading Standards

A. Pleading Requirements of Rules 12(b)(6), 9(b) and the PSLRA

*3 A motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) "is viewed with disfavor and is rarely granted." *Lowrey v. Texas A & M Univ. Sys.,* 117 F.3d 242, 247 (5th Cir.1997). A district court must not dismiss a complaint, or any part of it, for failure to state a claim upon which relief can be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957); *Coates v. Heartland Wireless Communica-*

*tions, Inc.,* 26 F.Supp.2d 910, 913–14 (N.D.Tex.1998) ( *"Coates I"* ). The court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir.1996). The plaintiff, however, must plead specific facts; the court will not accept conclusory allegations in the complaint as true. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards,* 677 F.2d 1045, 1050 (5th Cir.1982); *Robertson v. Strassner,* 32 F.Supp.2d 443, 445 (S.D.Tex.1998); *Zuckerman v. Foxmeyer Health Corp.,* 4 F.Supp.2d 618, 621 (N.D.Tex.1998).

Plaintiffs assert a claim pursuant to the Section 10(b) of the Securities and Exchange Act, 15 U.S.C. 78j, as amended by the PSLRA. Section 10(b) makes it unlawful for a person to:

> use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). In relevant part, Rule 10b–5 makes it unlawful for any person, directly or indirectly, to:
> make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

To state a claim under these provisions, a plaintiff must allege (1) a misrepresentation or omission; (2) of a material fact; (3) made with the intent to defraud; (4) on which the plaintiff relies; (5) which proximately caused the plaintiff's injury. *Williams v. WMX Technologies, Inc.,* 112 F.3d 175,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 318441 (N.D.Tex.), Fed. Sec. L. Rep. P 91,722
**(Cite as: 2002 WL 318441 (N.D.Tex.))**

177 (5th Cir.1997); *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067 (5th Cir.1994); *Cyrak v. Lemon,* 919 F.2d 320, 325 (5th Cir.1990). Where a plaintiff alleges "a fraud on the market" theory, it is not necessary for the plaintiff to prove individual reliance on the false or misleading statement. *Nathenson v. Zonagen, Inc.,* 267 F .3d 400, 414 (5th Cir.2001); *Coates I,* 26 F.Supp.2d at 914 n. 1; *Zuckerman,* 4 F.Supp.2d at 621. Instead, a plaintiff may show that he indirectly relied on the statements by relying on the integrity of the market price of the stock. *Nathenson,* 267 F.3d at 414.

**\*4** Because section 10(b) claims sound in fraud, the plaintiff must also satisfy the pleading requirements imposed by Fed.R.Civ.P. 9(b). *Melder v. Morris,* 27 F.3d 1097, 1100 (5th Cir.1994); *Tuchman,* 14 F.3d at 1067. Rule 9(b) requires certain minimum allegations in a securities fraud case, namely, the specific time, place, and contents of the false representations, along with the identity of the person making the false representations and what the person obtained thereby. *Melder,* 27 F.3d at 1100; *Shushany v. Allwaste, Inc.,* 992 F.2d 517, 521 (5th Cir.1993). This application of the heightened pleading standard provides defendants with fair notice of the plaintiff's claims, protects them from harm to their reputations and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs. *Melder,* 27 F.3d at 1100; *Tuchman,* 14 F.3d at 1067.

The PSLRA further reinforces the particularity requirement. *Coates I,* 26 F.Supp.2d at 914. The PSLRA requires that

> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1). To satisfy Rule 9(b)

and the PSLRA, a plaintiff must plead facts and avoid reliance on conclusory allegations. *Tuchman,* 14 F.3d at 1067; *Coates I,* 26 F.Supp.2d at 915. The PSLRA further requires that any allegations made on information and belief must state with particularity all facts on which that belief is formed. *Robertson,* 32 F.Supp.2d at 446; *Coates I,* 26 F.Supp.2d at 915.

B. Scienter Requirement

In addition to the aforementioned pleading requirements, plaintiffs asserting securities fraud claims must allege facts demonstrating scienter. *Lovelace,* 78 F.3d at 1018; *Tuchman,* 14 F.3d at 1068; *Zuckerman,* 4 F.Supp.2d at 622. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud ." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12 (1976); *Lovelace,* 78 F.3d at 1018. Allegations of recklessness may satisfy the scienter requirement, however, such occasions are limited to "severe recklessness," which "resembles a slightly lesser species of intentional misconduct." *Nathenson,* 267 F.3d at 408. The Fifth Circuit defines "severe recklessness" as

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."

*Id.*

The PSLRA also requires that the "complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). When such facts are based on information and belief, the PSLRA requires that the complaint state with particularity all facts on which that belief is informed. 15 U.S.C. § 78u–4(b)(1).

Not Reported in F.Supp.2d, 2002 WL 318441 (N.D.Tex.), Fed. Sec. L. Rep. P 91,722
**(Cite as: 2002 WL 318441 (N.D.Tex.))**

III. Analysis

*5 Defendants move to dismiss plaintiffs' complaint, contending it fails to satisfy the particularity requirements of Rule 9(b) and the PSLRA, and because Plaintiffs have not adequately pleaded facts raising a strong inference of scienter. These arguments are examined below.

A. Particularity

Plaintiffs' Third Amended Complaint, which spans sixty-seven pages, represents a labyrinth, requiring the court to piece together the elements of the claims from allegations made all over the complaint.[FN3] The purported misrepresentations and omissions are broadly organized into four sections arranged in chronological order: The first section encompasses statements made by PRG and the Individual Defendants between September 18, 1995 and November 12, 1996, Third Am. Compl. ¶¶ 29–62; the second section encompasses those statements made between November 14, 1996 and February 11, 1997, *id.* ¶¶ 64–79; the third section includes statements made between February 12, 1997 and September 4, 1997, *id.* ¶¶ 81–88; and, the fourth section identifies a series of purportedly false financial statements made in publically filed documents, *id.* ¶¶ 98, 100, 110–112. In each of these aforementioned paragraphs, the complaint identifies the alleged statement or omission, pleads the time, place, and content of the false representation, and in some cases, attempts to identify the speaker. The complaint contains no fewer than 56 purported misrepresentations.

> FN3. For example, rather than identify a false statement or omission and match it with specific facts explaining how the statement is misleading, Plaintiff's Complaint catalogs scores of purportedly false statements culled from press releases and other public information. The complaint reserves explanation regarding how or why the statements are misleading for several paragraphs interspersed throughout its sixty-seven pages. *See, e.g.,* Third Am.

Compl. ¶¶ 63, 80, 82, 89. Moreover, nowhere does the complaint distinguish those facts relevant to Defendants' state of mind from those facts relevant to whether a misrepresentation is misleading. The court finds the complaint redundant and confusing. The organization of the complaint, or the lack thereof, makes it substantially more difficult for the court to assess the sufficiency of the complaint under Rule 9(b) and the PSLRA.

The court holds that Plaintiffs have failed to satisfy Rule 9(b) with respect to all purported misrepresentations or omissions that rely on "group pleading." Rule 9(b) requires Plaintiffs to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams,* 112 F.3d at 177–78. Before the adoption of the PSLRA, the "group pleading" doctrine created the presumption that the senior executives of a corporation may be held personally liable for misrepresentations or omissions contained in public statements attributed to or issued by the corporation. *In re Silicon Graphics, Inc. Sec. Litig.,* 970 F.Supp. 746, 759 (N.D.Cal.1997). Although there exists some debate in the district courts whether or not the group pleading doctrine survived the enactment of the PSLRA, this district has come to the resounding conclusion that it does not. *See Coates I,* 26 F.Supp.2d at 916 ("The PSLRA codifies a ban on group pleading.") (Fitzwater, J.); *Zishka v. American Pad & Paper Co.,* No. 3:98–CV–0660–M, 2000 WL 1310529, at *1 (N.D.Tex. Sept. 13, 2000) ("[T]his Court rejects the notion of 'group pleading,' and 'group publication' and concludes that such concepts ... did not survive the adoption of the PSLRA.") (Lynn, J.); *Lemmer v. Nu–Kote Holding, Inc.,* No. 3:98–CV–0161–L, 2001 WL 1112577, at *7 (N.D.Tex. Sept. 6, 2001) ("The group pleading doctrine is inconsistent with the particularity requirements of the PSLRA....") (Lindsay, J.); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* No.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 318441 (N.D.Tex.), Fed. Sec. L. Rep. P 91,722
**(Cite as: 2002 WL 318441 (N.D.Tex.))**

4:00–CV–355–Y, slip op. at 6 (N.D.Tex. March 12, 2001) ("The Court initially finds that Plaintiffs' complaint fails because of its reliance on group pleading.") (Means, J.); *Calliot v. HFS, Inc.,* No. 3:97–CV–09241–I, 2000 WL 351753, at \*5 (N.D.Tex. March 31, 2000) (dismissing complaint based, in part, on plaintiffs' use of group pleading) (Lindsay, J.); *Branca v. Paymentech, Inc.,* No. 3:97–CV–2507–L, 2000 WL 145083, at \*8 (N.D.Tex. Feb. 8, 2000) (same) (Lindsay, J.). Thus, the PSLRA requires plaintiffs to "distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud." *In re Silicon Graphics, Inc.,* 970 F.Supp.2d at 752 (emphasis added).

*\*6* With few exceptions, the complaint is replete with instances of such group pleading. For example, the complaint repeatedly asserts that Moore, D'Amico, Owen, and Bingham: "reviewed and approved" misleading reports issued by securities analysts,[FN4] disseminated false information during healthcare-conference presentations and roadshows,[FN5] issued false statements during conference calls to shareholders, analysts, money managers, and others,[FN6] and that Owen and Bingham signed the Form 10–Q's filed with the SEC.[FN7] Plaintiffs fail to identify any statements or omissions attributable specifically to either D'Amico or Owen, and in thirty-one references to Bingham, none contains any statements attributable to him apart from a group of individuals. The PSLRA and Rule 9(b) require Plaintiffs to identify the particular individual who made the misstatement or omission. Plaintiffs cannot avoid the bar on group pleading by simply identifying the constituents of a group of defendants in rote and conclusory fashion. Plaintiffs cannot satisfy Rule 9(b) by attributing statements or omissions to the corporation without any identification of the officer or director responsible for making the statement.[FN8] *See Coates v. Heartland Wireless Communications, Inc,* 55 F.Supp.2d 628, 633 n. 3 (N.D.Tex.1999) ( *"Coates II"* ) (finding statements attributed solely to corporation insufficiently particular under Rule 9(b) and the PSLRA).

FN4. *See, e.g.,* Third Am. Compl. ¶¶ 35, 35, 39, 46, 48, 50, 54, 55, 56, 59, 61, 62, 68, 69, 70, 72, 73, 76, 77, 79.

FN5. *Id.* ¶¶ 30, 31, 43, 57, 78.

FN6. *Id.* ¶¶ 37, 52, 66.

FN7. *Id.* ¶ 100.

FN8. *See, e.g., id.* ¶¶ 28, 41, 42, 44, 60, 81, 83, 85, 88.

The court thus concludes that Plaintiffs have failed to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA with respect to statements or omissions contained in the Third Am. Compl. ¶¶ 28, 30, 31, 34, 35, 37, 38, 39, 41, 42, 43, 44, 46, 48, 50, 52, 54, 55, 56, 57, 59, 60, 61, 62, 66, 68, 69, 70, 72, 73, 76, 77, 78, 79, 81, 83, 85, 88, 100.

B. Scienter

The PSLRA states that a securities fraud complaint "shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that defendants acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Plaintiffs must "set forth specific facts to support an inference of fraud." *Lovelace,* 78 F.3d at 1018. "A plaintiff may not rely on boilerplate or conclusory allegations to satisfy its pleading obligations." *Coates II,* 55 F.Supp.2d at 633. These facts, when "assumed to be true" must "constitute persuasive, effective, and cogent evidence from which it can logically be deduced that defendants acted with intent to deceive, manipulate, or defraud." *Coates v. Heartland Wireless Communications, Inc.,* 100 F.Supp.2d 417, 422 (N.D.Tex.2000) ( *"Coates III"* ). "A mere reasonable inference is insufficient to survive a motion to dismiss." *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 196 (1st Cir.1999). The Fifth Circuit, in *Nathenson,* recently clarified what "patterns of facts ... may be pleaded in order to create the 'strong inference' of either intentional misconduct or severe

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

App. 106

Not Reported in F.Supp.2d, 2002 WL 318441 (N.D.Tex.), Fed. Sec. L. Rep. P 91,722
**(Cite as: 2002 WL 318441 (N.D.Tex.))**

recklessness." 267 F.3d at 409. Before *Nathenson*, there existed some uncertainty in this circuit whether the motive and opportunity test for establishing scienter survived the passage of the PSLRA. *See id.* at 410. After an exhaustive analysis of the pleading requirements in various other circuits, and a review of the PSLRA's legislative history, the Fifth Circuit determined that

> **\*7** [w]hat must be alleged is not motive and opportunity as such but particularized facts giving rise to a strong inference of scienter. Appropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter, but it would seem to be a rare set of circumstances indeed where those allegations alone are both sufficiently persuasive to give rise to a scienter inference of the necessary strength....

*Id.* at 412. Thus, the district court may consider evidence demonstrating a defendant's motive and opportunity to commit fraud so long as the totality of the allegations raises a strong inference of fraudulent intent. *Nathenson*, 267 F.3d at 411–412. When a complaint fails to plead scienter in conformity with the PSLRA, dismissal is required. 15 U.S.C. 78u–4(b)(3)(A); *Coates II*, 55 F.Supp.2d at 634.

### 1. Motive and Opportunity

*a. Allegations Related to the Use of Stock as Currency*

Plaintiffs' scienter theory rests primarily on the PRG and the Individual Defendants' purported motivation to maximize PRG's stock price to complete a large number of acquisitions. Only by completing acquisitions, Plaintiffs contend, could PRG meet earnings and growth expectations. Plaintiffs articulate this theory in ¶ 26 under the heading "PRG's and Individual Defendants' Motive for Participation in the Wrongful Course of Conduct":

The Company and its top officers had strong

motives to inflate the stock price. They wanted to pursue an accelerated acquisition program, because growth by acquisition provided the only way that they could foster the perception in the business community that PRG was a "growth" company, thereby ensuring a substantially inflated stock price. Because the Company did not have the cash necessary to pay for the acquisitions that the Individual Defendants wanted to make, PRG had to pay for them by issuing or selling stock or securities related to its stock to raise cash to pay for part of the acquisition prices. A high stock price was also important to the Individual Defendants because a material part of their net worth consisted of PRG's stock and the Company needed to maintain the appearance that it was profitable.

Third Am. Compl. ¶ 26. Judge Fitzwater twice rejected this scienter theory in a case involving PRG and several of the same individual defendants. *See RGB Eye Assocs., P.A. v. Physicians Resource Group, Inc.,* No. 3:98–CV–1715–D, slip op. (N.D. Tex May 13, 1999) ( *"RGB I"* ); *RGB Eye Assocs., P.A. v. Physicians Resource Group, Inc.,* No. 3:98–CV–1715–D, 1999 WL 980801 (N.D.Tex. Oct. 27, 1999) ( *"RGB II"* ). In *RGB I*, the court held that a "company's animus to inflate its stock price because it is expanding through acquisitions and is primarily paying for them with common stock is indistinguishable from a motive to inflate its stock price to ensure a successful public offering." *RGB II*, 1999 WL 980801 at *3. This does not create a strong inference of fraud because, if held to be adequate, it "would almost universally permit an inference of fraud." *Id.* at *9; *See also Mortensen v. AmeriCredit Corp.,* 123 F.Supp.2d 1018, 1023 (N.D.Tex.2000) ("[A]ssertions that would almost universally be true, such as the desire to raise capital, or successfully bring a public offering to fruition, economic self-interest, and the desire to maintain good relationships with suppliers, encourage retailers, forestall lenders, and protect one's executive position, are inadequate of themselves to plead motive.") (citations omitted).

Not Reported in F.Supp.2d, 2002 WL 318441 (N.D.Tex.), Fed. Sec. L. Rep. P 91,722
**(Cite as: 2002 WL 318441 (N.D.Tex.))**

**\*8** Plaintiffs contend the amended complaint in this case differs from the *RBG* complaints in two relevant respects. First, Plaintiffs claim the present complaint, unlike the complaint in *RGB I* or *RGB II,* details each of the specific acquisitions made during the class period that used stock as currency. *See* ¶ 15, 29, 58. These allegations, according to Plaintiffs, plead with particularity the dates, number of shares, and the reasons behind each of the transactions. While the court agrees that the present complaint may satisfy Rule 9(b) in this regard, the court nevertheless finds Plaintiffs' motive theory unpersuasive. The court in *RGB I* and *RGB II* held that such generalized or universal allegations of motive are insufficient to establish scienter as a matter of law. This court agrees. In other words, Plaintiffs' motive theory does not fail for lack of particularity, but because in any transaction involving a combination of stock and cash, "[o]ne could always infer that the purchaser had acted with intent to 'preserve its capital.' " *RGB II,* 1999 WL 980801, at \*9.

Second, Plaintiffs claim that the present complaint, unlike the complaint in *RGB II,* alleges a stronger form motive. Plaintiffs argue that PRG's very existence was premised on a "growth by acquisition" business model. This fact, they suggest, adds weight to their motive theory because the entire business would fail should PRG and the Individual Defendants be unable to complete a large, and presumably never-ending set of acquisitions. These allegations do not bolster or give any added weight to Plaintiffs' motive theory. Instead, the court finds Plaintiffs' theory circular and confusing. Under Plaintiffs' theory, the defendants artificially inflated the stock price to complete acquisitions, but found they must complete acquisitions, many of them without engaging in due diligence, solely to inflate the stock price and increase earning and growth. However characterized, Plaintiffs' motive theory boils down to one already rejected in both *RGB I* and *II,* namely, that the defendants sought to cheapen the cost of expansion by using a mix of cash and stock as currency.

Accordingly, the court holds that Plaintiffs' first motive theory does not meaningfully enhance any strong inference of scienter.

*b. Allegations Related to Defendants' Wealth*

Plaintiffs also allege as motive that Defendants inflated the stock price "because a material part of their net worth consisted of PRG stock." Third Am. Compl. ¶ 26. "To plead motive, a plaintiff must aver with particularity the concrete benefits that could be recognized by a statement or omission." *Coates II,* 55 F.Supp.2d at 642 (citations omitted). Allegations regarding compensation, without more, do not sufficiently plead a motive to commit securities fraud. *See Melder,* 27 F.3d at 1103; *Tuchman,* 14 F.3d at 1068 (finding no inference of scienter based on personal compensation where Plaintiffs did not aver that Defendants sold or purchased stock during the class period); *Nathenson,* 267 F.3d at 420 ("[A]llegations that corporate officers and directors would benefit from enhancing the value of their stock ... are likewise insufficient to support a strong inference of scienter."). Here, Plaintiffs do not allege that Defendants purchased, sold, or engaged in any other improper stock transaction during the class period. Absent any allegation that Defendants acted in their own self-interest to obtain concrete benefits, the court finds no inference of scienter. *See Melder,* 27 F.3d at 1102 (finding no "readily apparent" motive to commit securities fraud where complaint contains no allegation corporate defendants profited from inflated stock values).

**\*9** Accordingly, the court concludes that Plaintiffs have failed to plead a strong inference of fraud based on personal gain.

*c. Allegations Related to Andersen's Motive*

Plaintiffs allege that Andersen was primarily motivated to engage in securities fraud because it feared the public would learn that the consulting services it allegedly performed with respect to PRG's management information and accounting systems had failed. Ps. Br. at 23. This motive is by no means clear from the face of the complaint. Un-

Not Reported in F.Supp.2d, 2002 WL 318441 (N.D.Tex.), Fed. Sec. L. Rep. P 91,722
**(Cite as: 2002 WL 318441 (N.D.Tex.))**

der the heading "Arthur Andersen's Motive for Participation in the Wrongful Course of Conduct," paragraph 27 states

> Arthur Andersen was motivated ... by its desire to retain PRG as a client, to continue to generate the substantial fees from its audit and review engagements, and to secure additional business from the Company including the more profitable consulting business. The partners responsible for the PRG engagement were particularly motivated to participate in the wrongdoing alleged because their incomes were directly tied to the fees generated from the engagement.... It also wanted to maintain and increase its market share for auditing, accounting, and consulting services in Texas and also in the managed care industry.

Third Am. Compl. ¶ 27. It is not until paragraphs 118 and 121(c) do Plaintiffs allege that Andersen "set up PRG's initial MIS and consulted extensively on its information systems." Third Am. Compl. ¶ 118; *see also* ¶ 121(c) ("Because [Andersen] had designed PRG's MIS and continued to consult with the Company about the system, the auditors were very familiar with its weaknesses."). As pled, Plaintiffs fail to provide particularized facts that support this theory. Absent the conclusory allegation that Andersen set up PRG's initial management information systems, Plaintiffs plead no other facts that indicate what services and systems Andersen provided to the company, the level of Andersen's involvement after it had "initially" set them up, when these initial systems were activated, or how Andersen became aware of the systems' failure. Further, Plaintiffs ask the court to assume that these management and accounting systems did in fact fail, a proposition that, as the court explains below, is not itself pleaded with sufficient particularity to support a strong inference of fraud.

Plaintiffs' remaining allegations concerning Andersen's purported motive do not meaningfully enhance any inference of fraud. In *Melder,* the Fifth Circuit rejected similar motive allegations even before the adoption of the PSLRA. 27 F.3d at 1103

(finding insufficient as motive for securities fraud allegations that accounting firm sought to "protect and enhance fees," "maintain and increase its market share," "increase the income received" by firm partners, and "maintain its competitive position" among other accounting firms). Plaintiffs' remaining motive theories are the same type of boilerplate, generic allegations that the *Melder* Court found insufficient, and that could be alleged against any accounting firm engaged in the audit and consulting business. Accordingly, the court does not find that Plaintiffs' motive theory with respect to Andersen meaningfully enhances an inference of fraud.

### 2. Conscious or Severely Reckless Behavior

**\*10** Absent an apparent motive to commit fraud, "a plaintiff can plead scienter 'by identifying circumstances that indicate conscious behavior on part of the defendant, though the strength of the circumstantial evidence must be correspondingly greater' " *Coates II,* 55 F.Supp.2d at 635 (quoting *Tuchman,* 14 F.3d at 1068). The conscious behavior standard is more stringent, and requires a strong inference that defendant knew the statement or omission was false or misleading when made. *See Coates III,* 100 F.Supp.2d at 424.

A Plaintiff may also plead scienter based on severe recklessness. "A Defendant's omissions or misrepresentations are severely reckless only if they (1) involve an extreme departure from the standards of ordinary care, and (2) present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Lovelace,* 78 F.3d at 1018 n. 2. When basing scienter on severe recklessness, the facts must present "strong circumstantial evidence of that recklessness and must, in fact, approximate an actual intent to aid in the fraud being perpetrated." *Coates III,* 100 F.Supp.2d at 424 (internal citations omitted); *see also Greebel,* 194 F.3d at 199 (noting that recklessness is closer to a lesser form of intent). Plaintiffs may not rely on rote conclusory allegations that Defendant "knowingly" or "recklessly" did something, but

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works. App. 109

Not Reported in F.Supp.2d, 2002 WL 318441 (N.D.Tex.), Fed. Sec. L. Rep. P 91,722
**(Cite as: 2002 WL 318441 (N.D.Tex.))**

must instead plead with particularity facts that indicate Defendants either knew, or recklessly disregarded, information that should have been disclosed to the investing public. *Melder,* 27 F.3d at 1104.

Plaintiffs may not rely on fraud by hindsight to establish a claim for securities fraud. *See, e.g., Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978). "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim for securities fraud." *Coates III,* 100 F.Supp.2d at 429 (quoting *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir.1999). A plaintiff must plead facts demonstrating that the statements or omissions alleged were fraudulent when made. *Thornton v. Micrografx, Inc.,* 878 F.Supp.2d 931, 934 (N.D.Tex.1995). Plaintiffs may not "scize upon disclosures in later reports and allege they should have been made in earlier ones." *Calliot,* 2000 WL 351753, at *8.

Plaintiffs allege that the Individual Defendants had access to internal corporate data and other non-public information that contradicted their public statements about the success of PRG's business and acquisition strategy.[FN9] A review of the complaint shows that Plaintiffs attempt to plead scienter based on the following alleged facts, statements, and omissions: (1) that PRG and the Individual Defendants failed to conduct adequate due diligence before making acquisitions; (2) that contrary to PRG's purported "sophisticated" MIS and "strong operational and financial controls," the Individual Defendants and PRG failed to monitor existing operations; and, (3) that in order to overstate revenues, net income, and EPS, the Individual Defendants caused PRG to violate GAAP and SEC regulations.[FN10]

> FN9. *See* Third Am. Compl. ¶ 21. As explained elsewhere, "if an allegation regarding [a] statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). In *Coates I,* the court noted that an "unsupported general claim of the

existence of confidential company reports is insufficient to survive a motion to dismiss." 26 F.Supp.2d at 920. The court further noted that to support an inference of fraud, Plaintiffs must "provide more details about the alleged negative internal reports, such as the report titles, when they were prepared, who prepared them, to whom they were directed, their content, and the sources from which plaintiffs obtained this information." *Id.* at 92.

> In this case, Plaintiffs fail to provide any facts that support its information and belief allegation that the Individual Defendants had access to any such internal information. The complaint fails to identify what type of information they had access to, if any, the contents of such unnamed documents, or even which of the several individual defendants were in possession of this information. Accordingly, to the extent that Plaintiffs attempt to plead scienter on information and belief based on "internal corporate documents" or other "non-public information," the court holds that such allegations, without more, are insufficient under the heightened pleading standard of Rule 9(b) and the PSLRA, and thus cannot support a strong inference of fraud.

FN10. Plaintiffs' allegations regarding scienter further demonstrate the tension between the group pleading doctrine and the PSLRA. The complaint fails to plead scienter with respect to any of the defendants individually. The complaint also fails to identify any corporate agent when attempting to attach scienter to PRG alone. Instead, Plaintiffs make allegations regarding the Defendants' collective state of mind. In paragraphs 63, 80 and 82, for example, Plaintiffs generally aver scienter with respect to PRG or the Individual De-

Not Reported in F.Supp.2d, 2002 WL 318441 (N.D.Tex.), Fed. Sec. L. Rep. P 91,722
(Cite as: 2002 WL 318441 (N.D.Tex.))

fendants as a group. *See, e.g.,* Third Am. Compl. ¶ 63 ("The positive statements made by defendants ... were each known to be or were recklessly disregarded by them as false and misleading when made."); ¶ 63(a) ("PRG and the Individual Defendants ... knew or recklessly disregarded ..." EquiMed's overstated assets); ¶ 63(p) ( "the Individual Defendants knew that the process of integrating ... would take much longer ..."); ¶ 80(a) ("PRG did virtually no due diligence."); ¶ 82 ("Individual Defendants knew of, but did not disclose, the negative effect of the EquiMed acquisition on revenue and operations.").

These allegations do not support a strong inference of fraud because they do not plead scienter with regard to any Individual Defendant or corporate officer. The court might find plaintiffs' scienter allegations deficient on this basis alone. *See Coates I,* 26 F.Supp.2d at 916–17 ("Plaintiffs must properly plead wrongdoing and scienter as to each individual defendant and cannot merely rely on the individuals' positions or committee memberships within [the company]."). In an abundance of caution, and because several of the alleged misrepresentations or omissions are attributed to Moore alone, the court will examine each of the theories that Plaintiffs claim support an inference of scienter.

*a. Allegations Related to Due Diligence*
**\*11** Plaintiffs first allege that PRG and the Individual Defendants failed to engage in adequate due diligence before making the EquiMed acquisition. Paragraph 63(a) alleges

Contrary to their representations ... PRG did virtually no due diligence before making acquisitions. For EquiMed, it never obtained separate, accurate, and complete financial statements of Equivision ... before completing the acquisition.

Moreover, no inquiries were done by the Company in connection with any of the EquiMed New York state practice groups that were acquired. PRG and defendants knew or recklessly disregarded that revenues from the acquired EquiMed practice groups would decline because New York state does not allow fees to be split with non-doctors nor can corporations practice medicine.... PRG did not even obtain EquiMed's financials before making the \$54–million cash acquisition.

Third Am. Compl. ¶ 63(a). These allegations do not create a strong inference of fraud. First, Plaintiffs do not state with sufficient particularity what due diligence PRG and the Individual Defendants engaged in prior to the EquiMed acquisition, or for that matter, any other acquisition made during the class period. Nowhere do plaintiffs provide any specific facts that allege the level of due diligence accomplished on other acquisitions, which other acquisitions were completed without adequate diligence, or which of the Individual Defendants participated or otherwise involved themselves in the due diligence process. Instead, Plaintiffs make the conclusory allegations that PRG did "virtually no due diligence" before completing this, and perhaps other, acquisitions. The court cannot find, based on these allegations, that defendants' conduct in connection with the due diligence process constitutes an extreme departure from the standards of ordinary care. The court refuses to make the inferential leap required to transform the allegation that PRG did *"virtually* no due diligence" (emphasis added) into a factual allegation that PRG *did no due diligence at all.* Finally, even assuming that such facts were pled with specificity, the failure to engage in due diligence before closing an acquisition does not automatically support an inference of fraud. *See, e.g., Brogen v. Pohlad,* 933 F.Supp. 793, 799 (D.Minn.1995) (failing "to adequately investigate the merits of a potential acquisition and subsequent steps to remedy that omission may give rise to a claim for negligence; but it cannot support a claim for securities fraud.").

Page 12

Not Reported in F.Supp.2d, 2002 WL 318441 (N.D.Tex.), Fed. Sec. L. Rep. P 91,722
**(Cite as: 2002 WL 318441 (N.D.Tex.))**

Plaintiffs' second allegation contends that the Individual Defendants knew, but did not disclose, that revenues would decline because new York state does not allow fee-splitting with non-doctors or corporations. Had Defendants conducted adequate due diligence, Plaintiffs claim, the Individual Defendants would have discovered and disclosed the existence of these purported illegal agreements. Plaintiffs ignore that Defendants did, in fact, warn investors that such "anti-kickback" or "fee-splitting" laws could adversely affect PRG's business operations. In a May 14, 1996 prospectus, for example, Defendants disclosed under the heading "Government Regulation" that "[s]everal states ... have adopted laws similar to the "anti-kickback" and "anti-referral" laws that cover patients in private programs as well as government programs." Def. PRG's App. "Tab D" at 11–12. This paragraph warns investors that "[a] determination of liability under any such laws could have a material adverse affect on PRG." *Id.* at 12. Defendants included similar or identical disclosures in prospectuses dated June 23, 1995, *id.* "Tab A" at 8; February 14, 1996, *id.* "Tab B" at 11–12; July 25, 1996, *id.* "Tab E" at 7; August 26, 1996, *id.* "Tab F" at 5; and January 2, 1997, *id.* "Tab G" at 7. The existence of these disclosures in no fewer than six prospectuses filed with the SEC substantially undermines any inference of scienter based on the these purportedly illegal practice management agreements. *See Lovelace,* 78 F.3d at 1019–20 (finding no inference of scienter after noting that defendants disclosed certain risk factors in prospectuses filed with the SEC).

*b. Allegations Related to PRG's Management Information and Accounting Systems*

**\*12** Plaintiffs next allege that PRG's "sophisticated" management information systems and "strong operational and financial controls" were inadequate to monitor existing operations and to integrate the acquired practices. Paragraph 63(c) asserts

The Company could not generate accurate

monthly financial statements for the practices it supposedly managed, which resulted in persistent disputes with them, including their refusal to pay disputed receivables to PRG.

Third Am. Compl. ¶ 63(c). Paragraph 63(e) further alleges that

PRG's accounting department was overwhelmed—it lacked adequate personnel, systems, or controls to monitor existing operations, let alone cope with the increasing number of acquisitions. As a result, the Company could not generate accurate financial statements for its individual practices or the parent public company.

*Id.* ¶ 63(e). These allegations are framed in conclusory terms and are based on hindsight, and therefore do not raise a strong inference of fraud. The complaint fails to identify with particularity which monthly financial statements were inaccurate, how they were inaccurate, the number or nature of the inaccuracies, or when, if ever, these financial statements were disputed. Nor does the complaint specify which individual practices disputed their financial statements or what particular statements were in dispute. The complaint does not even specify, except in conclusory terms, that any of the Individual Defendants knew of these inaccuracies or when they became aware of them. Plaintiffs argue that PRG's internal accounting problems were so pervasive and severe the Individual Defendants were reckless in not knowing about them, yet Plaintiffs identify only one practice that experienced problems with its payroll. Without a stronger factual predicate, the court cannot, based on so few well-pleaded factual allegations, find strong circumstantial evidence of reckless conduct that would give rise to an actionable inference of fraud. Finally, even assuming that PRG experienced accounting and information failures, "the securities laws simply do not guarantee sound business practices" *Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 361 (1st Cir.1994) (quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990).

*c. Allegations Relating to PRG's Failure to Follow*

Not Reported in F.Supp.2d, 2002 WL 318441 (N.D.Tex.), Fed. Sec. L. Rep. P 91,722
**(Cite as: 2002 WL 318441 (N.D.Tex.))**

*GAAP*

Finally, Plaintiffs assert that PRG and the Individual Defendants violated generally accepted accounting principles and relevant securities and exchange regulations. Specifically, paragraph 98 alleges:

> In order to overstate PRG's revenues, net income, and EPS during the Class Period, the Individual Defendants caused the Company to violate GAAP and SEC rules by improperly recognizing revenue on management services for which it could not reasonably expect ever to be paid due to its woefully inadequate internal controls, which made collection improbable. PRG failed to adequately accrue reserves for its uncollectible accounts receivable and receivables from affiliates, and failed to account for financial impairment caused by the over-valuation of EquiMed when it became aware of the need to write off EquiMed's assets.

**\*13** Third Am. Compl. ¶ 98.

As a general rule, "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information." *Lovelace,* 78 F.3d at 1020 (quoting *Fine v. American Solar King Corp.,* 919 F.2d 290, 297 (5th Cir.1990); *see also Comshare, Inc. Sec. Litig.,* 183 F.3d 542, 553 (6th Cir.1999) ("The failure to follow GAAP is, by itself, insufficient to state a securities fraud claim."). In *Lemmer,* this court recognized that GAAP requirements "often require the substantial application of judgment to the totality of circumstances." *Lemmer,* 2001 WL 1112577, at 10. "The term 'generally acceptable accounting procedures' ... encompass[es] a wide range of acceptable procedures, such that 'an ethical, reasonably diligent accountant may choose to apply any of a variety of acceptable procedures when that accountant prepares a financial statement." *Lovelace,* 78 F.3d at 1021 (citations omitted).

Plaintiffs allege that Defendants improperly recognized revenue from management services for which it could not reasonably expect to recover. Third Am. Compl. ¶ 98. In similar fashion, Plaintiffs contend that PRG failed to accrue adequate reserves for its uncollectible accounts receivable and receivables from affiliates. *Id.* Plaintiffs fail to state "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-(b)(2). To establish a strong inference of scienter, plaintiffs must provide additional facts that describe what accounts receivable were uncollectible, when they became due, why they are presently uncollectible, and perhaps most importantly, why the Individual Defendants knew that they could not expect to recover on the accounts at the time such statements or omissions were made.

Plaintiffs also fail to state with any particularity what percentage of the accounts were uncollectible, what proportion of accounts were uncollectible in relation to all of its accounts, what reserves were allocated, or what reserves Plaintiffs believe should have been taken. They also have not alleged the "significance of the overstated receivables in relation to [the company's] total financial picture." *Coates II,* 55 F.Supp.2d at 639 (holding inadequate under Rule 9(b) pleading that alleged defendants overstated receivables but did not provide facts that support overstatement was material); *see also Shushany v. Allwaste, Inc.,* 992 F.2d 517, 522 (5th Cir.1993) (holding inadequate under Rule 9(b) complaint that did not specify whether accounting adjustments were material); *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1419 (7th Cir.1992) (finding inadequate allegations concerning reserve allocations where plaintiff failed to allege what reserves were or what they should have been). Absent greater particularity, the court cannot determine whether these alleged GAAP violations constitute "an extreme departure from the standards of ordinary care." *Nathenson,* 267 F.3d at 408. As pleaded, Plaintiffs' allegations in this regard do not support a strong inference of fraudulent intent.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 318441 (N.D.Tex.), Fed. Sec. L. Rep. P 91,722
**(Cite as: 2002 WL 318441 (N.D.Tex.))**

**\*14** In its current form, Plaintiffs' complaint pleads fraud by hindsight, suggesting that Defendants "must have" known that certain accounts were uncollectible and that reserves should have been accrued. As evidence of scienter, Plaintiffs point to comments made during a meeting in late November 1997 by Defendant D'Amico. In this meeting, Plaintiffs allege that D'Amico admitted, *inter alia,* that PRG lacked the necessary accounting systems to generate reliable Form 10-Q's, that PRG could not add more practices because of internal control problems, and that a number of the acquired practices experienced diminishing bottom lines. Third Am. Compl. ¶ 93. Plaintiffs bolster D'Amico's "admissions" with a December 1997 news article and with comments made in mid-January by PRG's new President and Chief Operating Officer, Peter G. Dorflinger. Third Am. Compl. ¶¶ 94, 95. All of these "admissions" post date the class period. To be sure, the statements and "admissions" made by D'Amico, Dorflinger, and other Board members indicate that PRG and some of the Individual Defendants were aware of a number of accounting inaccuracies by late November 1997 and early 1998; however, contrary to what Plaintiffs allege, none of these comments suggests that the Individual Defendants knew or recklessly disregarded PRG's accounting errors at the time these "errors" were made.

Plaintiffs also allege that PRG failed to account for the financial impairment caused by its overvaluation of EquiMed. The overvaluation resulted in a one-time $31.75 million charge for uncollectible accounts receivable and practice closings and created a $18 million loss in the third quarter of 1997. Plaintiffs maintain that PRG and the Individual Defendants knew by at least June 30 of the second quarter of 1997 that EquiMed's assets were overstated. As evidence of Defendants' scienter, Plaintiffs point to a $45 million counterclaim filed in June 1997 by PRG against EquiMed in an arbitration proceeding. PRG announced these counterclaims in a June 17, 1997 press release stating, in relevant part, that PRG's counterclaims "include,

among others, breach of representation and warranties, fraud and conversion." Def. PRG's App. "Tab P"; *see also* Third Am. Compl. ¶ 85. Plaintiffs contend that PRG should have taken the impairment as the time it became aware of the need, or the latest, sometime in the second quarter of 1997.

The timing of a write-off alone, however, cannot support an inference of fraud. *See Coates III,* 100 F.Supp.2d at 429. Instead, Plaintiffs must allege that "the need to write-down ... was 'so apparent' to [the defendant] before the announcement, that a failure to take an earlier write-down amounts to fraud." *Id.* (internal citations omitted). Although PRG did not take a write-down in the second quarter of 1997, the company did disclose this information to the market when it became of aware that an accounting adjustment might be necessary. This disclosure substantially undermines any strong inference of fraud based on the impairment PRG later deemed necessary. The court rejects the opportunity to find a strong inference of fraud based on these allegations, particularly in light of Defendants' disclosure.

**\*15** Finally, Plaintiffs allege that the magnitude of the accounting errors creates an inference of fraud. Paragraph 110, for example, estimate

> the extent of PRG's misstated financial results, related to the Company's improper revenue recognition and failure to adequately reserve for uncollectible accounts receivables, was to misstate its 1996 operating income (excluding merger charges) by a minimum of $1 million for Q1, $1.3 million for Q2, $1.9 million for Q3, and $3.0 million for Q4, and by a minimum of $4.0 million, and $6.0 million of Q1 and Q2 1997 respectively. PRG's 1995 results were similarly misstated due its [sic] improper revenue recognition on uncollectible reserves.

Third Am. Compl. ¶ 110. To the extent these estimations are based on information and belief, Plaintiffs nowhere in the complaint "state with particularity all facts on which that belief is formed."

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 318441 (N.D.Tex.), Fed. Sec. L. Rep. P 91,722
**(Cite as: 2002 WL 318441 (N.D.Tex.))**

15 U.S.C. § 78u–4(b)(1). Thus, the court cannot determine from the face of the complaint how these estimations were made, whether they are reasonable, or whether they support an inference of fraud.

*d. Allegations Related to Andersen's Intentional Misconduct and Severe Recklessness*

Plaintiffs maintain that Andersen possessed actual knowledge or recklessly disregarded that PRG's 1995 and 1996 year-end, and 1997 quarterly financial statements were false and misleading. As evidence of Andersen's scienter, Plaintiffs point to the same facts they claim support an inference of fraud against PRG and the Individual Defendants; namely, that (1) Andersen knew, but disregarded, that PRG did not conduct adequate due diligence on a number of its acquisitions, (2) Andersen knew, and disregarded, PRG's lack of adequate internal controls, and finally, that (3) Andersen violated GAAS and GAAP by (i) recognizing improperly revenue that would not be realized, (ii) failing to accrue adequate reserves for the uncollectible receivables, and (iii) failing to account for the financial impairment of EquiMed. Plaintiffs further allege that the magnitude of fraud supports a strong inference of scienter.

In support of these general allegations, Plaintiffs do not distinguish those facts they allege support an inference of fraud against PRG with those facts that support such an inference against Andersen. Instead, the paragraphs that contain allegations regarding PRG and the Individual Defendants' scienter also contain boilerplate averments that Andersen "intentionally or recklessly concealed" certain "true facts ... which were 'red flags.' " *See, e.g.,* Third Am. Compl. ¶ 63. These "red flags" include the same general and conclusory allegations that the court, as explained above, determined were insufficient to support an inference of fraud on the part of PRG and the Individual Defendants.[FN11] These allegations do not support any greater inference of fraud when alleged against Andersen alone.

FN11. Specifically, these "red flags" in-

clude allegations that PRG never obtained EquiMed's complete financial statements, Third Am. Compl. ¶ 63(a), that EquiMed could not generate monthly or quarterly financial reports, *id.,* that PRG did not generate accurate monthly financial statements for its affiliated practices, *id.* ¶ 63(c), that the acquired practices refused to pay disputed receivables, *id.,* that PRG lacked the personnel and infrastructure required to integrate its acquisitions, *id.* ¶ 63(j), and that PRG's core revenue growth was slowing, which put pressure on its ability to achieve EPS growth, *id.* ¶ 63(o), among others.

Moreover, nowhere does the complaint plead with sufficient particularity facts that support how Andersen knew or became aware of these "red flags." Plaintiffs generally base Andersen's knowledge on its participation in "audits and reviews," "consulting services," and "its review of [PRG's] prospectuses and other SEC filings." Third Am. Compl. ¶ 63. Plaintiffs also claim that Andersen was aware of PRG's internal control deficiencies because Andersen "set up" PRG's information and accounting systems, *id.* ¶ 118, and because Andersen advised PRG of weaknesses in PRG's internal control structures in connection with its year 1997 audit, *id.* ¶ 97. The complaint does not, however, match any of these general averments with any particularized facts that support the claim that Andersen knew or recklessly disregarded this information at the time it conducted its audits and quarterly reviews. As pleaded, the complaint generally avers knowledge or severe recklessness with respect to all of the Defendants, and asks this court to assume, based on conclusory averments of fact, that Andersen participated in a scheme to defraud investors. Plaintiffs cannot rely on Andersen's eventual resignation as the PRG's auditor to support an inference of fraud. That Andersen later became aware of, and ultimately disclosed, PRG's internal accounting control problems does not support the inference that Andersen had knowledge or recklessly disregarded that information earlier.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 318441 (N.D.Tex.), Fed. Sec. L. Rep. P 91,722
**(Cite as: 2002 WL 318441 (N.D.Tex.))**

**\*16** Taken together, Plaintiff's allegations do not raise a strong inference of fraudulent intent and therefore do not adequately plead scienter with respect to any Defendants. 15 U.S.C. §§ 78u–4(b)(2); *Robertson,* 32 F.Supp.2d at 477. Plaintiffs criticize the piecemeal examination of its claims, however, the PSLRA "does not permit the Court to look at the broad picture to determine if Plaintiff has properly plead its claim." *Lain v. Evans,* 123 F.Supp.2d 344, 348 (N.D.Tex.2000). Accordingly, all Defendants are entitled to dismissal of the § 10(b) and Rule 10b–5 claims against them in light of Plaintiffs' failure to plead sufficient facts that establish a strong inference of the required state of mind. 15 U.S.C. § 78u–4(b)(3)(A).

IV. Plaintiffs' Remaining Claims
Plaintiffs' also allege violations of section 20(a) of the Exchange Act. This section defines controlling person liability, providing that:

[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter ... shall also be liable jointly and severally with and to the same extent as such controlled person....

15 U.S.C. 78t(a). Where a primary violation by the "controlled person" has not been adequately pleaded, the court should also dismiss a section 20(a) claim. *See Coates I,* 26 F.Supp.2d at 923. Because Plaintiffs have failed to plead a violations of section 10(b) and Rule 10b–5, Plaintiffs' section 20(a) claim must also be dismissed. *See Coates II,* 55 F.Supp.2 d at 645.

V. Conclusion
For the reasons stated above, the court concludes that Plaintiffs have failed to plead fraud with sufficient particularly to state a claim under the federal securities laws. The court also concludes that Plaintiffs have not adequately alleged scienter with respect to any Defendants.

Plaintiffs have requested the court to allow further amendment of their Complaint if it believes

that they have not stated a claim upon which relief can be granted. The decision to allow amendment of the pleadings is within the sound discretion of the district court. *Norman v. Apache Corp.,* 19 F.3d 1017, 1021 (5th Cir.1994). In determining whether to allow an amendment of the pleadings, the court considers the following: 'undue delay in the proceedings, undue prejudice to the opposing parties, timeliness of the amendment, and futility of the amendment. *See Foman v. Davis,* 371 U.S. 178, 182 (1962); *Chitimacha Tribe of Louisiana v. Harry L. Laws Co., Inc.,* 690 F.2d 1157, 1163 (5th Cir.1982).

The court concludes that Plaintiffs have stated their best case after four bites at the apple. As the Fifth Circuit has stated, "[a]t some point, a court must decide that a plaintiff has had fair opportunity to make his case; if, after that time, a cause of action has not been established, the court should finally dismiss the suit." *Jacquez v. Procunier,* 801 F.2d 789, 792–93 (5th Cir.1986). The court believes that permitting a fifth pleading attempt would be an inefficient use of the parties' and the court's resources, would cause unnecessary and undue delay, and would be futile. For the reasons stated herein, Plaintiffs' claims are dismissed with prejudice. Judgment will be entered by separate document as required by Fed.R.Civ.P. 58.

N.D.Tex.,2002.
Schiller v. Physicians Resource Group, Inc.
Not Reported in F.Supp.2d, 2002 WL 318441 (N.D.Tex.), Fed. Sec. L. Rep. P 91,722

END OF DOCUMENT

# EXHIBIT J

Westlaw.

Not Reported in F.Supp.2d, 2005 WL 1801946 (S.D.Tex.)
**(Cite as: 2005 WL 1801946 (S.D.Tex.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. Texas, Houston Division.
Bruce SIMONS, et al., Plaintiffs,
v.
DYNACQ HEALTHCARE, INC., et al., Defendants.

No. Civ.A. H-03-5825.
July 28, 2005.

Martin D. Chitwood, Chitwood & Harley, Atlanta, GA, Robert C. Finkel, Wolf Popper LLP, Steven G. Schulman, Milberg Weiss et al., Eric J. Belfi, Murray Frank and Sailer LLP, New York, NY, Tom Alan Cunningham, Cunningham Darlow et al., Thomas E. Bilek, Hoeffner and Bilek LLP, Larry Richard Veselka, Smyser Kaplan et al., Houston, TX, David R. Scott, Scott & Scott, Colchester, CT, Andrew M. Schatz, Schatz & Noble PC, Hartford, CT, Theodore C. Anderson, Kilgore & Kilgore PLLC, Dallas, TX, Andy Wade Tindel, Provost Umphrey Law Firm LLP, Tyler, TX, John G. Emerson, Jr., Emerson Poynter LLP, Little Rock, AR, Andrew J. Mytelka, Greer Herz & Adams, Galveston, TX, for Plaintiffs.

Eugene Jones, Eric G. Carter, Attorneys at Law, John Alexander Irvine, Porter & Hedges, Houston, TX, for Defendants.

*MEMORANDUM AND ORDER*
ELLISON, J.
   *1 This class action has been filed on behalf of those who purchased or otherwise acquired shares of Dynacq Healthcare, Inc. ("Dynacq") from November 27, 2002 through December 13, 2004 (the "Class Period"). Named as defendants are Dynacq, Philip S. Chan, Chiu M. Chan, James N. Baxter ("Baxter"), and Ernst & Young, L.L.P. ("E & Y").

   In particular, Plaintiffs' Second Amended Complaint (the "Complaint") seeks recovery for securities fraud under § 10(b) (and Rule 10(b)-5), and § 20(a) of the Securities Exchange Act. Defendants have each filed a Motion to Dismiss the Complaint pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(3), and Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6), for failure to satisfy applicable pleading requirements.

   For the reasons that follow, the Motions to Dismiss of Baxter and E & Y are GRANTED, and the Motions of the other Defendants are DENIED.

I. *STANDARD OF REVIEW.*
   The applicable legal standard is clear. A motion to dismiss for failure to state a claim tests the formal sufficiency of the pleadings in a complaint. *See Ramming v. United States,* 281 F.3d 158, 161 (5th Cir.2001), *cert. denied sub nom. Cloud v. United States,* 536 U.S. 960, 122 S.Ct. 2665, 153 L.Ed.2d 839 (2002). Accordingly, the Court must accept the factual allegations of the Complaint as true, view them in the light most favorable to Plaintiffs, and draw all reasonable inferences in Plaintiffs' favor. *Id.* "[A] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).

> When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.

> *Id.* at 511 (quoting *Scheuer v. Rhodes,* 416 U.S.

Not Reported in F.Supp.2d, 2005 WL 1801946 (S.D.Tex.)
**(Cite as: 2005 WL 1801946 (S.D.Tex.))**

232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

## II. *BAXTER'S MOTION TO DISMISS*

Baxter became an Executive Vice President of Investor Relations at Dynacq on July 15, 2003. He had previously done consulting work for the company. During most of the Class Period, therefore, Baxter was not an employee of Dynacq. At no time did his duties include preparing financial statements, or providing healthcare, which was Dynacq's business.

The only allegation in Plaintiffs' lengthy Complaint that refers to Baxter with sufficient specificity to satisfy the PSLRA is in paragraph 52. In response to an article in *Barron's* that was critical of Dynacq and that apparently caused Dynacq's stock price to drop 23% on the day after the article appeared, Baxter said:

> The short sellers must be heaving a sigh of relief to have some negative "news" to pen-nit [sic] some covering positions before the Company reports its results for the fiscal year ended August 31, 2003.

**\*2** Plaintiffs do not allege that Baxter had knowledge (i.e., scienter) that this statement was false. And, indeed, the statement was almost certainly not false. Short sellers would be pleased at a drop in Dynacq's stock price, just as they would generally be pleased at a drop in the price of any stock in which they held a short position. Baxter's reference to the forthcoming results for its fiscal year ending August 31, 2003, did prove erroneous. But, again, Plaintiffs do not allege scienter and, in any event, such generalized statements about a company's prospects are not actionable. *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 372 (5th Cir.2004).

Accordingly, Baxter's Motion to Dismiss is GRANTED.

## III. *ERNST & YOUNG'S MOTION TO DISMISS.*

E & Y did audit and non-audit work for Dyn-

acq. Plaintiffs assert claims against E & Y for securities fraud under section 10(b) of the Securities Exchange Act of 1934 for E & Y's audit opinion of Dynacq's annual financial statements for the period ending August 31, 2002 ("2002 financial statements").

Dynacq engaged E & Y to be its outside auditor in June 2002. The opinion on the 2002 financial statements was issued on November 22, 2002 and was without any qualifications or disclaimers. E & Y resigned as Dynacq's auditor on or about December 17, 2003, citing an absence of internal controls necessary to develop reliable financial statements.

Plaintiffs' allegations as to the errors and omissions in the 2002 financial statements fall into four basic categories:

1. a lack of independence by E & Y as a result of its doing both audit and non-audit work for Dynacq;

2. the failure to note the insufficiency of internal controls;

3. improper recognition of revenue with respect to workers' compensation payment provisions; and

4. overstatement of accounts receivable.

### A. *Lack of Independence*

To begin with the first of these allegations, the Complaint does provide the amounts that E & Y received from Dynacq for its audit and non-audit services during pertinent times. The Complaint also includes reference to strongly worded criticism by the SEC of E & Y's pattern of insensitivity to issues of independence in its work. There is no allegation, however, that the SEC or anyone else forbade E & Y from doing audit and non-audit work for the same client. Nor is there any suggestion that the SEC's criticism of E & Y related to its work for Dynacq, or to any of the individual E & Y partners or employees who worked on the Dynacq account. The fact that the SEC had criticized E & Y as to is-

Not Reported in F.Supp.2d, 2005 WL 1801946 (S.D.Tex.)
**(Cite as: 2005 WL 1801946 (S.D.Tex.))**

sues of independence simply does not provide a sufficient basis for a securities claim against E & Y any time it does both audit and non-audit work for the same client. *See Melder v. Morris,* 27 F.3d 1097, 1103 (5th Cir.1994).

The remaining three categories of claims against E & Y relate to errors and omissions in E & Y's auditing of the 2002 financial statements. And, if claims under the 1934 Act could be maintained for negligence, the Complaint would easily survive a motion to dismiss (which is not, of course, to say whether the claims can ultimately be proven). *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 381-82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

**\*3** Under the PSLRA, however, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In this instance, the required state of mind is scienter, i.e., intent or severe recklessness. The Complaint lacks the required particularity and does not give rise to an inference-much less a strong inference-of scienter.

If anything, the more logical inference is that E & Y would go to great effort to avoid engaging in anything resembling securities fraud. Accountants are regularly sued for huge amounts and the legal fees alone for the defense of even non-meritorious cases can easily consume all or a large fraction of the amount of fees that E & Y had earned for its work on behalf of Dynacq. Indeed, the fees from Dynacq were surely immaterial to the point of near triviality for an international firm of E & Y's size and overall fee revenue-not the kind of client for whom an accounting firm would normally want to take a substantial risk. Moreover, none of the allegations in the Complaint, even taken as true, contain any suggestion that individual members of E & Y stood improperly to gain from concealing financial irregularities at Dynacq. No one at E & Y is alleged to have owned Dynacq stock, to have received illicit benefits or promises of benefits, or to have sought in-house employment at Dynacq.

The allegations of specific errors in omissions in the 2002 financial statements will be considered in turn.

B. *Lack of Internal Controls.*

E & Y's stated reason for its resignation from the Dynacq account in December 2003 was E & Y's conclusion that the company lacked the internal controls necessary to develop reliable financial statements. E & Y stated:

Specifically in November 2003, the Company's Chief Executive Officer negotiated a significant transaction to sell certain accounts receivable to another entity. This transaction was not disclosed to the Company's Chief Financial Officer, the Company's independent auditors nor the Company's Board of Directors prior to its execution and represents significant deficiencies in the Company's disclosure controls, accounting controls and controls over the safeguarding of its assets.

Dynacq's 2003 10-K. The transaction was never closed.

Plaintiffs seek to infer from the inadequacy of internal controls at the time of E & Y's withdrawal that internal controls were also lacking for the period covered by the 2002 financial statements. But the Complaint contains no allegation that there was any similar transaction during fiscal 2002. Additionally, because the transaction in question was never consummated, there would not seem to be any impact on Dynacq's financial statements, and Plaintiffs have alleged none.

Plaintiffs also invoke the fact that a successor auditor found internal control weaknesses in its audit of Dynacq's fiscal 2003 financial statements. Again, this does not demonstrate weaknesses in internal controls during fiscal 2002, nor is any impact on Dynacq's 2002 financial statements alleged.

**\*4** Plaintiffs also refer to the fact that E & Y was Dynacq's fourth auditor in eight years. This

Not Reported in F.Supp.2d, 2005 WL 1801946 (S.D.Tex.)
**(Cite as: 2005 WL 1801946 (S.D.Tex.))**

fact does distinguish Dynacq from most publicly traded companies, but it cannot be used, without substantially more, to show that E & Y knew or recklessly disregarded the alleged lack of internal controls during fiscal 2002. If such an inference were allowed, publicly traded companies would be unable to obtain a successor auditor after one had resigned.

Plaintiffs also contend, apparently with justification, that operating expenses were misstated in the quarterly reports for FY 2003. E & Y is not being sued, however, for the FY 2003 quarterly reports, upon which they did not opine.

Plaintiffs correctly point out that Dynacq was sued for violations of securities laws and that investigations were, at various times, undertaken by the SEC, NASDAQ, the Texas Attorney General, the Texas State Board of Medical Examiners, and Texas State Representative Ron Wilson. Most public companies, however, are sued at one time or another and auditors are not required, even when the defendant company is unsuccessful in defending the suits, to credit all of the allegations in such suits. Plaintiffs' Complaint does not allege that E & Y failed to take into account Dynacq's litigation. Also, Plaintiffs fail to allege with particularity how the investigations should have put E & Y on notice of internal control deficiencies in FY 2002, since each of them was initiated after E & Y issued its audit opinion.

C. *Improper Recognition of Revenues by use of "Stop Loss" Provisions.*

Plaintiffs' set of contentions regarding improper recognition of revenue focuses on Dynacq's treatment of workers' compensation payments. Specifically, Plaintiffs contend that Dynacq was able to overstate its revenue by using "stop loss" provisions of the applicable regulations as the rule rather than an exception, and that E & Y knew, or was reckless in not knowing, of this inappropriate treatment of revenue. None of the sources that Plaintiffs rely upon for their allegations that E & Y knew or should have known of this alleged impropriety-even

if the allegations are assumed to be true-satisfy the requirement that such sources be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 352 (5th Cir.2002) (quoting *Novak v. Kasaks,* 216 F.3d 300, 313-14 (2d Cir.2000)). Moreover, the Complaint also fails to make clear how the allegations as to the inappropriate treatment of revenue materially affected the 2002 financial statements.

D. *Improper Revenue Recognition Through Over-statement of Accounts Receivable.*

Plaintiffs further contend that Dynacq overstated the expected revenue from its accounts receivable. Here again it must be noted that allegations of violating generally accepted accounting principles-even if true-do not suffice to show scienter. *Abrams v. Baker Hughes, Inc.,* 292 F.3d 424, 432 (5th Cir.2002). Moreover, the collectibility of accounts receivable, especially in a new and apparently fast-growing business, are notoriously difficult to estimate with precision. In any event, the SEC has not required a writedown of Dynacq fiscal 2002 revenues or accounts receivable. The reclassification by the successor auditor of certain accounts receivable from short-term to long-term status had no effect on net revenues, net income, retained earnings, or earnings per share.

**\*5** Finally, even if the accounts receivable were misstated in the 2002 financial statements, the Complaint contains no allegations sufficient under the *ABC Arbitrage* standard to suggest scienter on the part of E & Y.

E & Y's Motion to Dismiss is GRANTED.

IV. *MOTIONS TO DISMISS BY DYNACQ, CHIU M. CHAN, AND PHILIP S. CHAN.*

Defendant Chiu M. Chan ("Chiu Chan"), the founder of Dynacq, is and was at all relevant times its Chief Executive Officer and Chairman of its Board of Directors. Philip S. Chan ("Philip Chan") is and was at all relevant times Dynacq's Chief Fin-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2005 WL 1801946 (S.D.Tex.)
**(Cite as: 2005 WL 1801946 (S.D.Tex.))**

ancial Officer, Vice President of Operations, and a director. He is alleged to hold advanced accounting degrees and to be a certified public accountant. Both Chans signed and certified Dynacq's SEC filings during the Class Period.

Although Dynacq and the Chans invoke many of the same arguments as Baxter and E & Y as to why the Complaint should be dismissed against them, their arguments carry much less force. That is so because the Complaint alleges, and Dynacq and the Chans do not seriously dispute, that before and during the Class Period, a Dynacq facility relied on, as its most prolific surgeon, a physician whose history of drug abuse, medical malpractice, unnecessary surgical procedures, and overbilling were, at all relevant times, well known to them. The Complaint further alleges that, even after this surgeon's license was suspended by the Texas Board of Medical Examiners, Chiu Chan allowed the physician to continue to practice at a Dynacq hospital.

These allegations, by themselves, easily surpass the minimum pleading requirements necessary to survive a motion to dismiss. At this early phase of the case, it would appear from the submissions that Dynacq and the Chans were willing to profit from a physician who was a known danger to the public. Having done so, there is not only a strong inference, but a high probability that they knew there would be related problems with Dynacq's quality of care, with workers' compensation claims, with accounts receivable, and indeed, with the overall integrity of Dynacq's financial statements. There would, likewise, be reason to be suspicious of the timing of any insider's sale of stock.

The Motions to Dismiss of Dynacq and the Chans are DENIED.

V. *CONCLUSION*

Baxter's Motion to Dismiss (Doc. # 55) and E & Y's Motion to Dismiss (Doc. # 70) are GRANTED. Philip Chan's and Chiu Chan's Joint Motion to Dismiss (Doc. # 53) and Dynacq's Motion to Dismiss (Doc. # 54) are DENIED.

IT IS SO ORDERED.

TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT.

S.D.Tex.,2005.
Simons v. Dynacq Healthcare, Inc.
Not Reported in F.Supp.2d, 2005 WL 1801946 (S.D.Tex.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

App. 122